# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND AFFILIATE AMERICAN CIVIL LIBERTIES UNION, INC., ET AL.<br>Plaintiffs<br><br>v.<br><br>ROGER N. BEGIN, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE RHODE ISLAND BOARD OF ELECTIONS, ET AL.<br>Defendants<br><br>GREATER PROVIDENCE CHAMBER OF COMMERCE,<br>Intervener | C.A. No. 04-487/T |

## PLAINTIFFS RHODE ISLAND AFFILIATE, AMERICAN CIVIL LIBERTIES UNION AND STEVEN BROWN'S TRIAL MEMORANDUM

RHODE ISLAND AFFILIATE AMERICAN CIVIL LIBERTIES UNION, INC. AND STEVEN BROWN, INDIVIDUALLY AND IN HIS CAPACITY AS EXECUTIVE DIRECTOR OF RHODE ISLAND AFFILIATE, AMERICAN CIVIL LIBERTIES UNION, INC.,

By Their Attorneys,

Howard A. Merten (#3171)
Michael W. Sweeney (#7160)
PARTRIDGE SNOW & HAHN LLP
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: October 31, 2005

# TABLE OF CONTENTS

**Page**

I. FACTS .......... 2

A. The Rhode Island Affiliate, American Civil Liberties Union .......... 2
B. Citizens for Representative Government .......... 4
C. The Rhode Island Voting Rights Campaign. .......... 5
D. The Rhode Island Campaign Contributions And Expenditures Report Act .......... 7

1. Prohibition Of Corporate Contributions .......... 7
2 Contribution Limitations .......... 9
3. The Confusing History of Section 10(b) – What is a "Person" .......... 9

II. THE SUPREME COURT HAS ALREADY RULED THAT PROHIBITIONS ON CORPORATE CONTRIBUTIONS VIOLATE THE FIRST AMENDMENT .......... 14

III. THE SUPREME COURT HAS ALREADY RULED THAT CONTRIBUTION LIMITATIONS VIOLATE THE FIRST AMENDMENT .......... 18

IV. THIS COURT CAN AND SHOULD CONSTRUE § 17-25-10((b) SO AS TO AVOID A CONSTITUTIONAL QUAGMIRE .......... 20

V. SECTION 17-25-10(b), IF APPLIED TO BALLOT QUESTIONS, AND THE BOARD'S 1995 ADVISORY OPINION ARE UNCONSTITUTIONALLY VAGUE .. 26

A. The Statute, If Applied to Ballot Questions, is Nonsensical .......... 26
B. The Board's Advisory Opinion Creates More Confusion .......... 28

VI. THE 1995 OPINION AND SECTION 17-25-10(B) VIOLATE THE PLAINTIFFS' FIRST AMENDMENT RIGHTS .......... 31

A. The Strict Scrutiny Test .......... 31
B. The Statute and Opinion Burden First Amendment Rights. .......... 31
C. The Board Has Not Demonstrated A Compelling Interest Justifying The Severe Restrictions On Core First Amendment Activities .......... 36
D. The Restrictions on RI ACLU's First Amendment Rights Are Not Narrowly Tailored .......... 41

VII. THE OFFICIAL POSITIONS OF THE BOARD REQUIRE COURT INTERVENTION ..... 47

VIII. CONCLUSION ..... 51

# Table of Authorities

**Page**

**Cases**

*Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ........ 47

*Buckley v. Valeo*, 424 U.S. 64 (1981) ........ 36, 43

*C & C Plywood Corp. v. Hanson*, 583 F.2d 421 (9th Cir. 1978) ........ 17

*C&C Plywood Corp. v. Hanson*, 420 F. Supp. 1254 (D. Mont. 1976) ........ 37

*California Democratic Party v. Jones*, 530 U.S. 567 (2000) ........ 42

*California Pro Life Council, Inc. v. Gertman*, 328 F.3d 1088 (9th Cir. 1003) ........ 37

*Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981) ........ passim

*City of Chicago v. Morales*, 527 U.S. 41 (1964) ........ 26

*Diamond v. Charles*, 476 U.S. 54 (1986) ........ 47

*Dupres v. City of Newport*, 978 F. Supp. 429 (D.R.I. 1997) ........ 47

*Eaton v. Sealol, Inc.*, 447 A.2d 1147 (R.I. 1982) ........ 26

*Elrod v. Burns*, 427 U.S. 347 (1976) ........ 37

*Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) ........ 31, 33, 35, 36

*First National Bank v. Bellotti*, 435 U.S. 765 (1978) ........ passim

*Goldman v. Forcier*, 27 A.2d. 340 (R.I. 1942) ........ 24

*Healthcare Review, Inc. v. Shalala*, 926 F. Supp. 274 (D.R.I. 1996) ........ 20

*Krikorian v. Rhode Island Dep't. of Human Serv.*, 606 A.2d 671 (R.I. 1992) ........ 24

*Majors v. Abell*, 317 F.3d 719 (7th Cir. 2003) ........ 49

*Marques v. Fitzgerald*, 99 F.3d 1 (1st Cir. 1996) ........ 24

*McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334 (1995) ........ 31, 38, 39, 40

*Montana Chamber of Commerce v. Argenbright*, 28 F. Supp. 2d 593 (D. Mont. 1998).. 37, 41, 44

*N.A.A.C.P. v. Button*, 371 U.S. 415 (1963) ........ 36

*N.A.A.C.P. v. Alabama*, 357 U.S. 449 (1958) ........ 18, 32

*New England Die Company v. Gen. Products Co.*, 168 A.2d 150 (R.I. 1961) ........ 24

*New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13-14 (1st Cir. 1996) ........ 49

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ........ 38

*Pacific Gas and Elec. Co. v. City of Berkeley*, 131 Cal. Rptr. 350 (1976) .................................. 37

*Poverman v. Walnut Hill Plaza, Inc.*, 261 F. Supp. 176 (D.R.I. 1966) ....................................... 20

*Pucci v. Algiere*, 261 A.2d 1 (R.I. 1970) ................................................................................ 24

*Reno v. ACLU*, 521 U.S. 844 (1997)......................................................................................... 26

*Rhode Island Board of Realtors, Inc. v. Whitehouse*, 199 F.3d 26 (1st Cir. 1999) ....................... 49

*Rhode Island Depositors Econ. Prot. Corp. v. Coffee and Martinelli, Ltd.*,
821 A.2d 222 (R.I. 2003)....................................................................................................... 21

*Rhode Island Med. Soc. v. Whitehouse*, 239 F.3d 104 (1st Cir. 2001) ......................................... 20

*Siravo v. U.S.*, 377 F.2d 469 (1st Cir. 1967)................................................................................ 26

*State v. Feng*, 421 A.2d 1258 (R.I. 1980) .................................................................................. 25

*State v. Milne*, 187 A.2d 136 (R.I. 1962) ................................................................................... 24

*Talley v. California,* 362 U.S. 60 (1960) ................................................................................ 35, 40

*U.S. v. Luna-Diaz*, 222 F.3d 1 (1st Cir. 2000) .............................................................................. 26

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State*,
454 U.S. 464 (1982)................................................................................................................ 47

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ........................................... 49

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)................................................................................................................ 38

*Vote Choice v. DiStefano*, 814 F. Supp. 186 (D.R.I. 1992) ................................................. passim

*Vote Choice, Inc. v. DiStefano*, 814 F. Supp. 195, 198 (D.R.I. 1993)...........................17, 36

*Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir. 1993) ........................................................... 31

Plaintiffs Rhode Island Affiliate of the American Civil Liberties Union and Steven Brown, its executive director ("RI ACLU"), submit this Trial Memorandum pursuant to an agreement of the parties to submit this matter to the Court for decision on the papers. RI ACLU also submits a Statement of Facts and a binder containing Exhibits 1 through 64, in support of its claims. For purposes of this submission the parties have agreed that the documents produced in discovery as well as the parties' respective pleadings and interrogatories are deemed admissible.

## I. FACTS

### A. The Rhode Island Affiliate, American Civil Liberties Union

RI ACLU is a non-profit corporation organized under Rhode Island law. Its principal activity is the protection and promotion of constitutional and statutory rights of individual citizens of the State of Rhode Island (Exhs.3, 4. See also, Exhs. 5-8). Plaintiff Steven Brown is Executive Director of the RI ACLU and is a member of the RI ACLU.

The RI ACLU engages in a variety of educational, public advocacy, media relations and litigation initiatives to promote its goals (Exhs. 62, Ans. No. 11; Exhs. 5-8). For many years, the RI ACLU has engaged in continuing efforts on a number of recurring issues, including such things as voting rights, discrimination, open records and meetings, freedom of speech, privacy, freedom of religion and access to courts (Exh. 5). The RI ACLU's efforts with respect to these issues can involve any number of different activities, from lobbying legislators and public officials, to educational efforts via press releases and legislative testimony, to engaging in election advocacy on particular ballot issues (Exhs. 5-8).

While nominally a corporation, the RI ACLU is predominantly a membership organization (Exhs. 3-4). The majority of the RI ACLU's funding comes from the National RI ACLU, which in turn receives its funding through membership dues, which RI ACLU helps

solicit (Exh. 62, Ans. Nos. 9,14; Exhs. 3, 4). The other major source of funding for the RI ACLU is the advertising book that the RI ACLU publishes in connection with its Annual Dinner in November of each year (Exhs. 7, 9). Members and supporters buy advertising in the book. The book generally contains submissions from more than 200 advertisers. Advertisers include members and non-members, individuals, businesses, corporations, associations, labor unions, political figures, and ad hoc groups of individuals (Exh. 9). The RI ACLU does not check or keep records on which advertisers are members or non-members, corporations or non-corporations, or what motivated the particular advertiser to make their contribution (Exh. 62, Ans. Nos. 9, 14).

One of the ways that the RI ACLU solicits contributions for the advertisements is through a newsletter. The newsletter regularly recounts many of the various activities engaged in by the RI ACLU, including ballot question activities (Exhs. 6, 7). The solicitation for contributions most often coincides with or immediately precedes election time as the RI ACLU's annual dinner is held in November. Accordingly, requests for contributions have coincided with newsletter references to the RI ACLU's position on various ballot questions (Exhs. 6, 7; Exh. 62, Ans. No. 14).

At present, it would be impossible for the RI ACLU to determine whether a particular contribution or membership came to the RI ACLU by virtue of the RI ACLU advocating for or against a ballot question. On occasions in the past, ballot issues have been a particular focus of the RI ACLU and those who share its goals. At other times, ballot question activity has been a part of the work of the organization but not a focal point of its efforts. In short, the RI ACLU is a multi-purpose organization. It and its membership respond to (and contribute or expend funds on) civil liberty issues as they arise (Exh. 62, Ans. No. 11).

The RI ACLU has received in the past and anticipates receiving in the future anonymous contributions from persons or entities that support its work but for any number of reasons do not wish to have that support known or publicized. Some of those who do not contribute anonymously to the RI ACLU would have their willingness to contribute chilled by disclosure of their names through Political Action Committee ("PAC") filings (Exh. 62, Ans. No. 11). The RI ACLU undertakes efforts to preserve the anonymity of its members and tells its members just that (Exh. 5, p. 5).

**B. <u>Citizens for Representative Government</u>**

Prior to and leading up to the 2004 election, the RI ACLU worked with a number of different organizations to press for the rejection of a Constitutional Convention for the State of Rhode Island (Exhs. 1, 2, 6). As part of that process, the RI ACLU informed its various members of its efforts and also urged them all to vote against the referendum. That was done, in part, via the newsletter which RI ACLU regularly sends to its members (Exh. 6). Mr. Brown also discussed these issues when meeting with members and potential members (Exh. 62, Ans. No. 5). The RI ACLU also distributed a separate flyer outlining why its members and supporters should vote against Question 2 (Exh. 21).

The RI ACLU's opposition to this Ballot Question was discussed in its regular September/October newsletter in the weeks leading up to the November 2004 election (Exh. 6, pp. 1, 6). Requests for donations were also made in the same September/October issue that mentioned the ballot question (Exh. 6, p. 10).

The RI ACLU also joined together with other like-minded community groups in an organized effort, Citizens for Representative Government, to defeat the Constitutional Convention ballot question. The RI ACLU issued a press release describing its efforts and its role in the coalition for a press conference at which many of the coalition members were present.

The RI ACLU identified the members of the coalition in its initial press release (Exhs. 1,2). In the flyer sent to its own members, the RI ACLU identified additional members of the Citizens for Representative Government coalition that opposed a Constitutional Convention (Exh. 21). The RI ACLU participated in the group and contributed $2,500 towards its efforts (Exh. 27).

In turn, the Citizens for Representative Government coalition also disclosed its contributors on its literature (Exh. 27). The participants were identified in press releases (Exh. 1). And the group voluntarily filed disclosures with the Board of Elections on November 4, 2004 identifying its contributors and expenditures (Exh. 27).

Nonetheless, a complaint was filed by Operation Clean Government against the RI ACLU and other members of the coalition (Exh. 61). The Board agreed not to take any action on the complaint pending resolution of this lawsuit (Exh. 21).

C. **The Rhode Island Voting Rights Campaign.**

Presently, the RI ACLU is engaged in efforts to promote passage of a 2006 ballot question aimed at restoring voting rights to felons upon their release from incarceration. Rhode Island is the only state in New England where felons are not allowed to vote during the duration of their probation or parole. This ballot question was approved for inclusion on the November 2006 ballot during the most recent Rhode Island legislative session. The RI ACLU participated in a coalition with various other organizations to bring this issue to public attention and to work for passage of the legislation this past year. That coalition was coordinated by the Rhode Island Family Life Center, a non-profit corporation whose purpose is to support and advocate for the reintegration of ex-offenders into the community. The RI ACLU and the National ACLU have long been involved in efforts to protect the right to vote (Exh. 63, Ans. No. 4; Exhs. 10, 11).

The RI ACLU is already involved in ongoing efforts to begin to organize and recruit a broad-based coalition to support this ballot question. It has had discussions with the

National Right to Vote Coalition and the Rhode Island Family Life Center with respect to beginning the coordination efforts, fundraising, and mapping out strategies to move forward. The RI ACLU has voted to contribute $1,500 to the Right to Vote campaign in Rhode Island to assist in organizational efforts and the campaign itself. In light of the present state of the campaign finance laws, the RI ACLU's Board has felt obliged to hold off actually donating this money for fear of prompting further complaints (Exhs. 61, 63, Ans. No. 4).

The National Right to Vote Campaign stands ready to contribute Thirty Thousand Dollars ($30,000) to the effort in Rhode Island. It has expressed concerns about contributing such sums, and who would or could be a proper recipient of those funds, in light of the Rhode Island Campaign Finance statutes and Board opinions interpreting them (*Id.*).

All interested parties believe that work on the 2006 referendum must proceed immediately. A website is already up and running (Exh. 11). Organizational and educational efforts have begun. The website lists participating organizations (Exhs. 10, 11). Plans drawn up by the Family Life Center had anticipated that a Campaign Director would be hired by September 1, 2005 (Exh. 10 ). Interns should have already been hired, support committees formed on local college campuses and polling was scheduled for November 2005. Given the nature of the ballot question – restoring voting rights to convicted felons–the RI ACLU and its coalition members believe it is critical to begin educational efforts in intimate settings over a long period of time (Exh. 10). (See also Exh. 63, Ans. No. 4).

Initial organization activities have been held up, in part due to funding confusion brought on by the State of Rhode Island's campaign finance rules. All entities involved are convinced that immediate, substantial and continuous voter education is essential for this ballot question to pass. All involved are concerned that they will lose out on valuable time necessary to

educate the public and lose out on potential funding (already earmarked for them or otherwise) if the issues raised in this lawsuit are not resolved expeditiously (Exh. 63, Ans. No. 4).

## D. The Rhode Island Campaign Contributions And Expenditures Report Act

In 1974, Rhode Island adopted the Rhode Island Campaign Contributions and Expenditures Reporting Act. R.I.G.L. § 17-25-1, *et seq*. The General Assembly has amended the statute numerous times since then, including in 1981, 1984, 1988, 1992, 1994 and 2001. The statute contains criminal penalties of a fine of up to One Thousand Dollars ($1,000) for a willful and knowing violation of the Act. R.I.G.L. § 17-25-13.

The statute covers campaign financing for both candidates and ballot questions. From the time of its adoption in 1981, there has been substantial confusion about the provisions respecting ballot question advocacy. The Rhode Island ACLU has participated in hearings before the Board and in one federal court constitutional challenge to the Act which resulted in several of its provisions being ruled unconstitutional. See, *Vote Choice v. DiStefano*, 814 F. Supp. 186 (D.R.I. 1992). (*See also*, Exhs. 47, 57, 58).

### 1. Prohibition Of Corporate Contributions

This suit challenges those portions of R.I.G.L. § 17-25-10.1(h) and (j) that impose a prohibition on corporate contributions directed to supporting or opposing ballot questions. Subsection (h)(1) states:

> "It shall be unlawful for any corporation, whether profit or non-profit, … to make any campaign contribution or expenditure …"

Subsection (j) prohibits anyone other than an individual, a political action committee, political party committee or candidate committee to make any contribution or expenditure on behalf of or in opposition to any candidate or ballot question.

In 1992, the RI ACLU and others successfully challenged the statute's prohibition on corporate expenditures. *Vote Choice*, 814 F. Supp. 186 (D.R.I. 1992). In that case, this Court

(Pettine, J.) relying on *First National Bank v. Bellotti* ("*Bellotti*"), 435 U.S. 765 (1978), held that bans on corporate expenditures were unconstitutional. However, the RI ACLU complaint in *Vote Choice* did not include a claim that it intended to make contributions. Accordingly, the District Court did not declare the prohibition on corporate contributions unconstitutional (even though the *Bellotti* decision so held).

In response to the *Vote Choice* decision, the Board revised its regulations. The Board distinguished between corporate contributions and expenditures. It eliminated the provision prohibiting corporate expenditures, but did not make any changes respecting corporate contributions (Exhs. 54, 55, 59).

To this day, the Board of Election Regulation, § 8(B)(4), states flatly that it is illegal for any "business entity" to make contributions to support or defeat ballot questions. "A contribution made by any 'business entity' as defined in R.I.G.L. 17-25-3(1) on April 29, 1992 or thereafter is strictly prohibited." The definition of business entity includes profit and non-profit corporations (Exh. 60, p. 18) .

In an internal memorandum, Board staffers note that they have advised callers that corporations are prohibited from making contributions, though they can spend their own money (Exh. 37). In this action, the Board has denied the allegation that corporate contribution limitations are unconstitutional as regards ballot questions (Complaint and Answer, ¶¶ 44-47).

The RI ACLU, a non-profit corporation, has made in the past and intends in the future to make contributions to support and defeat ballot questions. As set forth above, in 2004, it contributed $2,500 to Citizens for Representative Government (Exh. 27; Exh. 62, Ans. No. 6). It has earmarked $1,500 to the 2006 Right to Vote ballot question (Exh. 63, Ans. No. 4). The RI ACLU also wishes to solicit contributions from corporations to support its own efforts and to

support the efforts of coalitions of like-minded community groups on ballot questions raising issues of mutual interest (Exh. 63, Ans. Nos. 4 and 26).

**2. Contribution Limitations**

This suit challenges the contribution limitations set forth in R.I.G.L. § 17-25-10.1(a). This section states:

> No person … nor any political action committee shall make a contribution or contributions to any candidate … or any political action committee … which in the aggregate exceeds one thousand dollars ($1,000) within a calendar year.

Subsection (a) also limits the amount that an individual can contribute in total in any given year to any and all candidates or political action committees to $10,000 per year, while PACs can contribute up to $25,000.

The Board's manual presently recites these contribution limitations. (Exh. 60, pp 19-20). Board Advisory Opinions also reiterate that any entity acting "in concert" with another is subject to the contribution limitations in the Act (Exh. 12).

The RI ACLU has in the past contributed more than $1,000 to a particular ballot question coalition and intends to do so in the future. In 2004, it contributed $2,500 to help defeat the Constitutional Convention question (Exh. 27). It has earmarked a contribution of $1,500 for the Right to Vote Campaign in 2006 (Exh. 63, Ans. No. 4). Further, as part of its efforts and to support the coalition of which RI ACLU is a part, the National Right to Vote Coalition has agreed to contribute $30,000 to the Rhode Island Right to Vote campaign, but has held up on making the contribution based on the present statutory language and Board interpretations (Exh. 63, Ans. No. 4).

**3. The Confusing History of Section 10(b) – What is a "Person"**

R.I.G.L. § 17-25-10(b) states:

> It shall be lawful for any *person* not otherwise prohibited by law and not acting in concert with any other person or group, to expend personally from that person's own funds a sum which is not to be repaid … to advocate the approval or rejection of any question, …

(emphasis added). "*Person*" is a defined term under the Act. It means: "an individual, partnership, committee, association, corporation, and any other organization." R.I.G.L. § 17-25-3(8).

Through the years, the Board has struggled with just who is a "person" under this provision and what constitutes that "person's" own funds under the provision. The Chairman of the Board of Elections declared in the minutes of an October 16, 1996 meeting that "The ambiguity of this issue is apparent." (Exh. 53). More recently, he declared the statute respecting the regulation of money spent to promote or defeat referenda questions was "ambiguous and impractical, resulting in an unenforceable law." (Exh. 64, Ans. No. 9).[1]

Back in 1996, the Board declared that the statute was ambiguous and in need of legislative clarification (Exhs. 53, 56). No such legislative clarification has been forthcoming (Exh. 36). The Board submitted clarifying legislation in 2005, (Exh. 64, Ans. No. 10), but it never made it out of committee.

The inherent ambiguity in the statute concerning who or what is a "person" and what constitutes "in concert" activity in the context of ballot questions has caused the Board of Elections to take inconsistent formal and informal positions on this issue.

In 1990, the Board declared that a Rhode Island non-business corporation formed for the purpose of accepting contributions from its members to be used for advocating the

---

[1]Defendant Begin claims that the statement was made in reference to the statute generally and was not intended as a comprehensive analysis of the separate provisions of the statute. *Id.*

approval or rejection of a ballot question was a PAC subject to all of the reporting requirements of a PAC (Exh. 12).

In 1995, The Greater Providence Chamber of Commerce asked the Board what its obligations were if it took a position on ballot questions and asked its members for financial support (Exh. 43). The Board responded, in Advisory Opinion 95-01, that if the Chamber sought financial support from its members respecting a ballot question, it would be considered to be acting "in concert" with its members and therefore subject to all of the filing, administrative and reporting requirements of a PAC under the statute (Exh. 44).

The Greater Providence Chamber of Commerce sought a hearing and reconsideration of this decision in August 1995 (Exh. 45). It argued that § 10(b) was ambiguous. It argued that the statute's reference to R.I.G.L. § 17-25-23 to define "in concert" activity was, at best, confusing and when read properly supported the conclusion that "in concert" activity should be limited to candidate elections. It argued that no compelling interest supported the Board's interpretation and that to require the Chamber to form a PAC to solicit funds from its own members unnecessarily and unreasonably burdened the Chamber's exercise of its First Amendment rights (Exh. 45).

The Board held a public hearing on the Chamber's request for reconsideration on April 11, 1996. The Chamber submitted testimony, as did the RI ACLU (Exhs. 46, 47). The RI ACLU's submission emphasized the difference between ballot advocacy and candidate elections and the Supreme Court's starkly different treatment of campaign finance laws in the two contexts. It also argued that the "in concert" prohibition served no purpose in the ballot question context and that the Board's previous interpretation of "in concert" activity in the 1995 Advisory Opinion raised constitutional problems (Exh. 47).

On May 29, 1996, the Board issued Advisory Opinion 96-01, completely reversing field on Advisory Opinion 95-01 (Exhs. 48, 49, 50). The Board recognized the constitutional issues raised by its earlier opinion and adopted an interpretation of R.I.G.L. § 17-25-10(b) that avoided those issues. The Board held that the Chamber and its members were "not more than one person as defined by R.I.G.L. § 17-25-10(b), but rather, a single person as defined by the statute." In reaching this conclusion the Board pointed out that the Chamber was not formed solely for the purpose of advocating one particular issue, had been in existence for 130 years, and was an organization of businesses collectively advocating issues which serve the best interests of those businesses that are members (Exh. 49).

Following the issuance of Advisory Opinion 96-01, the Board adopted an "interim policy" of allowing any entity advocating for or against ballot questions to report its expenditures as if it were a single independent entity, but not requiring the formation of PACs (Exhs. 52, 53).

The documents produced by the Board in this lawsuit demonstrate that from 1996 through 2004, a wide variety of entities and organizations reported their expenditures as a single "person" under the Act, and not as persons acting "in concert". These entities have included:

- RIte Track (Exh. 13, 14);
- Preserve Rhode Island (Exh. 18);
- West Broadway Neighborhood Association (Exh. 19);
- Working Rhode Island (Exh. 20);
- The Rhode Island Shoreline Coalition (Exh. 22);
- Operation Clean Government (Exh. 23);
- Common Cause of Rhode Island (Exh. 24);
- The North Kingstown Chamber of Commerce/Complete Quonset Coalition (Exh. 25);
- The Coalition for Progressive Economic Development

(Exh. 26);

- Citizens for Representative Government (Exh. 27);

- The Community College of Rhode Island Foundation, (Exh. 28);

- The URI College of Business Administration Advisory Council (Exh. 29);

- Construction Industries of RI, a.k.a. Rhode Island Heavy and Highway Construction Industry Advancement Fund (Exhs. 15, 30)

- NEARI (Exh. 32);

- The Town of Jamestown (Exh. 33);

- The Smithfield Charter Review Commission (Exh. 34).

On numerous occasions, several of these entities voluntarily disclosed their contributors despite not considering themselves PACs or subject to the statute's PAC disclosure requirements. (*See, e.g.*, Exhs. 13, 14, 35, 25, 27) (*See also* Exh. 31; "Far from trying to conceal or disguise our organizational support, officers of Common Cause ... have participated in a series of broadcast interviews, press briefings and editorial meetings ...".)

Several voluntarily disclosed and indeed publicized via press releases and websites, that they were collaborating with other like-minded entities. (*See, e.g.*, Exhs. 1, 13, 19, 20, 34.)

In 2004, the Board revisited the issue of "in concert" activity as regards ballot questions in light of an upcoming casino referendum (Exh. 64, Ans. No. 12). The RI ACLU objected (Complaint and Answer, ¶¶ 32-34). So did the Greater Providence Chamber of Commerce (Exh. 51).

After hearings on August 11, 2004 and September 13, 2004, the Board voted to reverse field again, revoke Advisory Opinion 96-01 (which itself had revoked 95-01) and

reinstate Advisory Opinion 95-01 (Exhs. 64, Ans. Nos. 10, 13; Exhs. 57, 58). The Board voted to put the re-implementation of Advisory Opinion 95-01 on hold until January 1, 2005 (Exh. 57).

In 2004, prior to reinstating 95-01 the Board routinely wrote to organizations informing them that "persons" could expend their own funds, quoting the definition of "person" from the Act as "an individual, partnership, committee, association, corporation, and any other organization" (Exhs. 18-22). The Board asked these "persons" to file "Form CF-8," a "Schedule of Independent Expenditures." *Id.*

Since January 2005, the Board has written to organizations notifying them that they constitute a PAC and are subject to the reporting requirements of a PAC (Exhs. 16, 17). The Board has specifically notified groups that they cannot "accept any contributions or make any expenditures prior to filing notice of its organization with the Board of Elections" (Exh. 16). The Board has also sent notice that R.I.G.L. 17-25-15(f) requires all ballot question PACs to "terminate all activity within (30) days following that election" (Exh. 17).

In response to interrogatories, the Board has conceded that with respect to any particular referenda questions since 1994 the Board is without sufficient information to assess whether voters did not have adequate information, stating it has not conducted any studies or investigations relative to this issue. More specifically, the Board has conceded it cannot assess whether voters did not have adequate information with respect to the identity of persons or entities supporting or opposing any particular referenda, again stating it has not conducted any studies or investigation relative to that issue (Exhs. 64, Ans. Nos. 3,4).

## II. THE SUPREME COURT HAS ALREADY RULED THAT PROHIBITIONS ON CORPORATE CONTRIBUTIONS VIOLATE THE FIRST AMENDMENT

R.I.G.L. §§ 17-25-10.1(h) & (j) prohibit corporations from making contributions on behalf of or in opposition to any ballot question. *See* R.I.G.L. §§ 17-25-10.1(h) & (j). The

United States Supreme Court has already held that a ban on corporate contributions in this context runs afoul of the First Amendment.

The controlling decision is *First National Bank v. Bellotti*, 435 U.S. 765 (1978). *See also Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 297-98 (1981). (*Bellotti* "held that a state could not prohibit corporations any more than it could individuals from making contributions or expenditures advocating views on ballot measures.") In *Bellotti*, several national banking associations challenged a Massachusetts statute that forbade corporations from "... making contributions and expenditures for the purpose of ... influencing or affecting the vote on any question submitted to the voters," *Bellotti*, 435 U.S. at 768, unless the ballot question materially affected the company's business (a more limited prohibition than Rhode Island's).

In assessing the validity of the statute, the Supreme Court asked whether the contribution prohibition " ... abridges expression that the First Amendment was meant to protect." *Id.* at 776. The Court noted that the expression regulated by the statute—advocacy on issues of such public concern that they were placed on the ballot—was "at the heart of the First Amendment's protection." *Id.*

The Court looked not to the source of the speech (corporations), but to the value of the speech to public discourse. Noting that a major purpose of the First Amendment is to protect free discussion of governmental affairs, the Court stated:

> If the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensable to decision-making in a democracy...

*Id.* at 776-77. The Court went on to crystallize a fundamental concept of First Amendment jurisprudence important to every issue raised in this lawsuit:

> The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual. *Id.* at 777.

The *Bellotti* Court found that prohibiting corporations from participating in political debate on public issues through contributions and expenditures was offensive to the First Amendment:

> In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue... If a legislature may direct business corporations to "stick to business," it also may limit other corporations—religious, charitable or civic—to their respective "business" when addressing the public. Such power in government to channel the expression of views is unacceptable under the First Amendment.

*Id.* at 784-85.

The Court also held that the State could not show the requisite compelling interest to justify the contribution and expenditure prohibition. *Id.* at 787-88. The Court dismissed the State's claim that speech of "wealthy and powerful" corporations might corrupt the political process in the context of a ballot campaign. *Id.* at 788 n.26. According to the Court, that interest was not present in *Bellotti* because "referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections, (citations omitted), simply is not present in a popular vote on a public issue." *Id.* at 790.

The Supreme Court reaffirmed this holding in *Citizens Against Rent Control v. City of Berkeley*, (*"Berkeley"*) when it struck down a California ordinance which impermissibly limited contributions to committees formed to support or oppose local ballot measures. *Berkeley*, 454 U.S. 290 (1981). Once again, the Court emphasized that contributions to ballot issue campaigns do not have the same potential to corrupt as do contributions to individual candidates. *Id.* at 297-98. The Court went on to note that "[w]hatever may be the state interest

or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Id.* at 299. *See, also, C & C Plywood Corp. v. Hanson*, 583 F.2d 421, 424-5 (9th Cir. 1978) (Bellotti did not distinguish between contribution and expenditure.

Pursuant to the Rhode Island statute and the current Board of Elections Manual (Exh. 60). RI ACLU, a corporation, is prohibited from contributing to any effort to support or defeat ballot questions, as is any corporation with whom it shares political goals. The National Right to Vote Coalition has held up a contribution to the Rhode Island Right to Vote Coalition, in which RI ACLU participates, out of concern for the status of this prohibition (Exh. 63, Ans. No. 4). RI ACLU is subject to a credible threat of criminal prosecution under §§ 17-25-10.1(h) & (j). This outright ban on corporate contributions directly suppresses RI ACLU's ability to communicate and "abridges expression that the First Amendment was meant to protect." *Bellotti*, 435 U.S. at 776 (1978).

*Bellotti* is the "law of the land" and "must control this Court's decision" with respect to §§ 17-25-10.1(h) & (j)'s blanket prohibition on corporate contributions with respect to ballot questions. *Vote Choice,* 814 F. Supp. at 190-91. "Under *Bellotti*, this aspect of the statute clearly violates the First and Fourteenth Amendment rights" of RI ACLU. *Id.*[2]

---

[2]In *Vote Choice, Inc. v. DiStefano*, the Plaintiffs made no allegation that they desired to contribute funds (as opposed to making an independent expenditure) directly to any other entity, such as a political action committee, for the purpose of ballot measure advocacy. As a result, the Court limited its ruling to enjoin the state from enforcing its prohibition on independent expenditures, but did not rule on the prohibition of corporate contributions with respect to ballot measure advocacy. *See Vote Choice, Inc. v. DiStefano*, 814 F. Supp. 195, 198 (D.R.I. 1993). In this case, RIACLU specifically pleads that it has made contributions to support or defeat ballot questions and intends to do so in the future.

Finally, one irony in the present state of the laws bears emphasis. As matters now stand, large corporations with large treasuries, can spend without limitations. Smaller corporations with limited resources, including non-profit corporations like the RI ACLU and the Family Life Center, face limitations and burdens on pooling resources and acting collectively to get their message to voters. Such disparity is anathema to free and full public discourse and must be remedied.

## III. THE SUPREME COURT HAS ALREADY RULED THAT CONTRIBUTION LIMITATIONS VIOLATE THE FIRST AMENDMENT

R.I.G.L. § 17-25-10.1(a) imposes limitations on the amount of money that may be contributed to advocate for or against ballot questions.[3] The U.S. Supreme Court has made clear that contribution limitations in the context of ballot advocacy are unconstitutional.

Once again, United States Supreme Court precedent controls. In *Berkeley*, the Supreme Court considered the constitutionality of a municipal ordinance placing a $250 dollar limitation on contributions to committees formed to support or oppose ballot referenda. *Berkeley*, 454 U.S. 290, 297 (1981). The Court struck down the ordinance as unconstitutional, holding that the statute imposed a significant restraint on the freedoms of association and speech of groups and individuals wishing to express their view on a ballot issue through committees. *Id.* at 299. The Berkeley court reiterated the central role of associating in groups (in this instance via contributions) in effective political advocacy, citing *N.A.A.C.P. v. Alabama*, 357 U.S. 449, 460 (1958). It reiterated that government cannot "restrict the speech of some elements of our society in order to enhance the voice of others..." *Berkeley*, 454 U.S. at 295. The Court concluded that limiting the rights of some to band together via contributions to advocate their

---

[3]These limitations, as written, apply to candidates, political party committees, and PACs. However, under the Board's current interpretation of § 10(b), Advisory Opinion 95-01, any entity receiving a contribution from another constitutes a PAC (Exh. 44).

views on ballot measures while allowing affluent persons, acting alone, to spend without limitation, violated the First Amendment right of association. *Id.* The Court also held the contribution limitations also imposed a significant restriction on the freedom of expression of those who wish to express their views through committees. *Id.*, 454 U.S. at 299.

Finally, once again, the Supreme Court emphasized, "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Id.* The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue. *Bellotti*, 435 U.S. at 790.

Just as the ordinance in *Berkeley*, the restrictions in R.I.G.L. § 17-25-10.1(a) seriously impair RI ACLU's freedoms of association and expression by placing limits on contributions for ballot advocacy. Section 17-25-10.1(a) and the Board manual that incorporates those limitations, (Exh. 60, p. 19-20), limit the RI ACLU's ability to band together via contributions with like-minded persons and entities on ballot issues and pose a credible threat of criminal prosecution. The statute also limits the RI ACLU's ability to solicit funds for its causes from others who might refrain from contributing to the RI ACLU's causes because of these contribution limitations.

Indeed, precisely that has happened with respect to the 2006 ballot question respecting the right to vote. The National Right to Vote Coalition has withheld funds ($30,000) earmarked for this cause, supported by the RI ACLU, in part out of concern for not violating the contribution limits set forth in R.I.G.L. § 17-25-10.1(a) (Exh. 63, Ans. No.4). The ability of the RI ACLU and others with whom it seeks to join to express a political message on an important issue already slated for referendum has been stymied by the statutory limitation. Information critical to educating the public about this public issue is not getting out, to the detriment of public discourse. *Berkeley*, 454 U.S. at 299 ("The contribution limit thus automatically affects

expenditures, and limits on expenditures operate as a direct restraint on freedom of expression of a group or committee desiring to engage in political dialogue concerning a ballot measure.").

Preventing would-be contributors from pooling their resources or making their views known places an unjustified burden on the public's right to be informed on public issues. *Bellotti*, 435 U.S. at 792 n.31 ("The First Amendment rejects the 'highly paternalistic' approach of statutes … which restrict what the people may hear."). For these reasons, § 17-25-10.1(a) is violative of the First Amendment and therefore unconstitutional.

## IV. THIS COURT CAN AND SHOULD CONSTRUE § 17-25-10((B) SO AS TO AVOID A CONSTITUTIONAL QUAGMIRE

Later sections of this memorandum will demonstrate that construing the "in concert" language as the Board presently suggests impermissibly burdens quintessential First Amendment protected activity. The Court can and should avoid those constitutional pitfalls by construing the statute strictly pursuant to its expressly defined terms—and in the same manner that the Board construed the statute for eight years – from 1996 to 2004. The Court can easily and properly accomplish this task by looking to the well-established rules of statutory interpretation. *Rhode Island Med. Soc. v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001). These rules dictate that R.I.G.L. §17-25-10(b) does not prohibit "in concert" expenditures by identified groups as regards ballot question advocacy, but rather expressly contemplates collective groups acting together on such issues.

When construing a statute, courts must examine the statute in its entirety while giving the words their plain and ordinary meaning. *Healthcare Review, Inc. v. Shalala*, 926 F. Supp. 274, 281 (D.R.I. 1996). When language contained in a statute is free from ambiguity and expresses a definite and sensible meaning, that meaning is conclusively presumed to be the one which the legislature conveyed. *Poverman v. Walnut Hill Plaza, Inc.*, 261 F. Supp. 176, 178

(D.R.I. 1966); *Rhode Island Depositors Econ. Prot. Corp. v. Coffee and Martinelli, Ltd.*, 821 A.2d 222, 228 (R.I. 2003).

The interpretation of R.I.G.L. §17-25-10(b) hinges on the plain meaning of its text as well as the text of the specific section(s) of the statute it incorporates.

In particular, R.I.G.L. § 17-25-10(b) states:

> It shall be lawful for any *person*, not otherwise prohibited by law and not acting *in concert* with any other person or group, to expend from that person's own funds a sum which is not to be repaid to him or her for any purpose not prohibited by law to support or defeat a candidate or to advocate the approval or rejection of any question.

Later in that very same section, the legislature declared:

> Whether a person is "acting in concert with any other person or group" for the purposes of this subsection shall be determined by application of the standards set forth in § 17-25-23. R.I.G.L §17-25-10(b).

Critically, "person" is a defined term in the Act, and expressly includes "individual, partnership, committee, associations, corporations and any other organization." R.I.G.L. §17-25-3(8). Substituting the legislature's definition of "person" into Section 10(b), that section reads:

> [i]t shall be unlawful for any [individual, partnership, committee, association, corporation, and any other organization], not otherwise prohibited by law and not acting in concert with any other person or group, to expend personally from that [individual's partnership's, committee's, association's, corporation's or organization's] own funds . . . to support or defeat a candidate or to advocate the approval or rejection of any question.

The legislature's definition of "person" is not limited to individuals. It includes organizations, including "loose" organizations such as committees, associations and "any other organization." By their nature, "committees" "associations" and "organizations" are inherently engaged in collaborative efforts. It must be presumed that when the legislature wrote Section

10(b) that it knew that it was authorizing entities that by their nature were groups that worked together to spend "their own funds."

The only limitation on the ability of such "groups" to spend their own funds is if they are "otherwise prohibited by law" or "acting *in concert* with any other person or group." Based on what has been said so far, acting *in concert* cannot mean simply acting as a group or organization. The statutory definition of "person" makes that clear. So what does acting "in concert" mean? The legislature answered that question as well, when it declared: "Whether a person is 'acting in concert' with any other person or group . . . shall be determined by application of the standards set forth in § 17-25-23." As a result, a plain reading of R.I.G.L. § 17-25-23 must determine what "in concert" activities are prohibited under the statute.

The Board concedes that R.I.G.L. § 17-25-23 refers only to candidates, and that all of the tests set forth in Section 23 are based on the relationship between candidates or their committees and the entity making an expenditure. Complaint and Answer, ¶¶ 17-18. It further concedes that the words "question" or "ballot question" do not appear at all in Section 23. *Id.*, ¶¶ 69-71. On its face, then, the statutory definition of "in concert" activity does not apply to ballot question advocacy.[4]

This reading comports with the intent of Section 23. The language of § 17-25-23 was designed to prevent the threat of "quid pro quo" corruption that exists with the election of candidates. One internal Board memorandum dated October 25, 2000 and recounting the history of the "in concert" issue states:

---

[4]Interestingly, the legislature considered legislation in 2005 submitted by he Board that would have expressly applied the prohibition of "in concert" activities to ballot measure advocacy. However, the bill failed to make it out of committee and the statute was not amended.

> The section 17-25-23 relates to Matching Public Funds and is concerned with expenditures for candidates as opposed to ballot questions.

(Exh. 37). Matching funds are not at issue with respect to ballot questions. Indeed, because the U.S. Supreme Court has declared that contribution limitations and prohibitions in the context of ballot questions are impermissible, there is no threat of circumventing *any* funding limitations at all in ballot question elections. There are no such limits. Protecting those limits from circumvention., of course, is the primary purpose of "in concert" prohibitions in candidate elections.

A close review of the provisions of Section 23 makes clear that the legislature did not intend for this Section to apply to ballot questions. The opening paragraph to § 17-25-23, references those expenditures made by "a person, committee of a political party, or political action committee to directly influence the outcome of the electoral contest involving the candidate." Following suit, § 17-25-23's seven standards state specific instances of prohibited "in concert" activities:

> Subsection 1 prohibits any arrangement, coordination, or direction with respect to an expenditure between the *candidate* or his agents and the person making the expenditure.
>
> Subsection 2 prohibits the person making an expenditure from raising funds on behalf of the *candidate* or from receiving compensation from the candidate.
>
> Subsection 3 prohibits the person making the expenditure from communicating, advising or counseling the *candidate* or his agents on the candidate's plans, projects or needs.
>
> Subsection 4 prohibits the person making the expenditure from retaining the professional services of any individual also providing those services to the *candidate* in connection with the *candidate's* pursuit of election to general office.
>
> Subsection 5 prohibits the person making the expenditure from communicating or consulting with a party committee or a person whose professional services have been retained by a political party

> committee about the *candidate's* plans, projects or needs relating to the *candidate's* pursuit of election to general office.
>
> Subsection 6 prohibits an expenditure based on information provided to the person making the expenditure directly or indirectly by the *candidate* or his agents about the *candidate's* plans, projects or needs.
>
> Subsection 7 prohibits an expenditure made by a person with the intention of seeking governmental benefit or consideration from the *candidate* by reason of the expenditure.

Each of these prohibitions is meant to diminish the threat of quid-pro-quo corruption or the surreptitious direction of funding by the candidate without tracking those funds. These threats are unique to candidate elections.

Not once does § 17-25-23 mention ballot questions or any actions remotely related to ballot question advocacy. This complete and repeated omission of any reference to ballot question advocacy from the "in concert" definition in § 17-25-23 demonstrates that the Rhode Island legislature did not intend for the prohibition of "in concert" activities to apply to ballot question advocacy. *Krikorian v. Rhode Island Dep't. of Human Serv.*, 606 A.2d 671 (R.I. 1992) (in construing a statute, Supreme Court attempts to ascertain intent of legislature by considering act in its entirety); *State v. Feng*, 421 A.2d 1258 (R.I. 1980) (statute is not to be interpreted to include a matter omitted). It has long been held that courts should not insert into a statute omitted words or language when facing such clear legislative intent. *Goldman v. Forcier*, 27 A.2d. 340 (R.I. 1942); *New England Die Company v. Gen. Products Co.*, 168 A.2d 150 (R.I. 1961).

Additionally, Rhode Island law does not allow statutes to be construed in a manner that results in absurdities. *Marques v. Fitzgerald*, 99 F.3d 1 (1st Cir. 1996); *see also Pucci v. Algiere*, 261 A.2d 1 (R.I. 1970) (words used in a statute must be given reasonable and sensible construction to carry out the legislative purpose); *State v. Milne*, 187 A.2d 136 (R.I.

1962) (statutes are not to be so construed as to reach meaningless and absurd results). As discussed in Section IV, *infra*, any attempt to substitute "ballot question advocacy" for "candidates" in § 17-25-23 simply makes no sense because only persons can be corrupted, not ballot questions. Consequently, § 17-25-10(b)'s prohibition on "in concert" expenditures cannot and should not be interpreted to apply to ballot question advocacy. To do so would result in the absurd outcome of personifying ballot questions or making up rules and language that simply do not exist in the statute.

Nor should the Court assume that the absence of any reference in Section 23 to ballot questions is a mistake or oversight. The Rhode Island legislature re-enacted § 17-25-10(b) in 1981, 1984, and 1992. It has amended the definition section of the statute six times, in 1981, 1984, 1988, 1992, 1994 and 2001. Each of these reenactments post-dated the Supreme Court's decisions in *Bellotti* and *Berkeley*. In both of those cases, the Supreme Court drew sharp distinctions between campaign finance laws regulating ballot questions and those regulating candidates. The Supreme Court struck down regulations on corporate contributions and expenditures involving ballot measures precisely because the need to regulate ballot question advocacy is significantly different from candidate electioneering. The Rhode Island legislature must be presumed to know that the *Berkeley* Court declared in 1978 that "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Berkeley*, 454 U.S. at 299. To date, these two cases are the only Supreme Court pronouncements with respect to ballot measures and stand for the principle of broad protection of political participation in such purely issue-driven referenda.

The Rhode Island Legislature is presumed to have known the state of existing relevant law when it enacted § 17-25-10(b). Moreover, in 1996, through Advisory Opinion 96-01 and the "interim" policy adopted thereafter, the Board of Elections essentially adopted the

interpretation of the statute set forth above. That interpretation was well publicized. In the intervening eight years, from 1996 to 2004, the legislature did not see fit to intervene to "correct" the Board's interpretation. As a result, it is reasonable to believe that the legislature intended the prohibition on "in concert" expenditures to apply only to candidates, as it says, and not ballot measure advocacy.[5]

## V. SECTION 17-25-10(B), IF APPLIED TO BALLOT QUESTIONS, AND THE BOARD'S 1995 ADVISORY OPINION ARE UNCONSTITUTIONALLY VAGUE

### A. The Statute, If Applied to Ballot Questions, is Nonsensical

If R.I.G.L. § 17-25-10(b) is not construed as set forth in the previous section, and one attempts to apply its definition of "in concert" activities to ballot advocacy, the statute is unconstitutionally vague. *Reno v. ACLU*, 521 U.S. 844, 864 (1997). The section provides no meaningful or intelligible standard for determining what a person or corporation engaged in ballot advocacy must or must not do in order to be considered acting "in concert." *City of Chicago v. Morales*, 527 U.S. 41, 46 (1964).

R.I.G.L. § 17-25-10(b) states that whether a "person" is acting "in concert" shall be determined by applying the standards set forth in R.I.G.L. § 17-25-23. Should someone turn to Section 23 for guidance, they would discovery that the statute does not mention ballot questions or any standard or activity related to ballot question advocacy. Beginning with the opening paragraph, such a reader would see that Section 23 references contributions and expenditures made by "a person, committee of a political party, or political action committee to

[5]Finally, R.I.G.L. § 17-25-10(b) is a penal statute and thus must be narrowly construed. *Siravo v. U.S.*, 377 F.2d 469 (1st Cir. 1967). Any ambiguities in the statute must be resolved in favor of the penalized parties. *U.S. v. Luna-Diaz*, 222 F.3d 1 (1st Cir. 2000); *Eaton v. Sealol, Inc.*, 447 A.2d 1147 (R.I. 1982). In the context of ballot question advocacy, at best, it might be argued that § 17-25-10(b)'s incorporation of § 17-25-23 is ambiguous. In this case, the prohibition of "in concert" expenditures must be limited to candidate elections and not ballot question advocacy.

directly influence the outcome of the electoral contest involving the *candidate*."[6] The section goes on to describe seven specific activities which would be considered "in concert" contributions or expenditures in candidate elections.

Any attempt to substitute "ballot question" for "candidate" in the statutory proscriptions leads to absurd and meaningless results:

> Subsection 1: How does one determine whether: "[t]here is any arrangement, coordination, or direction with respect to the expenditure between the *ballot question* or the *ballot question's* agent and the person making the expenditure?" Ballot questions do not have agents. They do not take or give direction.
>
> Subsection 2: How does one determine whether a person has been authorized to raise or expend funds on behalf of the *ballot question*, has been an officer of the *ballot question's* authorized committees, or has been receiving compensation from the *ballot question?* Ballot questions do not authorize, they do not form committees, they do not pay people.
>
> Subsection 3: How does one determine whether the person has communicated with, advised or counseled the *ballot question* or the *ballot question's* agents at any time on the *ballot question's* pursuit of election to general office? One cannot counsel or communicate with a ballot question, nor does a ballot question pursue anything.
>
> Subsection 4: How does one determine whether he has retained the professional services of any individual or person also providing those services to the *ballot question* in connection with the *ballot question's* pursuit of election to general office? One does not provide services to a ballot question.
>
> Subsection 5: How does one communicate or consult about a *ballot question's* needs? Ballot questions do not have needs.
>
> Subsection 6: How does one determine whether that person's expenditure is based upon information provided directly or indirectly by the *ballot question* or the *ballot question's* agents about the *ballot question's* plans, projects or needs? Ballot questions do not provide information.

---

[6]The Board of Elections concedes that "this provision is not strictly applicable to ballot questions." Exh. 40.

> Subsection 7: How does one determine whether the person made an expenditure with the intention of seeking or obtaining any governmental benefit or consideration from the *ballot question* by reason of the expenditure? Ballot questions do not provide benefit or consideration.

These observations are not meant to be flip. They are meant to illustrate the point that there is a fundamental distinction between ballot questions and candidate elections. Candidates can communicate needs to supposedly "independent" groups who might shade their message to curry favor. Ballot questions cannot arrange, coordinate, plan, direct, hire or confer governmental benefits. Nor do ballot questions have agents, officers, directors, employees, or political party committees. There is no focal point of influence surrounding a ballot question. There is for candidates. The application of every activity described in § 17-25-23 makes no sense in the context of ballot questions. Any attempt by a reader of ordinary intelligence to apply this section to ballot advocacy is apt to be incorrect, overbroad or contradictory. Such a haphazard standard is unacceptable where it impacts quintessential First Amendment activity such as ballot advocacy.

### B. The Board's Advisory Opinion Creates More Confusion

The Board has attempted to "fix" R.I.G.L. § 17-25-23 as it applies, or does not apply, to ballot questions. In 1995, the Board issued Advisory Opinion #95-01 ("1995 Opinion") in which it concluded that the Providence Chamber of Commerce, a non-profit corporation, would be in violation of the prohibition on "in concert" expenditures if it solicited its members for contributions to fund a campaign initiative with respect to a ballot question. In order to come to this conclusion, the Board "redrafted" the provisions of R.I.G.L. § 17-25-23 in an attempt to make them applicable to ballot questions. Shortly thereafter, the Board reversed field completely, revoked Advisory Opinion #95-01 and issued Advisory Opinion #96-01.

In 2004, the Board reversed field again, this time rescinding the 1996 Opinion and reinstating the 1995 Opinion it had previously rescinded. This history of inconsistent application by the very agency designated to enforce it demonstrates the inherent vagueness of R.I.G.L. §17-25-10(b)—at least as the Board attempts to apply it to ballot questions.

The entity responsible for its implementation has struggled for years to apply its standards to ballot question advocacy[7].

Be that as it may, at least as of now, the Board is back to Advisory Opinion #95-01 and the Board-created standards for "in concert" activity contained therein. In the process of rewriting the legislation, however, the Board has made contradictory and interpretational leaps which are not apparent from the language of the statute.

For example, there is textual confusion about whether collaboration or proscribed "in concert" activity must even be on the same side of the same ballot question. The second and third standards of the 1995 Opinion prohibit certain expenditures that are tied to aiding or defeating *"a ballot question."* The fourth and fifth standards of the 1995 Opinion prohibit certain expenditures tied to aiding or defeating the *"same"* ballot question. The sixth standard of the 1995 Opinion prohibits certain expenditures tied to advocating or defeating a ballot question *"on the same side as the person making the expenditure.*[8]*"* Thus, the Board uses unpredictable and inconsistent language when applying its newly created standards to ballot questions. There is no reason or logical explanation as to why one standard must be tied to advocating or

---

[7]The Board collective comments on this issue confirm this confusion. The Board Chairman has said, "The ambiguity of this issue is apparent" (Exh. 53), and that the statute was "ambiguous and impractical, resulting in a unenforceable law," (Exh. 64, Ans. No. 9). Back in 1996, the Board declared that the statute was ambiguous and in need of legislative clarification (Exhs. 53, 56).

[8]Noticeably absent from the Board's 1995 Opinion is an equivalent for the seventh standard listed in § 17-25-23 – yet another indication that ballot advocacy cannot be shoe-horned into the candidate standards of Section 23.

defeating a ballot question, while another standard requires advocating or defeating a ballot question on the same side as the person making the expenditure. (Such confusion does not exist in the statutory language precisely because those provisions are directed to candidates, not issues.)

The Board's interpretation as set forth in the opinion is also so broad as to render its prohibitions unclear to the ordinary reader. For example, the Opinion states that a person will be deemed acting "in concert" with another if: "(a) there is any arrangement, coordination, or direction with respect to the expenditure between the person making the expenditure and any other person" (Exh. 44). Read literally, this means that a person cannot spend money to purchase a newspaper ad or television spot because doing so necessarily involves coordination and direction with another person. The 1995 Opinion second standard precludes a person from making an expenditure "if the person making the expense will be receiving any form of compensation or reimbursement from any other person" (*Id.*). Read literally, this would mean that a person wishing to spend money on a ballot question could not do so if he received any form of employment compensation. (In the statute, the comparable provision makes sense. It prohibits individuals from receiving compensation or reimbursement from the "*candidate*." This limitation gives the provision meaning and purpose.)

The Board may argue that it has no intention of enforcing the Opinion in such a fashion. However, while the above-mentioned examples are reductions to the absurd, they are precisely what the 1995Advisory Opinion says. To the extent that the Board is arguing that the language of the 1995 Opinion cannot and should not be read literally, it simply reinforces the conclusion that ordinary citizens have no means of determining what is legal or illegal under the Board's Opinion.

## VI. THE 1995 OPINION AND SECTION 17-25-10(B) VIOLATE THE PLAINTIFFS' FIRST AMENDMENT RIGHTS

### A. The Strict Scrutiny Test

Section 17-25-10(b)'s prohibition of "in concert" activities, as applied to ballot question advocacy under the 1995 Opinion, violates RI ACLU's First Amendment rights. In assessing the constitutionality of a state statute claimed to be in violation of the First Amendment, it is necessary to determine whether the restriction burdens speech, and if so, whether the burden is justified by a compelling state interest. *Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc. ("MCFL"),* 479 U.S. 238, 252 (1986). It is the state's burden to demonstrate not only a compelling state interest, but also that the statute is narrowly drawn to meet that interest. *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995). *See, also, Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 31-32 (1st Cir. 1993).

### B. The Statute and Opinion Burden First Amendment Rights.

There is no doubt that the 1995 Opinion (and Section 10(b) as interpreted by the Board) places numerous substantial burdens on RI ACLU's speech, both substantive and procedural.

Under the 1995 Opinion, organizations such as RI ACLU are prohibited from seeking financial support from their members or soliciting contributions for the purpose of advocating on ballot questions. The 1995 Advisory Opinion declares all of the following to constitute "in concert" activity, which is declared unlawful by Section 10(b): coordinating or arranging expenditures with any other person; making expenditures on behalf of another person to advocate a ballot question; receiving compensation while intending to make an expenditure on a ballot question; communicating or counseling with others on needs related to ballot question advocacy; retaining professional services of any person who provides services to others advocating on the same ballot question; communicating or consulting with any other entity,

officer, director or employer intending to make expenditures advocating the same side of a ballot question; and making expenditures based upon information provided directly or indirectly by others making similar expenditures, provided that the other person is aware that he has made or is planning to make expenditures expressly to advocate or defeat the same side of a ballot question as the person making the expenditure (Exh. 44).

Read collectively, these standards compel the conclusion that any kind of collaborative campaigning on ballot questions—by individuals with like interests, by community groups, by businesses affected by a proposal, or by combinations of any of the above— is prohibited. Once one person or group consults with another about their plans or needs, about who is a good graphic designer, about the best way to communicate a political message or where to concentrate their efforts, a regulatory switch is flipped. These entities are acting "in concert." The regulatory restrictions and burdens kick in.

While the Board wants to sweep all such conduct into the category of prohibited "in concert" activity, the Supreme Court has a different name for it—core First Amendment activity. "… [T]he practice of persons sharing common views binding together to achieve a common end is deeply embedded in the American political process." Berkeley, 454 U.S. at 294. "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 460 (1958).

The United States Supreme Court made this the point most directly in *Berkeley*:

> To place a Spartan limit—or indeed any limit—on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association.

*Berkeley,* 454 U.S. at 296.

The First Circuit declared that the just quoted passage "enunciates three fundamental precepts":

> First, any law that burdens the rights of individuals to come together for political purposes is suspect and must be viewed warily. Second, burdens which fall exclusively on those who choose to exercise their right to band together, leaving individual speakers unbowed, merit heightened scrutiny. Third, measures which hinder group efforts to make independent initiatives are particularly vulnerable to constitutional attack.

*Vote Choice,* 4 F.3d at 34.

According to the 1995 Opinion, RI ACLU's only means of engaging in any of the constitutionally protected associative activities is through the establishment of a separate political action committee. This requires RI ACLU to make even more significant efforts in order to exercise its First Amendment rights, hence the procedural burdens. *MCFL*, 479 U.S. at 252.

Under the Rhode Island Campaign Contributions and Expenditures Reporting Act, political action committees are required to comply with the following statutory mandates:

- Prior to accepting any contributions or making any expenditures, RI ACLU must file a notice of formation of a political action committee with the Board of Elections. The notice shall contain: (a) name(s) of the question(s) the committee intends to advocate; (b) names and addresses of all officers of the committee; (c) mailing address of the committee; (d) goals and purposes of the political action committee; (e) and a statement indicating whether membership of the PAC is derived primarily from employees of one corporation or entity or from one business or professional group or association or labor union (R.I.G.L.§ 17-25-15);

- Appoint a Campaign Treasurer before receiving any contribution or expending any money for the purpose of advocating the approval or rejection of a ballot question (R.I.G.L.§ 17-25-8.1);

- Ensure that its Treasurer keeps accurate records (R.I.G.L. § 17-25-7);

- Ensure that its Treasurer makes a full report of all contributions received in excess of $100 from any one source within a calendar year (R.I.G.L. § 17-25-7);

- Ensure that the Treasurer's report contains the name, address, and place of employment of each person or source who contributes in excess of $100 and the amount contributed by each person or source (R.I.G.L § 17-25-7);

- Ensure that the Treasurer's reports are filed with the Board of Elections on the dates designated in R.I.G.L § 17-25-11 (R.I.G.L. § 17-25-7);

- Ensure that each report contains: the source and amount of all funds received by the committee in excess of $100 in the aggregate from a single source in a calendar year; the name and address of each person to whom expenditures were made and the amount and purpose of each expenditure (R.I.G.L § 17-25-15(c));

- Ensure that the Treasurer's report keeps an account of all contributions received and expenditures made (R.I.G.L § 17-25-11);

- Ensure that the Treasurer files a report on the 28th day following the election containing: a) the name, address, and place of employment of each person from whom contributions in excess of $100 were received; b) the amount contributed by each person; c) the name and address of each person to whom expenditures in excess of $100 were made; d) the amount and purpose of each expenditure (R.I.G.L § 17-25-11);

- Ensure that the Treasurer does not spend any anonymous contribution and returns any such contribution to the donor (R.I.G.L. § 17-25-10);

- Ensure that the Treasurer certifies the correctness of each report (R.I.G.L § 17-25-7);

- Ensure that reports filed pursuant to the Act include contributions received from cocktail parties, breakfasts, luncheons, dinners, dances, picnics or similar affairs (R.I.G.L § 17-25-7);

- Ensure that contributions to other political action committees or political party committees do not exceed $1,000 within a calendar year (R.I.G.L § 17-25-10.1(a)(1));

- Ensure that it does not make contributions to more than one political action committee, more than one political party committee, or to a combination of both which in the aggregate exceed $10,000 (R.I.G.L § 17-25-10.1(a)(1));

- Ensure that it does not receive a contribution or contributions which in the aggregate exceed $1,000 from any one person or political action committee (R.I.G.L § 17-25-10.1(a)(1));

- Ensure that no dependent child shall contribute an amount which, when added to contributions made by that child's parent, exceeds the $1,000 maximum to

a single political action committee or the $10,000 maximum to all political action committees within a calendar year (R.I.G.L § 17-25-10.1(f)(2));

- Ensure that it does not receive any contributions from corporations to or for the committee (R.I.G.L § 17-25-10.1(h)(1));
- Ensure that all voluntary contribution of funds are made by check or money order identifying the source of the funds (R.I.G.L § 17-25-10.1(h)(2));
- Ensure that all activity is terminated within thirty days (30) following the election (R.I.G.L § 17-25-15).

These regulations and statutory provisions place substantial burdens on RI ACLU's ability to engage in core political speech[9].

First, under the Board's interpretation, pursuant to R.I.G.L. § 17-25-15(a), the RI ACLU (or anyone it wishes to collaborate with on political issues) *must* file notice with the Board *prior to* accepting any contributions or making any expenditures. This pre-speech condition is a prior restraint on RI ACLU's right to speak. *See Talley v. California,* 362 U.S. 60, 64 (1960) ("There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression.").

Second, the Supreme Court has repeatedly found that compelled disclosure—which under the Board's 1995 Opinion would be required for ***any*** collaborative political activity involving any expenditure—in itself, seriously infringes on First Amendment rights. *See*

[9]At the most recent status conference, the Court asked the parties to address how the burdens imposed on individual entities, such as the RI ACLU, bore on the constitutionality of the challenged restrictions. This section of the RI ACLU's memorandum addresses that issue. *See, also MCFL,* 479 U.S. at 252-256; *Vote Choice v. DiStefano,* 814 F.Supp. 186, 191 (discussing characteristics of entity in *MCFL* that rendered statutory scheme unconstitutionally burdensome). To the extend the Court finds that the 1995 opinion or statute impose burdens on individual entities, such as the RI ACLU when engaging in constitutionally protected activity, it must strictly scrutinize these burdens and ensure that the restrictions are narrowly tailored to achieve a compelling state interest.

*Buckley v. Valeo*, 424 U.S. 64 (1981); *N.A.A.C.P. v. Button*, 371 U.S. 415 (1963); *Vote Choice, Inc. v. DiStefano*, 814 F. Supp. 195, 199 (D.R.I. 1993).

Third, detailed registration record-keeping and disclosure requirements, along with the duty to appoint a campaign treasurer, impose unnecessary and expensive administrative costs and burdens on the RI ACLU. *MCFL*, 479 U.S. at 255. For a multi-purpose, long-standing entity like the RI ACLU, these reporting and registration requirements pose particular concerns. It is difficult for the RI ACLU to track when and why particular contributions are made, when the statute's requirements kick in, how it could terminate its work 30 days after an election, etc.

Fourth, the restrictions on the sources and amount of money that the RI ACLU can spend during a campaign "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 18. The Board's interpretation that the RI ACLU asking its own members for money constitutes "in concert" activity vastly reduces the ready sources of funding for RI ACLU, which relies upon funds from its members and others to communicate its views. Moreover, RI ACLU is not free to use funds generated from its own members for the purpose of advocating a ballot question. *MCFL*, 479 U.S. at 252.

In short, R.I.G.L. § 17-25-10(b) makes engaging in protected speech a severely demanding task. *Id.* at 256. RI ACLU is forced to establish a political action committee if it wishes to advocate a ballot measure. While this does not remove all opportunities for speech, "the avenue it leaves open is more burdensome than the one it forecloses." *Id.* at 255.

### C. <u>**The Board Has Not Demonstrated A Compelling Interest Justifying The Severe Restrictions On Core First Amendment Activities**</u>

The Board will attempt to argue that there are governmental interests substantial enough to tip the balance in favor of the burdens it places on fundamental political expression.

The constitutionality of the Board's interpretation of § 17-25-10(b) and the 1995 Advisory Opinion "turns on whether it can survive the exacting scrutiny necessitated by a state-imposed restriction of freedom of speech. Especially where, as here, a prohibition is directed at speech itself, and the speech is intimately related to the process of governing, 'the State may prevail only upon showing a subordinating interest which is compelling.'" *Bellotti*, 435 U.S. at 786.

In this case the Board has asserted one and only one alleged compelling state interest—informational. The State claims that ballot measures are often confusing and that disclosing the identity of persons supporting or opposing a ballot question will enable voters to determine who stands to benefit from the legislation (Exh. 40, p. 4). Importantly, "the burden is on the government to show the existence of such an interest." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). *See, also, California Pro Life Council, Inc. v. Gertman*, 328 F.3d 1088, 1104 (9th Cir. 1003) (holding informational interest could justify disclosure requirements, but remanding for assessment and proof of compelling interest). On this point, the Board falls well short of the mark.

Whether the Board's "informational" purpose is compelling is, itself, subject to challenge as a legal matter and should be approached gingerly by this Court. History reveals that state arguments for a compelling state interest come up empty when attempting to restrict expenditures and contributions involving ballot measure advocacy. *See Bellotti*, 435 U.S. 765 (1978); *Montana Chamber of Commerce v. Argenbright*, 28 F. Supp. 2d 593 (D. Mont. 1998) ("Montana has no compelling state interest which would justify the abridgment of First Amendment rights imposed by Initiative 1251"); *C&C Plywood Corp. v. Hanson*, 420 F. Supp. 1254 (D. Mont. 1976); *Pacific Gas and Elec. Co. v. City of Berkeley*, 131 Cal. Rptr. 350 (1976). In *Bellotti*, the Supreme Court noted that the State could not show the requisite compelling interest in regulating corporate speech, noting that "the risk of corruption perceived in cases

*Bellotti*, 435 U.S. at 792, n. 32, the Court most recently described the comments from *Bellotti* as "dicta" that derived from a comment in *Buckley* applicable to candidate elections. *McIntyre*, 514 U.S. at 353-4

Factually, the Board cannot demonstrate a compelling interest. The evil that Rhode Island wishes to prevent is merely hypothetical. The record, such as it is, shows no evidence of misleading or insufficient evidence. In fact, it shows just the opposite.

The Board was asked, via interrogatory, if it contended that voters did not have adequate information to assess how to vote on any particular referenda since 1994 and, if so, to identify facts respecting that contention. Its answer:

> The Board is without sufficient information to assess whether voters did not have adequate information with respect to any particular referenda question since 1994 as it has not conducted any studies or investigations of this issue...

(Exh. 64, Ans. No. 3). The Board was also asked to supply any facts to support the contention that voters had inadequate or misleading information with respect to the *identity* of persons or entities supporting or opposing ballot questions. It responded again that it had no such information (Exh. 64, Ans. No. 4).

The Board did produce historical records respecting ballot advocacy from its files. Those records contain repeated examples of organizations *voluntarily* disclosing the entities with which they were collaborating, to the Board, on their websites and in their literature (Exhs. 1, 13, 14, 35, 25, 27). This is not surprising. Documenting for the public that other influential persons or groups support a position adds to the speaker's message. Withholding such information in the face of demands from the public for such disclosure risks detracting or distracting from the message.

involving candidate elections, (citations omitted), simply is not present in a popular vote on a public issue." *Bellotti*, 435 U.S. at 790. The Court would strengthen its stance in *Berkeley*, when it declared that "[w]hatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Berkeley*, 454 U.S. at 299. The Supreme Court has noted that the "people are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments." *Bellotti*, 435 U.S. at 791. This is especially important when citizens participate in a referendum, when there is an increased need for "the widest possible dissemination of information from diverse and antagonistic sources." *Bellotti*, 435 U.S. at 792 n.29, citing *New York Times v. Sullivan*, 376 U.S. 254, 266 (1964). In this regard, the First Amendment rejects the "highly paternalistic" approach of statutes like § 17-25-10(b) which restrict what citizens may hear. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976).

More recently, the Supreme Court examined an Ohio statute in *McIntyre v. Ohio Elections Comm'n* which prohibited the distribution of anonymous campaign literature. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995). In finding that the statute violated the First Amendment, the Court held that the law rested on "less powerful state interests" and found that "Ohio's informational interest is plainly insufficient to support the constitutionality of its disclosure requirement." *Id.* at 356. The Court also held that the statute was not narrowly drawn because Ohio's regulations extended to referenda and other issue-based ballot measures. *McIntyre*, 514 U.S. 334 (1995). Unlike the risk of *quid pro quo* corruption in candidate elections, the simple interest in providing additional information adds little, if anything, to the reader's ability to evaluate speech with respect to a ballot measure. *Id.* at 356. While the Court has intimated that disclosure rules might pass constitutional scrutiny, *Berkeley,* 454 U.S. at 298;

In all of the records produced by the Board, there was only one instance where a question was raised as to who was behind a particular group supporting a ballot question. In 1996, a group called "RIte Track" supported a ballot question seeking funding for development of Quonset Point. Operation Clean Government raised questions about who was behind the group. Immediately, the group voluntarily disclosed the identity of its contributors. In fact, it issued a press release on the subject (Exh. 13, 14, 35).

The reason RIte Track did so is patent—and fatal to any claim that there is a compelling state interest in compelled disclosure in this context. RIte Track clearly determined that keeping information about its contributors private in the face of a charge of impropriety could detract from its political message. But having RIte Track decide *on its own* to identify its contributors is a far cry indeed, constitutionally, from the government compelling that disclosure as the price of exercising speech.

There may be all sorts of reasons why a group may want to disclose its backers—to bolster the appeal of its message, to signal political power through wide spread support, and even to deflect claims that the arguments presented are biased. Equally important, there may be circumstances where entities *do not* want to disclose their backers. Ballot questions on race, abortion, gay marriage and religion spring readily to mind as issues where individuals may not welcome compelled disclosure of their political views.

For its part, the RI ACLU has contributors who, for a variety of reasons, prefer to remain anonymous (Exh. 62, Ans. No. 29). And it undertakes efforts to preserve their anonymity (Exh. 5). Anonymous speech on political issues has historically been afforded constitutional protection. *McIntyre*, 514 U.S. at 341; *Talley*, 362 U.S. at 64.

The bottom line is this—the information the Board seeks to compel through burdensome recordkeeping, organizational and registration requirements is already being

provided as a natural consequence of public debate. The Board fails to demonstrate any incidence or prevalence of misleading or inadequate information with respect to referenda questions, or attempts by persons or entities to avoid disclosure or deceive voters regarding the identity of parties supporting or opposing referenda (Exh. 64, Ans. Nos. 3, 4,5, 6, 10) (failing to allege any instances, incidents or prevalence of misleading or incomplete information on ballot referenda). Overall, there has been no showing that "hidden" or "secret" contributions pose any threat whatsoever of voter confusion. *See Bellotti*, 435 U.S. at 789. As a result, the Board has demonstrated no compelling interest which would justify the broad abridgment of First Amendment rights imposed under its interpretation of R.I.G.L. § 17-25-10(b). *Argenbright*, 28 F. Supp. 2d at 599.

### D. The Restrictions on RI ACLU's First Amendment Rights Are Not Narrowly Tailored

Should the Court determine that the Board has carried its burden that a compelling "informational" need exists, the Board must still satisfy the Court that it has not imposed limitations on protected activities broader than is necessary to serve that interest. It must avoid infringing on speech that does not pose the danger that has prompted the regulation. *MCFL,* 479 U.S. at 265. The starting point for the analysis is the compelling interest to be served—providing information to the voters about who is actually supporting ballot questions. Do the restrictions support that goal in the least restrictive way?

The 1995 Opinion and R.I.G.L. § 17-25-10(b) as interpreted burden speech which poses no danger of misinformation and, in fact, is valuable and deserving of the utmost protection. Procedurally, the PAC registration, reporting, record-keeping, and disclosure requirements, originally designed for candidate election, impose more and broader restrictions than are necessary in the ballot advocacy context.

First and most importantly, the 1995 Advisory Opinion precludes all kinds of informal political collaboration which takes place constantly and is the life-blood of local politics. Public interest and community organizations like the RI ACLU and the Family Life Center should be allowed, indeed encouraged, to collaborate on political issues, including important public issues put to the voters in the form of ballot questions. They should be allowed to band together when their interests align and to share tactics and information. They should be allowed to agree to support each other on some issues and fight each other on other issues. They should be encouraged and aided in efforts to effectively and efficiently communicate their message to the public.

They should not be forced to form a PAC and file a notice of formation before they do so. They should not be forced to pool their resources in a common bank account as a precondition to collaborating politically. But that is precisely what the 1995 Opinion requires—a forced and formal political association, complete with formal state registration and a shotgun financial wedding. *See, California Democratic Party v. Jones*, 530 U.S. 567, 581-582 (2000) (prohibiting "forced association" compelled by statute opening Democratic primary to non-party members).

The 1995 Opinion's discussion of what constitutes "in concert" activity is co-terminus with all associative political activity. If the ACLU spends money after consulting with other public interest groups about strategy,[10] it is acting "in concert" and *must* form a PAC or be subject to criminal sanction.

The voter's theoretical need for information cannot support so broad an assault on collective political action. If persons or groups coordinate their tactics and message, the voters

---

[10]The 1995 Opinion prohibits sharing "plans, projects or needs," para. (f); or "arrangements, coordinations or directions with respect to an expenditure, para. (a) (Exh. 44).

will know that by the similar substance of the message. Moreover, there are valid and important reasons why entities might wish to share tactics and plans, or coordinate on a particular issue, but not wish to form a PAC. It may be that certain persons or groups agree on a particular issue, but otherwise are on opposite ends of the political spectrum. It may be that the two groups are vying for leadership or publicity on a particular issue. It may be that persons or groups agree on the overall goal of passage of a particular question but disagree on strategy or message. Such groups should be allowed to discuss their "plans" and "needs" without being forced to form a PAC to do so.

In sum, the language of Advisory Opinion 95-01 is far more broad and encompassing than is justified by "informational" needs of voters. The reason is simple. Its provisions are modeled after R.I.G.L. § 17-25-23, which was drafted broadly to prevent fraud and corruption in candidate elections. Ballot questions deal with *issues*, not candidates. Diverse groups can share interests in issues and even work together without threat to democracy.

Second, the 1995 Opinion applies across the board to any and all persons, entities, corporations or groups. It applies, then, even to entities with well-defined public persona and long public histories—entities about which the voters have a great deal of understanding. The RI ACLU is a case in point. So, too, is the Greater Providence Chamber of Commerce. Looking to the documents produced by the Board other such entities include the North Kingstown Chamber of Commerce, Common Cause, NEA RI (National Education Association RI), Working RI, the Town of Johnston, the University of Rhode Island Foundation, the Smithfield Charter Review Commission. These entities in and of themselves convey all of the information voters need to assess the message they convey. When the RI ACLU runs an ad in favor of a ballot measure, the voters understand the source of that ad. There is no real informational value to know also that John Smith and Mary Q. Public, individual members of RI ACLU, contributed to the RI ACLU

to help fund that ad. Nonetheless, if the RI ACLU or any of these entities wish to seek funding from their members or constituents, they must register as PACs under the Board's current interpretation of the Act.

Third, the net cast by § 17-25-10(b) is too wide and "arguably catches tens of thousands of little fish," including individuals, small businesses and corporations who have banded together to enhance their political speech. *Argenbright*, 28 F. Supp. 2d at 599. If the critical purpose of the statute is to provide information to the public, it has the perverse effect of preventing the very goals it seeks to implement, as the restrictions imposed by § 17-25-10(b) could prohibit smaller organizations from rendering their messages effectively or indeed getting their message out at all. *Berkeley*, 454 U.S. at 294 ("Its value is that by collective effort individuals can make their views known, when, individually, their voices would be faint or lost.").

Fourth, as set forth above, R.I.G.L. 17-25-15 (f) requires groups engaged in broadly-defined "in concert" activity to register with the state *before* accepting any contributions or making any expenditures. Such prior restraints imposed as a pre-condition to speech are constitutionally flawed. No compelling interest warrants muting speech on ballot questions in such a way. Later disclosure would suffice.

Fifth, the procedural conditions imposed on the RI ACLU and others similarly situated when they choose to act "in concert" represent overbroad burdens on the exercise of First Amendment rights. Once deemed to be acting "in concert," the RI ACLU would be subject to the registration, reporting, organizational and recordkeeping requirements of a PAC, geared towards and designed in accordance with the demands of candidate elections . The statute does *not* require just the disclosure of contributors. The details are set forth, *supra,* at page 32-33. It requires, among many other things: (1) disclosure of the names and addresses of officers,

updated as they change; (2) the appointment of a campaign treasurer; (3) disclosure of the name, address and place of employment of each person who contributes over $100; (4) an accounting of all contributions received, no matter how small; (5) dissolution of the PAC within 30 days after the election; and (6) maintenance of all records and supporting documentation for four years.

While the four year record retention requirement might make sense for candidate elections where there is a threat of fraud or corruption, it is excessive if disclosure *before* the vote is the compelling interest. The same is true for disclosure of officers, addresses and places of employment for all contributors or the appointment of a separate campaign treasurer.

Likewise, for a long-standing, issue-driven entity like the RI ACLU, the dissolution requirement is burdensome, confusing and unnecessary. The vote has occurred. There is no threat of continuing corruption or influence. On the other hand, just when the RI ACLU finishes with an "issue" is not cut and dry. For example, the RI ACLU has steadfastly advocated for right to vote issues for many years. That advocacy will not end when the vote is over on the particular 2006 referendum. Under the Board's interpretation, however, the "PAC" must terminate within 30 days.

This same problem is of even greater concern prospectively. Again using the Right to Vote Campaign as an example, the RI ACLU and others were working collaboratively on the expansion of voting rights for felons before the legislature approved the ballot question. Must the RI ACLU and those with whom it lobbied the State House for passage of the bill authorizing the referenda immediately cease all activity on the issue when the bill passes? Is a joint press conference to discuss next steps, including possible plans for raising and expending funds, "in concert" activity? When must the RI ACLU form a PAC to continue doing that which is was doing all along? The answer is difficult and confusing.

Sixth, reporting "contributors" to its ballot question activities is not a simple task for the RI ACLU, an entity which is involved in, and publicizes, numerous issues all of the time. The RI ACLU has taken positions in its newsletters on ballot issues and solicited contributions in those same newsletters. Are whatever contributions the RI ACLU receives after that attributable to the ballot question comments or to any of the other myriad of issues discussed in its newsletters? How is the RI ACLU to render that determination? Must it segregate its speech and reconfigure how it writes newsletters and how it fundraises? Must it ask its contributors what motivated their contribution?

The key point here is that all of these questions are prompted by the Board's claim that there is some compelling interest in requiring disclosure to the voters that the RI ACLU *and* some of its supporters agree on a ballot question. Of course they do. The burdens placed in the RI ACLU far outstrip any informational benefit. They are unnecessary to inform voters.

As demonstrated throughout this brief, the 1995 Opinion and § 17-25-10(b) as interpreted by the Board are not narrow or specific in their application, but rather open-ended, overly broad, and unduly burdensome. As a result, the 1995 Opinion and the Board's interpretation of the statute prevent persons from supporting or opposing a referendum even when there is no demonstrated state interest which warrants its enforcement. "[A] restriction so destructive of the right of public discussion [as § 17-25-10(b)], without greater or more imminent danger to the public interest" is incompatible with the freedoms secured by the First Amendment. *Bellotti,* at 435 U.S. at 792.

## VII. THE OFFICIAL POSITIONS OF THE BOARD REQUIRE COURT INTERVENTION

The Board has intimated that it does not intend to enforce its 1995 Advisory Opinion or the statute according to their terms. In turn, the Board argues that the Opinion and statute are not unconstitutional as they intend to enforce them. It is a unique position. The RI ACLU remains unsure of its exact parameters. The Board's recent litigation position stands in contrast to its just recently reconsidered and readopted 1995 Opinion, its Campaign Manual (Exh. 60), its positions as revealed in its own documents, and its Answer in this case. The RI ACLU will respond to this argument in this memorandum as best it can. For lack of a better rubric under which to analyze this argument until it is spelled out more clearly, RI ACLU will address the issue as a standing argument — i.e., lack of a threat of enforcement.

"It is well settled that the traditional principles of standing are relaxed in the context of a pre-enforcement challenge to a statute that facially abridges either the First Amendment or Fourteenth Amendment and provides for criminal penalties." *Dupres v. City of Newport*, 978 F. Supp. 429, 432 (D.R.I. 1997). Moreover, a conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law demonstrates a "classic case or controversy within the meaning of Article III." *Diamond v. Charles*, 476 U.S. 54, 64 (1986).

In order to establish standing, RIACLU must show that the Board's conduct has subjected RIACLU to an actual or threatened injury. *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982). In this regard, it is enough for the party to demonstrate that (1) he or she intends to engage in a specific course of conduct; (2) the conduct is arguably affected with a constitutional interest; (3) the conduct is proscribed by the statute; and (4) a credible threat of prosecution exists. *Babbit v. United Farm*

*Workers Nat'l Union*, 442 U.S. 289, 298 (1979). The current state of affairs demonstrates that RIACLU has the requisite standing to maintain its cause of action.

It is clear that RIACLU has engaged in and intends to engage in proscribed speech. It is a corporation. It has made contributions and desires to make contributions over the limits set forth in the statute and the Board's manual. It has and intends to work collaboratively with like-minded groups and persons on ballot questions to consult on "plans, projects, or needs" and coordinate with those groups to effectively present its political messages..

It is also clear that the RI ACLU's activities are proscribed under R.I.G.L. § 17-25-1 *et. seq.*, as interpreted by the Board by the 1995 Opinion, and the Board's administrative rules. The statute prohibits corporations from making contributions on behalf of or in opposition to any ballot question. *See* §§ 17-25-10.1(h) & (j). That prohibition is reiterated in the Board's manual (Exh. 60, p. 8). Documents produced by the Board demonstrate that the Board has told interested parties that corporations cannot make contributions (Exh. 37). The Board denied that this provision is unconstitutional in its answer to this lawsuit (Complaint and Answer, ¶¶ 44-47).

The statute also limits the amount of money a person can contribute to advocate for or against ballot questions. *See* § 17-25-10.1(a). This means that all funds in excess of $1,000 that RI ACLU has earmarked to support the 2006 ballot question are prohibited under the statute, as is the intended $30,000 contribution from the National Right to Vote Campaign. Again, the Board's manual—posted on line even as this brief is being written — reaffirms those limitations (Exh. 60, pp. 19-20). The Board denied that this provision was unconstitutional in its answer to this lawsuit (Complaint and Answer, ¶¶ 49-52).

Additionally, § 17-25-10(b) prohibits persons from making expenditures when "acting in concert with any other person or group." The Board of Elections has only recently re-adopted its 1995 Advisory Opinion interpreting that language. It did so over the objection of the

RI ACLU and the Greater Providence Chamber of Commerce that the language was overbroad and impermissibly burdened constitutionally protected activity. It did so without modification or revision. Since then, it has written to organizations demanding they register before making any expenditures or accepting donations and requiring that they wrap up their affairs within 30 days after a referendum (Exh. 16, 17).

Finally, a plaintiff who mounts a pre-enforcement challenge to a statute which violates the First Amendment need not show that the authorities have actually threatened to prosecute him. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). "The threat is latent in the existence of the statute." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003). Unique to the First Amendment context, an actual injury can exist when the plaintiff is chilled from exercising the right to free expression or forgoes expression in order to avoid enforcement consequences. *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13-14 (1st Cir. 1996). "In such situations, the vice of the statute is its pull toward self-censorship." *Id.*

No matter what cautious phrasing is used by the Board to suggest that it will apply the statute only in a constitutional manner, it is a far cry from a flat commitment not to prosecute in this particular instance. *Rhode Island Board of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 35 (1st Cir. 1999). As long as the 1995 Opinion, the Manual and the statute arguably prohibits and/or burdens RI ACLU's speech activities, it deters constitutionally protected expression and promotes self-censorship. *Majors v. Abell*, 317 F.3d at 721. The chilling effect of the statute and 1995 Opinion is demonstrated through the hesitancy of the National Right to Vote Campaign to contribute $30,000 earmarked for RI ACLU's coalition.

However, the threat exists not only in the statute's chilling potential, but also as a real threat of enforcement. This statute is "aimed directly" at entities like RI ACLU which would

have to significantly change its structure, financing and fund-raising techniques, and restrict its exercise of political speech or risk criminal prosecution. Demonstrating this reality, the Board wrote to RI ACLU regarding its expenditures on a November 2004 ballot question and quoted the "in concert" provisions of the statute. Furthermore, the threat of future prosecution becomes quite real when one considers that there is ample reason for concluding that RI ACLU's proposed activities would violate the statute as interpreted by the Board. Its activities fall squarely within the statutory prohibition on corporate contributions, contribution limitations and the 1995 Opinion prohibition on coordinating, directing and arranging expenditures with respect to ballot questions, even with one's own members.

Once again, the Board has not stated that it will not enforce the statute or 1995 Opinion. As a matter of fact, the Board refuses to take the position that the statute is unconstitutional, increasing the likelihood and potential for future enforcement. As a result, RIACLU is injured by the very fact that the 1995 Opinion and statute chills its First Amendment speech and the speech of those with whom it seeks to ally itself. Both present a real threat to future enforcement.

## VIII. CONCLUSION

For all of the reasons set forth above, this Court should enter judgment in favor of RI ACLU as set forth in the Complaint's Prayer for Relief.

RHODE ISLAND AFFILIATE
AMERICAN CIVIL LIBERTIES UNION,
INC. AND STEVEN BROWN,
INDIVIDUALLY AND IN HIS
CAPACITY AS EXECUTIVE DIRECTOR
OF RHODE ISLAND AFFILIATE,
AMERICAN CIVIL LIBERTIES UNION,
INC.,

By Their Attorneys,

PARTRIDGE SNOW & HAHN LLP

Howard A. Merten (#3171)
Michael W. Sweeney (#7160)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: October 31, 2005

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFFS RHODE ISLAND AFFILIATE, AMERICAN CIVIL LIBERTIES UNION AND STEVEN BROWN'S TRIAL MEMORANDUM was mailed, postage prepaid, on this 31st day of October, 2005 to:

Raymond A. Marcaccio, Esq.
Christine M. Curley, Esq.
Oliverio & Marcaccio, LLP
55 Dorrance Street, Suite 400
Providence, RI 02903

James Ryan, Esq.
Partridge Snow & Hahn LLP.
180 South Main Street
Providence, RI 02903