# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND AFFILIATE AMERICAN CIVIL LIBERTIES UNION, INC., ET AL.
Plaintiffs

v.

ROGER N. BEGIN, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE RHODE ISLAND BOARD OF ELECTIONS, ET AL.
Defendants

GREATER PROVIDENCE CHAMBER OF COMMERCE,
Intervenor

C.A. No. 04-487/T

## PLAINTIFFS RHODE ISLAND AFFILIATE, AMERICAN CIVIL LIBERTIES UNION AND STEVEN BROWN'S STATEMENT OF FACTS IN SUPPORT OF TRIAL MEMORANDUM

RHODE ISLAND AFFILIATE AMERICAN CIVIL LIBERTIES UNION, INC. AND STEVEN BROWN, INDIVIDUALLY AND IN HIS CAPACITY AS EXECUTIVE DIRECTOR OF RHODE ISLAND AFFILIATE, AMERICAN CIVIL LIBERTIES UNION, INC.,

By Their Attorneys,

PARTRIDGE SNOW & HAHN LLP

Howard A. Merten (#3171)
Michael W. Sweeney (#7160)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: October 28, 2005

**a. <u>The Rhode Island Affiliate, American Civil Liberties Union.</u>**

1. Plaintiff Rhode Island Affiliate, American Civil Liberties Union, Inc. ("RI ACLU"), is a non-profit corporation organized under Rhode Island law. (Exhs.3, 4).

2. Its principal activity is the protection and promotion of constitutional and statutory rights of individual citizens of the State of Rhode Island (Exhs.3, 4. See also, Exhs. 5-8).

3. Plaintiff, Steven Brown ("Mr. Brown") is Executive Director of the RI ACLU and is a member of the RI ACLU.

4. The RI ACLU engages in a variety of educational, public advocacy, media relations and litigation initiatives to promote its goals (Exhs. 62, Ans. No. 11; Exhs. 5-8).

5. For many years, the RI ACLU has engaged in continuing efforts on a number of recurring issues, including such things as voting rights, discrimination, open records and meetings, freedom of speech, privacy, freedom of religion and access to courts (Exh. 5).

6. The RI ACLU's efforts with respect to these issues can involve any number of different activities, from lobbying legislators and public officials, to educational efforts via press releases and legislative testimony, to engaging in election advocacy on particular ballot issues (Exhs. 5-8).

7. While nominally a corporation, the RI ACLU is predominantly a membership organization (Exhs. 3-4). The majority of the RI ACLU's funding comes from the National RI ACLU, which in turn receives its funding through membership dues, which RI ACLU helps solicit (Exh. 62, Ans. Nos. 9,14; Exhs. 3, 4).

8. The other major source of funding for the RI ACLU is the advertising book that the RI ACLU publishes in connection with its Annual Dinner in November of each year.

Members and supporters buy advertising in the book. The book generally contains submissions from more than 200 advertisers (Exhs. 7, 9).

9. Advertisers include members and non-members, individuals, businesses, corporations, associations, labor unions, political figures, and ad hoc groups of individuals (Exh. 9). The RI ACLU does not check or keep records on which advertisers are members or non-members, corporations or non-corporations, or what motivated the particular advertiser to make their contribution (Exh. 62, Ans. Nos. 9, 14).

10. One of the ways that the RI ACLU solicits contributions for the advertisements is through its newsletter. The newsletter regularly recounts many of the various activities engaged in by the RI ACLU, including ballot question activities (Exhs. 6, 7).

11. The solicitation for contributions most often coincides with or immediately precedes election time as the RI ACLU's annual dinner is held in November. Accordingly, requests for contributions have coincided with newsletter references to the RI ACLU's position on various ballot questions (Exhs. 6, 7; Exh. 62, Ans. No. 14).

12. At present, it would be impossible for the RI ACLU to determine whether a particular contribution or membership came to the RI ACLU by virtue of the RI ACLU advocating for or against a ballot question. On occasions in the past, ballot issues have been a particular focus of the RI ACLU and those who share its goals. At other times, ballot question activity has been a part of the work of the organization but not a focal point of its efforts (Exh. 62, Ans. No. 14).

13. The RI ACLU is a multi-purpose organization. It and its membership respond to (and contribute or expend funds on) civil liberty issues as they arise (Exh. 62, Ans. No. 11).

14. The RI ACLU has received in the past and anticipates receiving in the future anonymous contributions from persons or entities that support its work but for any number of reasons do not wish to have that support known or publicized. Some of those who do not contribute anonymously to the RI ACLU would have their willingness to contribute chilled by disclosure of their names through PAC filings (Exh. 62, Ans. No. 11). The RI ACLU undertakes efforts to preserve the anonymity of its members and tells its members just that (Exh. 5, p. 5).

**b. Citizens for Representative Government.**

15. Prior to and leading up to the 2004 election, the RI ACLU worked with a number of different organizations to press for the rejection of a Constitutional Convention for the State of Rhode Island (Exhs. 1, 2, 6).

16. As part of that process, the RI ACLU informed its various members of its efforts and also urged them all to vote against the referendum. That was done, in part, via the newsletter which RI ACLU regularly sends to its members (Exh. 6).

17. Mr. Brown also discussed these issues when meeting with members and potential members (Exh. 62, Ans. No. 5).

18. The RI ACLU also distributed a separate flyer outlining why its members and supporters should vote against Question 2 (Exh. 21).

19. The RI ACLU's opposition to this Ballot Question was discussed in its regular September/October newsletter in the weeks leading up to the November 2004 election (Exh. 6, pp. 1, 6). Requests for donations were also made in the same September/October issue that mentioned the ballot question (Exh. 6, p. 10).

20. The RI ACLU also joined together with other like-minded community groups in an organized effort, Citizens for Representative Government, to defeat the Constitutional Convention ballot question. The RI ACLU issued a press release describing its efforts and its

role in the coalition for a press conference at which many of the coalition members were present. The RI ACLU identified the members of the coalition in its initial press release (Exhs. 1, 2).

21. In the flyer sent to its own members, the RI ACLU identified other members of the Citizens for Representative Government coalition that opposed a Constitutional Convention (Exh. 21).

22. The RI ACLU contributed $2,500 to Citizens for Representative Government (Exh. 27).

23. The Citizens for Representative Government coalition disclosed its contributors on its literature (Exh. 27). The participants were identified in press releases (Exh. 1). And the group voluntarily filed disclosures with the Board of Elections on November 4, 2004 identifying its contributors and expenditures (Exh. 27).

24. Operation Clean Government filed a complaint with the Board against the RI ACLU and other members of the Citizens for Represntative Government coalition (Exh. 61). The Board agreed not to take any action on the complaint pending resolution of this lawsuit (Exh. 21).

**c. The Rhode Island Voting Rights Campaign.**

25. Presently, the RI ACLU is engaged in efforts to promote passage of a 2006 ballot question aimed at restoring voting rights to felons upon their release from incarceration. Rhode Island is the only state in New England where felons are not allowed to vote during the duration of their probation or parole. The RI ACLU and the National ACLU have long been involved in efforts to protect the right to vote. This ballot question was approved for inclusion on the November 2006 ballot during the most recent Rhode Island legislative session (Exh. 63, Ans. No. 4; Exhs. 10, 11).

26. The RI ACLU participated in a coalition with various other organizations to bring this issue to public attention and to work for passage of the legislation this past year. That coalition was coordinated by the Rhode Island Family Life Center, a non-profit corporation whose purpose is to support and advocate for the reintegration of ex-offenders into the community (Exh. 63, Ans. No. 4; Exhs. 10, 11).

27. The RI ACLU is already involved in ongoing efforts to begin to organize and recruit a broad-based coalition to support this ballot question. It has had discussions with the National Right to Vote Coalition and the Rhode Island Family Life Center with respect to beginning the coordination efforts, fundraising, and mapping out strategies to move forward (Exh. 63, Ans. No. 4).

28. The RI ACLU has voted to contribute $1,500 to the Right to Vote campaign in Rhode Island to assist in organizational efforts and the campaign itself. In light of the present state of the campaign finance laws, the RI ACLU's Board has felt obliged to hold off donating any money to any other organization for fear of prompting further complaints (Exhs. 61, 63, Ans. No. 4).

29. The National Right to Vote Campaign stands ready to contribute Thirty Thousand Dollars ($30,000) to the effort in Rhode Island. It has expressed concerns about contributing such sums, and who would or could be a proper recipient of those funds, in light of the Rhode Island Campaign Finance statutes and Board opinions interpreting them (Exhs. 61, 63, Ans. No. 4).

30. All interested parties believe that work on the 2006 referendum must proceed immediately. A website is already up and running. Organizational and educational efforts have begun. The website lists participating organizations. Plans drawn up by the Family Life Center

had anticipated that a Campaign Director would be hired by September 1, 2005. Interns should have already been hired, support committees formed on local college campuses and polling was scheduled for November 2005 (Exhs. 10, 11).

31. Given the nature of the ballot question – restoring voting rights to convicted felons–the RI ACLU and its coalition members believe it is critical to begin educational efforts in intimate settings over a long period of time (Exh. 10). (See also Exh. 63, Ans. No. 4).

32. Initial organization activities have been held up, in part due to funding confusion brought on by the State of Rhode Island's campaign finance rules. All entities involved are convinced that immediate, substantial and continuous voter education is essential for this ballot question to pass. All involved are concerned that they will lose out on valuable time necessary to educate the public and lose out on potential funding (already earmarked for them or otherwise) if the issues raised in this lawsuit are not resolved expeditiously (Exh. 63, Ans. No. 4).

**d. The Rhode Island Campaign Contributions And Expenditures Report Act.**

33. In 1974, Rhode Island adopted the Rhode Island Campaign Contributions and Expenditures Reporting Act. R.I.G.L. § 17-25-1, *et seq.* The General Assembly has amended the statute numerous times since then, including in 1981, 19894, 1988, 1992, 1994 and 2001. The statute contains criminal penalties of a fine of up to One Thousand Dollars ($1,000) for a willful and knowing violation of the Act. R.I.G.L. § 17-25-13.

34. The Rhode Island ACLU has participated in hearings before the Board and in one federal court constitutional challenge to the Act which resulted in several of its provisions being ruled unconstitutional. *See*, *Vote Choice v. DiStefano*, 814 F. Supp. 186 (D.R.I. 1992). (*See also*, Exhs. 47, 57, 58).

**i. Prohibition Of Corporate Contributions**

35. R.I.G.L. § 17-25-10.1(h) and (j) impose a prohibition on corporate contributions directed to supporting or opposing ballot questions. Subsection (h)(1) states:

> "It shall be unlawful for any corporation, whether profit or non-profit, … to make any campaign contribution or expenditure …"

Subsection (j) prohibits anyone other than an individual, a political action committee, political party committee or candidate committee to make any contribution or expenditure on behalf of or in opposition to any candidate or ballot question.

36. In 1992, the RI ACLU and others successfully challenged the statute's prohibition on corporate expenditures. *Vote Choice*, 814 F. Supp. 186 (D.R.I. 1992). In that case, this Court (Pettine, J.), relying on *First National Bank v. Bellotti* ("*Bellotti*"), 435 U.S. 765 (1978), held that bans on corporate expenditures were unconstitutional. The RI ACLU complaint in *Vote Choice* did not include a claim that it intended to make contributions.

37. In response to the *Vote Choice* decision, the Board revised its regulations. The Board distinguished between corporate contributions and expenditures. It eliminated the provision prohibiting corporate expenditures, but did not make any changes respecting corporate contributions (Exhs. 54, 55, 59).

38. The Board of Elections Regulation, § 8(B)(4) states that it is illegal for any "business entity" to make contributions to support or defeat ballot questions. "A contribution made by any 'business entity' as defined in R.I.G.L. 17-25-3(1) on April 29, 1992 or thereafter is strictly prohibited." The definition of business entity includes profit and non-profit corporations (Exh. 60, p. 18) .

39. In an internal memorandum, Board staffers noted that they have advised callers that corporations are prohibited from making contributions, though they can spend their own money (Exh. 37).

40. In this action, the Board has denied the allegation that corporate contribution limitations are unconstitutional as regards ballot questions (Complaint and Answer, ¶¶ 44-47).

41. The RI ACLU, a non-profit corporation, has in the past and intends in the future to make contributions to support and defeat ballot questions. As set forth above, in 2004, it contributed $2,500 to Citizens for Representative Government (Exh. 27; Exh. 62, Ans. No. 6). It has earmarked $1,500 to the 2006 Right to Vote ballot question (Exh. 63, Ans. No. 4).

42. The RI ACLU also wishes to solicit contributions from corporations to support its own efforts and to support the efforts of coalitions of like-minded community groups on ballot questions raising issues of mutual interest (Exh. 63, Ans. Nos. 4 and 26).

**ii. Contribution Limitations**

43. R.I.G.L. § 17-25-10.1(a) states:

> No person … nor any political action committee shall make a contribution or contributions to any candidate … or any political action committee … which in the aggregate exceeds one thousand dollars ($1,000) within a calendar year.

Subsection (a) also limits the amount that an individual can contribute in total in any given year to any and all candidates or political action committees to $10,000 per year, $25,000 per year for PAC's.

44. The Board's manual, § 8(E)(1), presently recites these contribution limitations (Exh. 60, pp 19-20).

45. Board Advisory Opinions state that any entity acting "in concert" with another is subject to the contribution limitations in the Act (Exh. 12).

46. In 2004, RI ACLU contributed $2,500 to help defeat the Constitutional Convention question (Exh. 27).

47. RI ACLU has earmarked a contribution of $1,500 for the Right to Vote Campaign in 2006 (Exh. 63, Ans. No. 4).

48. As part of its efforts, and to support the coalition of which RI ACLU is a part, the National Right to Vote Coalition has agreed to contribute $30,000 to the Rhode Island Right to Vote campaign, but has held up on making the contribution based on the present statutory language and Board interpretations (Exh. 63, Ans. No. 4).

**iii. The History of Section 10(b)**

49. R.I.G.L. § 17-25-10(b) states:

> It shall be lawful for any *person* not otherwise prohibited by law and not acting in concert with any other person or group, to expend personally from that person's own funds a sum which is not to be repaid … to advocate the approval or rejection of any question, …

(emphasis added).

50. "*Person*" is a defined term under the Act. It means: "an individual, partnership, committee, association, corporation, and any other organization." R.I.G.L. § 17-25-3(8).

51. The Chairman of the Board of Elections declared in the minutes of an October 16, 1996 meeting that, as regards the regulation of money spent to promote or defeat referenda questions, "the ambiguity of this issue is apparent" (Exh. 53).

52. More recently, the Chairman declared the statute was "ambiguous and impractical, resulting in an unenforceable law," though he claims that the statement was made in

reference to the statute generally and was not intended as a comprehensive analysis of the separate provisions of the statute (Exh. 64, Ans. No. 9).

53. In 1996, the Board declared that the statute was ambiguous and in need of legislative clarification (Exhs. 53, 56). No such legislative clarification has been forthcoming (Exh. 36). The Board submitted clarifying legislation in 2005 (Exh. 64, Ans. No. 10), but it never made it out of committee.

54. In 1990, the Board declared that a Rhode Island non-business corporation formed for the purpose of accepting contributions from its members to be used for advocating the approval or rejection of a ballot question was a PAC subject to all of the reporting requirements of a PAC (Exh. 12).

55. In 1995, The Greater Providence Chamber of Commerce asked the Board what its obligations were if it took a position on ballot questions and asked its members for financial support (Exh. 43). The Board responded, in Advisory Opinion 95-01, that if the Chamber sought financial support from its members respecting a ballot question, it would be considered to be acting "in concert" with its members and therefore subject to all of the filing, administrative and reporting requirements of a PAC under the statute (Exh. 44).

56. The Greater Providence Chamber of Commerce sought a hearing and reconsideration of that decision in August 1995 (Exh. 45). It argued that § 10(b) was ambiguous. It argued that the statute's reference to R.I.G.L. § 17-25-23 to define "in concert" activity was, at best, confusing and when read properly supported the conclusion that "in concert" activity should be limited to candidate elections. It argued that no compelling interest supported the Board's interpretation and that to require the Chamber to form a PAC to solicit funds from its

own members unnecessarily and unreasonably burdened the Chamber's exercise of its First Amendment rights (Exh. 45).

57. The Board held a public hearing on the Chamber's request for reconsideration on April 11, 1996. The Chamber submitted testimony, as did the RI ACLU (Exhs. 46, 47). The RI ACLU's submission emphasized the difference between ballot advocacy and candidate elections and the Supreme Court's starkly different treatment of campaign finance laws in the two contexts. It also argued that the "in concert" prohibition served no purpose in the ballot question context and that the Board's previous interpretation of "in concert" actively in the 1995 Advisory Opinion raised constitutional problems (Exh. 47).

58. On May 29, 1996, the Board issued Advisory Opinion 96-01 and rescinded Advisory Opinion 95-01 (Exhs. 48, 49, 50). The Board recognized the constitutional issues raised by its earlier opinion and adopted an interpretation of R.I.G.L. § 17-25-10(b) that avoided those issues. The Board held that the Chamber and its members were "not more than one person as defined by R.I.G.L. § 17-25-10(b), but rather, a single person as defined by the statute." In reaching this conclusion the Board pointed out that the Chamber was not formed solely for the purpose of advocating one particular issue, had been in existence for 130 years, and was an organization of businesses collectively advocating issues which serve the best interests of those businesses that are members (Exh. 49).

59. Following the issuance of Advisory Opinion 96-01, the Board adopted an "interim policy" of allowing any entity advocating for or against ballot questions to report its expenditures as if it were a single independent entity, but not requiring the formation of PACs (Exhs. 52, 53).

60. In documents produced by the Board, a wide variety of entities and organizations reported their expenditures as a single "person" under the Act, and not as persons acting "in concert." These entities have included:

- RIte Track (Exh. 13, 14);
- Preserve Rhode Island (Exh. 18);
- West Broadway Neighborhood Association (Exh. 19);
- Working Rhode Island (Exh. 20);
- The Rhode Island Shoreline Coalition (Exh. 22);
- Operation Clean Government (Exh. 23);
- Common Cause of Rhode Island (Exh. 24);
- The North Kingstown Chamber of Commerce/Complete Quonset Coalition (Exh. 25);
- The Coalition for Progressive Economic Development (Exh. 26);
- Citizens for Representative Government (Exh. 27);
- The Community College of Rhode Island Foundation, (Exh. 28);
- The URI College of Business Administration Advisory Council (Exh. 29);
- Construction Industries of RI, a.k.a. Rhode Island Heavy and Highway Construction Industry Advancement Fund (Exhs. 15, 30)
- NEARI (Exh. 32);
- The Town of Jamestown (Exh. 33);
- The Smithfield Charter Review Commission (Exh. 34).

61. Several of these entities voluntarily disclosed their contributors in filings with the Board (Exhs. 13, 14, 35, 25, 27) (*See also* Exh. 31).

62. Several of the entities voluntarily disclosed and indeed publicized via press releases and websites, that they were collaborating with other like-minded entities (Exhs. 1, 13, 19, 20, 34).

63. In 2004, the Board revisited the issue of "in concert" activity as regards ballot questions in light of an upcoming casino referendum (Exh. 64, Ans. No. 12). The RI ACLU objected (Complaint and Answer, ¶¶ 32-34) So did the Greater Providence Chamber of Commerce (Exh. 51).

64. After hearings on August 11, 2004 and September 13, 2004, the Board voted to revoke Advisory Opinion 96-01 (which had earlier revoked 95-01) and reinstate Advisory Opinion 95-01 (Exhs. 64, Ans. Nos. 10, 13; Exhs. 57, 58). The Board voted to put the re-implementation of Advisory Opinion 95-01 on hold until January 1, 2005 (Exh. 57).

65. In 2004, the Board wrote to numerous organizations informing them that "persons" could expend their own funds, quoting the definition of "person" from the Act as "an individual, partnership, committee, association, corporation, and any other organization." The Board asked these "persons" to file "Form CF-8," a "Schedule of Independent Expenditures" (Exhs. 18-22).

66. Since January 2005, the Board has written to organizations notifying them that they constitute a PAC and are subject to the reporting requirements of a PAC. The Board has specifically notified groups that they cannot "accept any contributions or make any expenditures prior to filing notice of its organization with the Board of Elections." The Board has also sent notice that R.I.G.L. 17-25-15(f) requires all ballot question PACs to "terminate all activity within (30) days following that election" (Exh. 16, 17).

67. In response to interrogatories, the Board stated that, with respect to any particular referenda questions since 1994 the Board is without sufficient information to assess whether voters did not have adequate information, because it had not conducted any studies or investigations relative to this issue. The Board also stated that it cannot assess whether voters did not have adequate information with respect to the identity of persons or entities supporting or opposing any particular referenda, again because it had not conducted any studies or investigation relative to that issue (Exhs. 64, Ans. Nos. 3,4).

RHODE ISLAND AFFILIATE
AMERICAN CIVIL LIBERTIES UNION,
INC. AND STEVEN BROWN,
INDIVIDUALLY AND IN HIS
CAPACITY AS EXECUTIVE DIRECTOR
OF RHODE ISLAND AFFILIATE,
AMERICAN CIVIL LIBERTIES UNION,
INC.,

By Their Attorneys,

PARTRIDGE SNOW & HAHN LLP

Howard A. Merten (#3171)
Michael W. Sweeney (#7160)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: October 28, 2005

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFFS RHODE ISLAND AFFILIATE, AMERICAN CIVIL LIBERTIES UNION AND STEVEN BROWN'S STATEMENT OF FACTS IN SUPPORT OF THEIR TRIAL MEMORANDUM was mailed, postage prepaid, on this ~~28th~~ 31st day of October, 2005 to:

Raymond A. Marcaccio, Esq.
Christine M. Curley, Esq.
Oliverio & Marcaccio, LLP
55 Dorrance Street, Suite 400
Providence, RI 02903

James Ryan, Esq.
Partridge Snow & Hahn LLP.
180 South Main Street
Providence, RI 02903

[signature]