UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND AFFILIATE,
AMERICAN CIVIL LIBERTIES UNION, INC.,
and STEVEN BROWN, Individually and in his
Capacity as Executive Director of Rhode Island
Affiliate, American Civil Liberties Union, Inc.

v.

ROGER N. BEGIN, in his Official Capacity as
Chairman of the Rhode Island Board of Elections,
and THOMAS V. IANNITTI, JUDITH A. BAILEY,
JOHN A. DALUZ, FLORENCE G. JOHNSON,
FRANK J. REGO, RAYMOND A. XAVIER, in
their Capacities as Commissioners of the Rhode Island
Board of Elections and GEORGE BOWEN, in his
Official Capacity as Acting Executive Director

C.A. No. 04-487-T

v.

THE GREATER PROVIDENCE CHAMBER OF
COMMERCE

**BRIEF OF *AMICUS CURIAE***
**THE RHODE ISLAND FOUNDATION AND**
**THE UNITED WAY OF RHODE ISLAND**

THE RHODE ISLAND FOUNDATION
and THE UNITED WAY OF RHODE
ISLAND

By Their Attorneys,

Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (fax)

Dated: February 15, 2006

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES........................................................................iii

I. INTRODUCTION........................................................................1

II. STATEMENT OF THE CASE........................................................................3

A. The Mission of the Rhode Island Foundation and the United Way Requires Them To Be Able To Act "In Concert" With Other Groups on Ballot Questions........................................................................3

B. The Act and the 1995 Opinion Have Prevented the RI Foundation and United Way From Releasing aGrant Money to the Family Life Center in Support of a Voting Rights Ballot Initiative........................................5

C. The Act and the 1995 Opinion Have Prevented the RI Foundation and United Way From Supporting Any Ballot Initiative for Affordable Housing....7

III. ARGUMENT........................................................................10

A. The Court Must Apply Strict Scrutiny to §17-25-10(B)'s Prohibition on "Acting in Concert" Activity........................................10

B. First Amendment-Protected Political Speech is Impermissibly Burdened by §17-25-10(B) Because "Acting in Concert" Activity is Prohibited and Subject To PAC Restrictions........................................................................11

1. The RI Foundation and the United Way are Prohibited From Engaging in Basic Ballot Question Advocacy Because they are "Acting in Concert"........................................................................12

2. Financial Restrictions Imposed on PAC's in the Act Burden Ballot Question Advocacy........................................................................13

C. Basic Informational Disclosure to Voters is the State's Only Valid Interest in Regulating Ballot Advocacy Campaigns........................................15

D. The Burdens Imposed by §17-25-10(B) on "In Concert" Activity Are Not Narrowly Tailored to the State's Disclosure Interest........................................16

IV. CONCLUSION........................................................................20

# TABLE OF AUTHORITIES


**Cases** **Page**

*Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999)........16-17

*Buckley v. Valeo*, 424 U.S. 1 (1976)........passim

*California Pro-Life Council v. Getman*, 328 F.3d 1088 (9th Cir. 2003)........17

*Citizens Against Rent Control (CARC) v. City of Berkeley*, 454 U.S. 290 (1981)........passim

*Federal Elections Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986)........18

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)........10, 17

*Iowans for Tax Relief v. Campaign Finance Disclosure Commission*, 331 N.W.2d 862 (Iowa 1983)........19

*Let's Help Florida v. McCrary*, 621 F.2d 195 (5th Cir. 1980)........19

*McConnell v. Federal Elections Commission*, 540 U.S. 93 (2003)........10

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995)........11, 14

*Montana Chamber of Commerce v. Argenbright*, 226 F.3d 1049 (9th Cir. 2000)........10

*VECO International, Inc., v. Alaska Public Offices Commission*, 753 P.2d 703 (Ak. 1988)........19

*Volle v. Webster*, 69 F.Supp.2d 171(D. Maine 1999)........11

*Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir. 1993)........18

**Statutes**

R.I. Gen. Laws § 17-25-3........12

R.I. Gen. Laws § 17-25-10........passim

R.I. Gen. Laws § 17-25-10.1........14-16

R.I. Gen. Laws § 17-25-23........12, 13

## I. INTRODUCTION

Before the Court is a fundamentally unfair and unconstitutional statute. For the reasons shown below, it infringes upon the First Amendment rights of individuals and entities that want to work together to advocate for or against certain ballot initiatives that come before Rhode Island voters every November. These individuals and entities cannot wait until November – or even March – for relief because it will be too late to organize a campaign to exercise their First Amendment rights for the November 2006 election. They need relief today from the criminal sanctions that face alleged violators of this unconstitutional law.

The Rhode Island Campaign Contribution and Expenditure Reporting Act (the "Act") prohibits an individual or entity from "acting in concert" with any other individual or entity to advocate for the approval or rejection of a ballot question. For example, according to a Rhode Island Board of Elections' (the "Board") 1995 Advisory Opinion (the "1995 Opinion"), which sets forth the Board's interpretation of relevant sections of the Act, if an entity advertises its efforts to advocate for the approval or rejection of a ballot question and includes the names of several other entities as sponsors of its advertising efforts, the advertising entity has violated the Act. According to the Board, for individuals or entities to work together to advocate for a ballot issue, those individuals or entities must do so only by forming a political action committee ("PAC"). But the Act limits contributions that an individual or entity may make to a PAC to $1,000 per calendar year, thereby hamstringing collective efforts to advocate for or against a ballot measure. Furthermore, corporations are forbidden from contributing to PACs. Individuals or entities acting alone, however, may expend unlimited funds on ballot

advocacy. The Act's prohibition on "in concert" advocacy and the requirement to form a PAC to engage in such activity is an unconstitutional infringement on free-speech and free-association rights that the First Amendment protects.

The Act's prohibition against "in concert" activity involving core political speech does not pass the applicable strict-scrutiny standard. Courts apply the strict-scrutiny standard to restrictions on speech and association in the context of ballot referenda. Thus, the Board must show that it has a compelling interest favoring the above-referenced restrictions on speech and that such restrictions are closely drawn to avoid unnecessary abridgement of speech. The Board asserts that the only state interest here is disclosure of information to voters. Although this may be a legitimate interest, the Act and the 1995 Opinion are not closely drawn to achieve this goal, in a way that would avoid unnecessary abridgement of speech. For example, the Board could require disclosure of information from the entities working together on a ballot initiative without also requiring that those entities form a PAC. The PAC requirement places unrealistic and impractical financial limits and burdens on the collaborating entities and individuals.

The plaintiffs, Rhode Island Affiliate, American Civil Liberties Union, Inc. ("RI ACLU") and Steven Brown, Individually and in his Capacity as Executive Director of RI ACLU, and Intervenor, Greater Providence Chamber of Commerce (the "Chamber") have challenged the constitutionality of certain provisions in the Act and the 1995 Opinion. The Rhode Island Foundation (the "RI Foundation") and the United Way of Rhode Island (the "United Way") submit this *amicus curiae* brief in support of the RI ACLU and the Chamber.

Among other requests, the RI ACLU and the Chamber have asked this Court to declare that: (a) the Board's 1995 Opinion is unconstitutionally overbroad; (b) the definition of "in concert" activity set forth in § 17-25-23 and incorporated into § 17-25-10(b) is unconstitutionally vague and overbroad as applied to the solicitation or expenditure of funds to advocate the approval or rejection of ballot questions; and (c) § 17-25-10(b) and the Board's 1995 Opinion are unconstitutional under the First Amendment to the extent that they prohibit the RI ACLU, Mr. Brown, and any other entity from: 1) soliciting or making "in concert" contributions or expenditures with respect to ballot questions; and 2) otherwise acting together with another entity to advocate for or against ballot questions without complying with PAC reporting requirements. They also ask the Court to permanently enjoin the Board from taking any enforcement action against the RI ACLU or Mr. Brown individually pursuant to the 1995 Opinion or § 17-25-10(b) for making "in concert" expenditures to advocate for or against a ballot question without forming a PAC. The RI Foundation and the United Way support this requested relief as fully justified under the circumstances and applicable law.

## II. STATEMENT OF THE CASE

### A. THE MISSION OF THE RHODE ISLAND FOUNDATION AND THE UNITED WAY REQUIRES THEM TO BE ABLE TO ACT "IN CONCERT" WITH OTHER GROUPS ON BALLOT QUESTIONS.

The RI Foundation and the United Way have important interests in the outcome of this litigation. Indeed, they urgently need to resolve the uncertainty that the Act and the Board's 1995 Opinion have created by obtaining immediate relief from its strictures. The RI Foundation, through the legacy of its donors, and the United Way, through its solicitation of annual contributions, raise funds from various segments of the Rhode

Island community to support their work in the community. See Affidavit of Ari Matusiak ("Matusiak Affidavit") at ¶ 4; Affidavit of Allan Stein ("Stein Affidavit") at ¶ 2. Given that both institutions focus their resources on some of the most prominent social and economic issues in the state, it is not surprising that they would, from time to time, have a compelling interest in supporting ballot-initiative campaigns. See Matusiak Affidavit at ¶ 4; Stein Affidavit at ¶ 4. They work together and with other organizations, pooling limited resources to advance a variety of charitable initiatives.

The RI Foundation is a nonprofit philanthropic organization that has been serving the Rhode Island community since 1916. See Matusiak Affidavit at ¶ 1. It focuses on creating connections between private charitable sources and projects beneficial to the public good. See Matusiak Affidavit at ¶ 2. The RI Foundation's mission includes "partnering" with other charitable and community-based organizations in Rhode Island to make the most effective use of available resources. See Matusiak Affidavit at ¶ 2. These activities range from gender-equality initiatives to community-development and affordable-housing projects. See Matusiak Affidavit at ¶ 3. The capacity to support and advocate for or against ballot referenda with other philanthropic and community-based organizations is an essential part of RI Foundation's strategy for community impact. See Matusiak Affidavit at ¶ 4.

Since 1926, the United Way, also a nonprofit philanthropic organization, has focused on reducing the number of Rhode Islanders in need. See Stein Affidavit at ¶ 2. Its activities include convening broad coalitions to identify high priority community issues. See Stein Affidavit at ¶ 2. Solutions are collaboratively developed and implemented by building partnerships, forging consensus, and leveraging resources with

other charitable and community-service organizations. See Stein Affidavit at ¶ 2. Although traditionally the United Way has functioned largely as a fundraiser, since 2001 its strategy has included implementing solutions that help people directly and foster systemic changes to reduce need in the future. See Stein Affidavit at ¶ 3. This mission is largely accomplished by fostering ties with other nonprofit organizations. See Stein Affidavit at ¶ 3. Ballot question advocacy, an essential part of this strategy, is only possible through collaborations with other charitable and community organizations. See Stein Affidavit at ¶ 4.

### B. THE ACT AND THE 1995 OPINION HAVE PREVENTED THE RI FOUNDATION FROM RELEASING GRANT MONEY TO THE FAMILY LIFE CENTER IN SUPPORT OF A VOTING RIGHTS BALLOT INITIATIVE.

Last year, the General Assembly approved the placement of a constitutional referendum question on the November 2006 ballot regarding voting rights for probationers and parolees. See Matusiak Affidavit at ¶ 5. The Family Life Center is a nonprofit, community-based organization leading Rhode Island's "Right to Vote" coalition of community organizations, including the RI ACLU. See Matusiak Affidavit at ¶ 6. The Family Life Center wants to inform voters about the ballot question and support its passage. See Matusiak Affidavit at ¶ 6. The Family Life Center received $15,000.00 from the RI Foundation in early 2005 in order to persuade the General Assembly to put the "Right to Vote" question on the ballot. Subsequent to their success with the General Assembly, the Family Life Center then applied for a grant from the RI Foundation to support its public campaign on this ballot question. See Matusiak Affidavit at ¶ 7. The RI Foundation approved a $79,000.00 grant to the Family Life Center, conditioned on the appropriate relief being obtained from the Court. See

Matusiak Affidavit at ¶ 7. The Family Life Center proposed a specific timetable to the RI Foundation for the campaign, a timetable that is no longer viable because § 17-25-10(b) prohibits the RI Foundation from releasing the funds. See Matusiak Affidavit at ¶ 8. For example, the Family Life Center could not hire a campaign manager without the funds from the RI Foundation. Indeed, under the terms of the grant, the Family Life Center must consult with the RI Foundation about the candidates for the campaign manager position, which they could not do under § 17-25-10(b). See Matusiak Affidavit at ¶ 8.

The funds from the RI Foundation for the "Right to Vote" campaign are urgently needed. See Matusiak Affidavit at ¶ 9. The November 2006 election is fast-approaching. The Family Life Center is depending on the RI Foundation to fund roughly one-third of their campaign. Without the RI Foundation's financial support, national charitable organizations will likely not support the Family Life Center and the campaign to support the "right to vote" will end before it begins. The Family Life Center will have great difficulty securing national grants required for their campaign before receiving funds from the RI Foundation. See Matusiak Affidavit at ¶ 9. The Family Life Center cannot obtain those national funds, however, because of §§ 17-25-10(b), 17-25-10.1(h),(j) (the "Ballot Advocacy Restrictions").

Under the Ballot Advocacy Restrictions, the RI Foundation cannot give Family Life Center any of the grant money without violating the Act. The outcome of the ballot question directly affects over 13,000 disenfranchised Rhode Islanders living in the community. See Matusiak Affidavit at ¶ 10. That activity depends on the Court granting the appropriate relief. Until then, Family Life Center remains on the periphery of the

November 2006 election, because the Act and the Board have effectively silenced its voice. The RI Foundation cannot wait any longer to release, and the Family Life Center cannot wait any longer to receive, the funds. They need immediate relief from the draconian provisions of the Act and the 1995 Opinion.

### C. THE ACT AND THE 1995 OPINION HAVE PREVENTED THE RI FOUNDATION AND UNITED WAY FROM SUPPORTING ANY BALLOT INITIATIVE FOR AFFORDABLE HOUSING.

If current efforts are successful, voters in Rhode Island will decide on the November 2006 ballot whether to approve a $75 million bond to facilitate the production of affordable housing. See Matusiak Affidavit at ¶ 19. Based on successful campaigns across the country, the RI Foundation and United Way have created HousingWorks RI as a vehicle for promoting the passage of the bond, the first of its kind for affordable housing in Rhode Island. If passed by the voters, it would be one of the largest voter approved bonds in state history. See Matusiak Affidavit at ¶¶ 17, 19.

HousingWorks RI is a coalition, a statewide policy, and a public education campaign dedicated to securing quality, affordable homes for all Rhode Islanders. See Matusiak Affidavit at ¶ 13. It now comprises over one hundred organizations and individuals, including representatives from the business, nonprofit, environmental, faith-based, and philanthropic communities. See Matusiak Affidavit at ¶ 13. Not an independent organization, it exists under the fiduciary umbrella of the RI Foundation and is largely managed by a complement of RI Foundation and United Way staff. See Matusiak Affidavit at ¶ 14. Funds for HousingWorks RI are almost entirely provided by the RI Foundation, United Way, and Rhode Island Housing. See Matusiak Affidavit at ¶ 14. The funds are administered by the RI Foundation. See Matusiak Affidavit at ¶ 14.

HousingWorks RI started in 2004 in response to the dramatic escalation of rent and home prices in Rhode Island and to the crisis of affordability that escalation created for working families and employers alike. See Matusiak Affidavit at ¶ 12. The RI Foundation and the United Way both have a long track record of supporting affordable housing efforts through charitable contributions. See Matusiak Affidavit at ¶ 11. In 2003, however, both institutions realized that grants alone would never be enough to address an affordability crisis of this scale. See Matusiak Affidavit at ¶ 11. Accordingly, the two organizations joined with Rhode Island Housing to convene a dialogue among all of the principal stakeholders – business leaders, community advocates, developers, state and local government – about how best to raise awareness about the issues involved and about what approaches would have the greatest long-term ameliorative impact. See Matusiak Affidavit at ¶ 12.

Over the last two years, the RI Foundation, the United Way, and Rhode Island Housing have invested considerable resources in this combined effort. See Matusiak Affidavit at ¶ 15. The assembled group advocated for the passage of the Low and Moderate Income Housing Act, funded the development of a State Strategic Housing Plan, supported the Governor in creating the first ever Office of Housing and Community Development, and secured $7.8 million in the 2005 legislative session for affordable housing programs. See Matusiak Affidavit at ¶ 15. All of this activity has created an organizational infrastructure, brand, and voice for HousingWorks RI; it also has served the broader interest of developing public understanding that Rhode Island does indeed have a housing crisis impacting every facet of the community. See Matusiak Affidavit at ¶ 16.

Although the successes to-date have been notable, the underlying strategy of this entire two-year enterprise has been to put HousingWorks RI in a position to meaningfully advocate for a significant increase in public investment in housing production. See Matusiak Affidavit at ¶ 17. The campaign is in that position now. On January 30, 2006, HousingWorks RI announced its 2006 Policy Platform, the centerpiece of which is a $75 million bond for housing. See Matusiak Affidavit at ¶ 18. By taking its case directly to the voters, the campaign will serve its twofold purpose of public education and of securing permanent solutions to this entrenched social and economic problem. See Matusiak Affidavit at ¶ 18. Accordingly, the funders have appropriated hundreds of thousands of dollars to ensure the campaign's success. In doing so, they necessarily have been acting "in concert" with each other and with the hundreds of campaign members to advance the HousingWorks RI agenda and to position the campaign for a successful referendum campaign in the fall. See Matusiak Affidavit at ¶ 20. But the Ballot Advocacy Restrictions prevent the RI Foundation and the United Way from contributing funds to HousingWorks RI so that it then can advocate for this bond once it becomes a ballot question. In addition, any advertisement supporting the ballot question sponsored by the RI Foundation, the United Way, and any others would violate the Act because it would constitute "in concert" activity. The success of this ballot referendum depends on the collaboration and commitment of all partners involved in HousingWorks RI. See Matusiak Affidavit at ¶ 21. The Ballot Advocacy Restrictions of the Act prohibit this necessary collaboration. Instead, the RI Foundation and the United Way remain on the periphery of the ballot-question campaign, because the Act and the Board have effectively squelched their desired collaborative advocacy effort.

## III. ARGUMENT

### A. THE COURT MUST APPLY STRICT SCRUTINY TO SECTION 17-25-10(B)'S PROHIBITION ON "ACTING IN CONCERT" ACTIVITY.

The Defendants argue that because all expenditures and contributions are not foreclosed by the Act, the Court should apply a "less exacting standard of review." See Defendant's Trial Brief at 19. As a matter of law, the Defendants are incorrect. For the reasons set forth below, the Court should apply a strict-scrutiny standard of review.

Courts apply strict scrutiny to restrictions on speech in the context of ballot referenda. See First National Bank of Boston v. Bellotti, 435 U.S. 765, 786 (1978); Montana Chamber of Commerce v. Argenbright, 226 F.3d 1049, 1055-56 (9th Cir. 2000). Courts distinguish between elections involving ballot issues and those involving candidates. See Montana v. Argenbright, 226 F.3d at 1055-56 (Bellotti remains the test for restrictions on advocacy for ballot referenda); see McConnell v. Federal Elections Comm'n, 540 U.S. 93, 193 (2003) (a less exacting standard of review is applied to all campaign finance advocacy as long as a clear candidate running for election is the true focus of the advocacy).

"The State may prevail [with restrictions on the exercise of political speech] only upon showing a subordinating interest which is compelling and the burden is on the government to show the existence of such an interest." First Nat'l v. Bellotti, 435 U.S. at 786 (internal citations omitted). "Even then, the State must employ means 'closely drawn to avoid unnecessary abridgement…'" Id. (citing Buckley v. Valeo, 424 U.S. 1, 25 (1976)).

Restrictions on campaign expenditures are generally subjected to closer scrutiny than limits on campaign contributions. See McConnell v. FEC, 540 U.S. at 134-35. The different treatment of contributions and expenditures reflects the importance of the interests that underlie contribution limits – interests in preventing corruption and the erosion of public confidence that results from the appearance of corruption. See id. at 136. "*Buckley* identified the single narrow exception to the rule that limits on political activity were contrary to the first amendment. The exception relates to the perception of undue influence of large contributors to a *candidate*." Citizens Against Rent Control (CARC) v. Berkeley, 454 U.S. 290, 296-97 (1981) (emphasis original). But § 17-25-10(b) impermissibly entangles contributions and expenditures in a single restriction that restricts the ability of organizations to engage in core political speech. See Volle v. Webster, 69 F.Supp.2d 171, 172 (D. Maine 1999) (advocacy concerning referendum-type elections involves "core political speech" and "exacting scrutiny" applied) (citing McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347 (1995)).

CARC v. Berkeley, 454 U.S. 290 (1981) ("CARC") is the definitive Supreme Court pronouncement regarding restrictions on ballot-question advocacy. Applying the strict-scrutiny standard, CARC struck down statutory provisions containing separate restrictions when individuals joined together for ballot advocacy. Id. "Contributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." Id. at 298. The "[r]egulation of First Amendment rights is always subject to exacting judicial scrutiny." Id. at 298.

### B. FIRST AMENDMENT-PROTECTED POLITICAL SPEECH IS IMPERMISSIBLY BURDENED BY § 17-25-10(B) BECAUSE "ACTING IN CONCERT" ACTIVITY IS PROHIBITED AND SUBJECT TO PAC RESTRICTIONS.

#### 1. The RI Foundation and the United Way are prohibited from engaging in basic ballot-question advocacy because they are "acting in concert."

Section 17-25-10(b) burdens the RI Foundation's and the United Way's political speech by prohibiting any "person" – defined in § 17-25-3(8) to include non-profit corporations and any other organizations – from:

> ...*acting in concert with any other person or group*, to *expend* personally from that person's own funds a sum which is not to be repaid to him or her for any purpose not prohibited by law to support or defeat a candidate or to *advocate the approval or rejection of any question*...Whether a person is 'acting in concert with any other person or group' for the purposes of this subsection shall be determined by application of the standards set forth in § 17-25-23.

R.I.G.L. § 17-25-10(b) (emphasis added). Section 17-25-23 sets forth descriptions of certain relationships between candidates and persons, political party committees, or political action committees that contribute to those candidates. Section 17-25-23 does not mention ballot initiatives.[1] Nevertheless, the 1995 Opinion states that § 17-25-23 lends "guidance to the definition of 'not acting in concert with another" as it relates to § 17-25-10(b) and then goes on to deem the following as acting as "in concert activity:"

> (a) there is any arrangement, coordination, or direction with respect to the expenditure between the person making the expenditure and any other person; (b) if, during the election cycle, the person making the expenditure is, or has been authorized to raise or expend funds on behalf of another person to be used to aid or defeat a ballot question, or if the person making

---

[1]Plaintiffs assert a facial challenge to § 17-25-10(b), arguing that it is void for vagueness. See Plaintiffs' Trial Memorandum at 26-30. The RI Foundation and the United Way join in Plaintiffs' vagueness challenge.

> the expense will be receiving any form of compensation or reimbursement from any other person; (c) the person making the expenditures communicated with, advised or counseled other persons on the plans, projects, and needs relating to the aiding or defeating of the election of the ballot question; (d) the person making the expenditure retains the professional services of any individual or other person also providing those services to others in connection with the aiding or defeating of the same ballot question; (e) the person making the expenditure communicated or consulted at any time during the election cycle about the person's plans, projects, or needs with any other entity, or officer, director, or employer or any other entity that has made, or intends to make expenditures to aid or defeat the ballot question on the same side as the person making the expenditure or any person whose professional services had been retained by another entity that has made or intends to make expenditures to aid or defeat the same ballot question; and (f) the expenditure is based on information provided to the person making the expenditure, directly or indirectly by others making similar expenditures about the person's plans, projects, or needs provided that the other person is aware that the other person has made, or is planning to make expenditures expressly to advocate or defeat the ballot question on the same side as the person making the expenditure.

Under the Act and the 1995 Opinion, the RI Foundation's grant to the Family Life Center for ballot advocacy is prohibited "acting in concert" activity. The RI Foundation's collaboration with the United Way on the ballot referendum regarding the $75 million bond issue will also be subject to this prohibition. If the RI Foundation and the United Way act alone, however, § 17-25-10(b)'s restrictions are not applicable. This distinction is not permissible. As the CARC decision explained:

> "there are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them. To place a Spartan limit – or indeed any limit – on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right[s] of association [and expression]."[2]

[2] The court also stated: "a limit on contributions in this setting need not be analyzed exclusively in terms of the right of association or the right of expression. The two rights overlap and blend..." CARC v. Berkeley, 454 U.S. at 296, 300 ("Apart from the...restraint on freedom of association, but virtually inseparable from it in this context, [the statute] imposes a significant restraint on the freedom of expression of groups and...individuals.").

454 U.S. at 296 (emphasis added).

**2. Financial restrictions imposed on PACs in the Act burden ballot question advocacy.**

Under the Act and the 1995 Opinion, undertaking collaborative advocacy requires the formation of a separate PAC. Individuals acting alone, however, do not have to form a PAC to make expenditures and contributions for ballot question advocacy. See R.I.G.L. § 17-25-10(b).

In CARC, 454 U.S. at 296, a statute similar to § 17-25-10(b) prevented individuals from pooling their resources through contributions for ballot-referendum advocacy. The court found that the statute imposed a significant restraint on the freedom of expression and association of groups and those individuals wishing to express their views through committees. See id. at 299. Affluent individuals acting alone could spend, without limit, to advocate their views on ballot measures. See id. at 296. The Court held that "placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression." See id. at 299. "The contribution limit thus automatically affects expenditures, and limits on expenditures operate as a direct restraint on freedom of expression…concerning a ballot measure." Id.

Similarly, the Act prohibits any entity from contributing to a single PAC more than an aggregate of $1,000 annually. See R.I.G.L. § 17-25-10.1(a)(1). In other words, no PAC is permitted to accept contributions from a single entity or another PAC that exceeds $1,000 annually. See id. Furthermore, PACs may not receive contributions from corporations. See R.I.G.L. § 17-25-10.1(h)(1). The PAC contribution limitations effectively prevent HousingWorks RI from undertaking any meaningful advocacy regarding the bond question for affordable housing. By its very nature, HousingWorks

RI is a collaborative organization primarily supported by the RI Foundation and United Way. Under the Act, the RI Foundation and the United Way would have to make HousingWorks RI into a PAC and would only be able to make contributions of $1,000 annually, even though both are willing to disclose the names of all contributors to the campaign. Moreover, the RI Foundation and United Way are prohibited from making any contributions to ballot question campaigns because they are corporations. See R.I.G.L. §§ 17-25-10.1(h),(j). This goes beyond the "Spartan limits" condemned in CARC and constitutes an unconscionable abridgement of core political speech.[3]

The contribution limitations also diminish the amount of possible expenditures. See CARC, 454 U.S. at 299; see also R.I.G.L. § 17-25-10.1(c) (expenditures made in consultation, suggestion, or cooperation with PACs or other entities are considered contributions).[4] The contribution limitations operate as direct burdens on RI Foundation's and United Way's ability to collaborate on ballot questions – permitted activities if undertaken alone. For example, the HousingWorks RI campaign for the $75 million bond ballot initiative will conservatively cost at least $8,000 per week of media purchases for 12 weeks; $50,000 for writing and creating ads; and at least $200,000 for staff time and advocacy. HousingWorks RI should not be limited to $1,000 contributions to fund such a campaign when individuals and single corporations have no such restrictions on their contributions.

---

[3] As corporations, the RI Foundation and United Way are prohibited from contributing to PACs. See R.I.G.L. §§ 17-25-10.1(h),(j). Thus, requiring HousingWorks RI to become a PAC would severely and immediately decrease funding from its largest supporters. The RI Foundation and United Way join with Plaintiffs' claims that R.I.G.L. §§ 17-25-10.1(h),(j) unconstitutionally limit corporations' First Amendment protections.

[4] This section refers to "political committees" and "candidates." The Board's position is that this statutory language is instructional for purposes of defining ballot-advocacy activities. The RI Foundation and the United Way join with Plaintiffs' claim that this interpretation is unconstitutionally vague.

### C. BASIC INFORMATIONAL DISCLOSURE TO VOTERS IS THE STATE'S ONLY VALID INTEREST IN REGULATING BALLOT ADVOCACY CAMPAIGNS.

The state's only interest in regulating contributions and expenditures of entities "acting in concert" on ballot-question advocacy is disclosure of information to voters. See Defendant's Trial Memorandum at 19, 22-23) ("The public has a legitimate interest in knowing the identity of persons contributing to another person, entity or fund for the support or defeat of a ballot question as well as how those funds are being expended by the entity or fund itself. Thus, the critical purpose is informational.")

The RI Foundation and the United Way are not challenging the disclosure requirements of the Act. The state does have an interest in requiring the disclosure of certain information, as limited by McIntyre v. Ohio Elections Comm'n and its progeny.[5] 514 U.S. 314 (1995). The Board mischaracterizes the PAC requirements as only serving a disclosure interest. (Defendant's Trial Brief, pp. 17-18). But, as described above, the PAC requirements extensively restrict contributions and expenditures. See R.I.G.L. § 17-25-10.1. These restrictions serve no informational purpose. Instead, they severely limit permissible contributions and expenditures. These restrictions are not narrowly tailored to achieve legitimate disclosure objectives, especially since core political speech and ballot-question advocacy are at stake.

### D. THE BURDENS IMPOSED BY § 17-25-10(B) ON "IN CONCERT" ACTIVITY ARE NOT NARROWLY TAILORED TO THE STATE'S DISCLOSURE INTEREST.

The First Amendment requires courts to be vigilant in making judgments and to guard against undue hindrances to political conversations and the exchange of ideas. See

[5] Whether the PAC disclosure and reporting requirements also go too far is addressed by the Plaintiffs' Trial Memoranda.

Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 192 (1999). The inherent worth of speech to inform the public does not depend upon the identity of its sources, whether it be corporations, associations, unions, or individuals. See First Nat'l. v. Bellotti, 435 U.S. at 777. Even if a compelling interest in disclosure exists, this interest is not without limitation: unnecessary administrative and organizational requirements will not pass constitutional muster. See California Pro-Life Council v. Getman, 328 F.3d 1088, 1107 (9th Cir. 2003).

Under the Act, entities "acting in concert" are prohibited from engaging in any ballot advocacy. The Act requires entities who seek to join forces to form a PAC, thereby subjecting them to draconian contribution and expenditure restrictions. Individuals or corporations making the same or similar expenditures and contributions, however, are not subject to PAC restrictions, but they are still required to make financial disclosures. See R.I.G.L. § 17-25-10(b) (individuals are required to report contributions and expenditures exceeding $100 to the Board within seven days). Thus, strict financial limitations are imposed on those "acting in concert," but not on individuals or corporations acting alone.

The PAC requirements are overbroad to meet the state's disclosure interest in ballot-question elections. To be on an equal footing with large, resource-rich private corporations, smaller organizations and nonprofit community-based organizations typically must pool their resources to advocate effectively for ballot initiatives. If they can be forced into complying with PAC requirements, voices of these smaller organizations will be diminished, if not silenced altogether. Disclosure requirements for

individual entities adequately satisfy the same interest, but those acting "in concert" are treated differently in violation of what the Constitution requires.

The PAC requirements are also underinclusive to meet the state's disclosure interest in ballot-question elections. The restrictions are based solely on "acting in concert" activity; thus, they exempt organizations if they act alone, regardless of the power, wealth, or influence they possess. Consequently, nothing prevents large corporations from individually making large expenditures in support of ballot measures. The state's only valid interest in having PAC requirements for ballot advocacy is disclosure. There is no reason why a distinction should be made, however, between disclosure for large wealthy corporations on the one hand and disclosure coupled with restrictions on expenditures for collaborations of non-profit community organizations on the other. See Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 34 (1st Cir. 1993) ("[A]ny law that burdens the right of individuals to come together for political purposes is suspect and viewed warily." This is due, in part, to "the importance of group expression as a method of amplifying the voices of those with meager means.").

In Federal Elections Commission v. Massachusetts Citizens for Life, Inc., 479 U.S. 238 (1986), the United States Supreme Court struck down a similar provision to § 17-25-10(b). The general reporting obligations applicable to all expenditures provided "precisely the information necessary to monitor the group's independent spending activity and receipt of contributions." Id. This particular case arose in the context of a group's expenditures supporting candidates in a state election and restrictions on soliciting contributions from the general public. The Court held that the state's interest in disclosure was met in a "manner less restrictive than imposing the full panoply of

regulations that accompany status as a political action committee under the Act." Id. at 262. "Thus while [the statute] does not remove all opportunities for spending, the avenue it leaves open is more burdensome than the one it forecloses." Id. at 255.

The Defendants cite three cases for the proposition that "PAC organization and reporting requirements have been upheld by other courts as supported by compelling state interests in disclosing information needed by the public and assisting enforcement of campaign finance laws." (Defendant's Trial Brief, p. 19). A close examination of these cases, however, shows why they are inapplicable here.

First, in Let's Help Florida v. McCrary the court distinguished between candidacy and referenda elections in striking down restrictions on contributions for referendum elections.[6] 621 F.2d 195, 200 (5th Cir. 1980). The court then struck down the PAC requirement because "although promoting disclosure of campaign contributors is an important state interest, the restrictions upon political contributions in [the statute] cannot be justified as disclosure measures ... These statutes that restrict the amount a person may contribute to a single committee do little to promote disclosure." Id.

Second, in VECO Internat'l, Inc. v. Alaska Public Offices Comm'n, PAC requirements were upheld for contributions but only in the context of candidate elections. 753 P.2d 703 (Ak. 1988) Additional state interests are involved in electoral contests involving candidates, as opposed to ballot question campaigns. See supra. at n.5.

Finally, the Defendants cite Iowans for Tax Relief v. Campaign Finance Disclosure Comm'n, 331 N.W.2d 862 (Iowa 1983). In this case, "the only question on

---

[6] A constitutionally-sufficient justification for contribution limitations to candidates is to limit the actuality and appearance of corruption resulting from large individual financial contributions. See McConnell v. FEC, 540 U.S. at 121 (citing Buckley v. Valeo, 424 U.S. at 26). "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." First Nat'l. v. Bellotti, 435 U.S at 790.

the merits … is whether the commission erred in its determination [that the organization] was a 'political committee' subject to the [statutory] reporting requirements." Id. at 864. The PAC disclosure and reporting requirements were upheld in this case, but there were no analogous limitations on expenditures or contributions imposed on the group. Here, the RI Foundation and the United Way dispute the expenditure and contribution restrictions in the Act.

The state's only interest in regulating ballot-advocacy contributions and expenditures is to disclose information to the voters about who is making the contributions and expenditures. See Defendants' Trial Memorandum at 19, 22-23. But the disclosure requirements for ballot questions established in § 17-25-10(b) for individuals satisfies that intent. The PAC restrictions far exceed those requirements and unconstitutionally restrict legitimate contributions and expenditures in connection with ballot measures.

## IV. CONCLUSION

For the reasons stated above, the RI Foundation and the United Way respectfully request the Court enter judgment in favor of the Plaintiffs and Intervenor and grant the relief requested in Plaintiffs' complaint.

THE RHODE ISLAND FOUNDATION and
THE UNITED WAY OF RHODE ISLAND
By Their Attorneys,

Robert G. Flanders, Jr. / Mitchell R. Edwards /RGF

Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (fax)

Dated: February 15, 2006

**CERTIFICATE OF SERVICE**

| | |
|---|---|
| Howard A. Merten, Esq.<br>Partridge, Snow & Hahn LLP<br>180 South Main Street<br>Providence, RI 02903<br>861-8200<br>Fax: 861-8210 | James W. Ryan, Esq.<br>Partridge, Snow & Hahn LLP<br>180 South Main Street<br>Providence, RI 02903<br>861-8200<br>Fax: 861-8210 |
| Thomas A. Palombo, Esq.<br>Attorney General's Office<br>150 South Main Street<br>Providence, RI 02903<br>274-4400<br>Fax: 222-2995 | Christine M. Curley, Esq.<br>275 Beacon Drive<br>North Kingstown, RI 02852<br>294-0847 |
| Raymond A. Marcaccio, Esq.<br>55 Dorrance Street<br>Suite 400<br>Providence, RI 02903<br>861-2900<br>Fax: 861-2922 | Thomas R. Bender, Esq.<br>Hanson Curran LLP<br>The Francis Building<br>146 Westminster Street<br>Providence, RI 02903 |

I certify that I mailed a copy of this Amicus Brief to the above named counsel of record on the 15th day of February, 2006.