UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND AFFILIATE,
AMERICAN CIVIL LIBERTIES UNION, INC.,
and STEVEN BROWN, Individually and in his
Capacity as Executive Director of Rhode Island
Affiliate, American Civil Liberties Union, Inc.

V.

ROGER N. BEGIN, in his Official Capacity as
Chairman of the Rhode Island Board of Elections,
and THOMAS V. IANNITTI, JUDITH A. BAILEY,
JOHN A. DALUZ, FLORENCE G. JOHNSON,
FRANK J. REGO, RAYMOND A. XAVIER, in their Capacities as Commissioners of the Rhode
Island Board of Elections and GEORGE BOWEN,
in his Official Capacity as Acting Executive Director

C.A. No. 04-487-T

V.

THE GREATER PROVIDENCE CHAMBER OF
COMMERCE

**BRIEF OF AMICUS CURIAE**
**COMMON CAUSE OF RHODE ISLAND**

Common Cause of Rhode Island
By its Attorney,

Thomas R. Bender, Esq. (#2799)
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154 – telephone
(401) 521-7040 – fax

## Table of Contents

Table of Authorities .......... ii

Introduction .......... 1

Statement of the Case .......... 3

- *The Statutory Scheme on its Face* .......... 3

- *"Acting in Concert" Contributions and Expenditures* .......... 6

- *Common Cause of Rhode Island* .......... 10

- *The RIACLU Attack on "Acting in Concert"* .......... 11

Argument .......... 14

I.) The PAC organizational and reporting requirements must be evaluated under strict scrutiny .......... 14

II.) The compelling interest the State claims requires PAC organizational and reporting requirements is "informational." .......... 18

III.) Disclosure burdens a nonprofit advocacy group's First Amendment rights and loses its constitutional viability as the universe of information to be disclosed grows past the information that actually helps voters .......... 22

IV.) The $100 PAC reporting threshold is not substantially related to serving the stated state interest, and the "acting in concert" PAC requirements are therefore not constitutionally permitted .......... 29

Conclusion .......... 31

## Table of Authorities

### Cases

*Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 1447 L.Ed.2d 554 (2000) .......... 15, 16

*Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed. 599 (1999) .......... 20

*Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) .......... passim

*Burson v. Freeman*, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed 2d 5 (1992) .......... 16

*Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 107 S.Ct. 434, 70 L.Ed.2d 492 (1981) .......... 11, 14, 15

*City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) .......... 16

*Colorado Right to Life Committee, Inc. v. Davidson*, 395 F.Supp.2d 1001 (D. Colo. 2005) .......... 28

*Day v. Holahan*, 34 F.3d 1356 (8th Cir. 1994) .......... 28

*FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed. 21 539 (1986) .......... 17, 18, 21, 27, 28

*FEC v. Nat'l Rifle Assoc. of Am.*, 254 F.3d 173 (D.C. Cir. 2000) .......... 28

*FEC v. Survival Education, Inc.*, 65 F.3d 285 (2d Cir. 1995) .......... 28

*First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) .......... 11, 14, 21

*Forum for Academic and Institutional Rights v. Rumsfeld*, 390 F.3d 219 (3rd Cir. 2004) .......... 16

*Garrison v. Louisiana*, 329 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 175 (1964) .......... 14

*McConnell v. Federal Election Commission*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) .......... 17, 18, 19, 21, 21

*Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) .................................14

*North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) ............................28

*Republican Party of Minnesota v. White*, 416 F.3d 738 (8th Cir. 2005) ..............................14, 15

*Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244,
82 L.Ed.2d 462 (1984) ..........................................................................15, 16

*Vote Choice, Inc. v. DiStefano*, 814 F.Supp. 195 (D.R.I. 1993) ..........................................5, 11

*Whitney v. California*, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) ................................ 1

**States and Public Laws**

P.L. 1981, ch. 188, sec. 1 ..........................................................................3, 7, 8

P.L. 1981, ch. 322, sec. 1 .......................................................................... 7

R.I.G.L. §17-25-3 ..........................................................................4, 5

R.I.G.L. §17-25-7 .......................................................................... 5, 10

R.I.G.L. §17-25-10 ..........................................................................passim

R.I.G.L. §17-25-10.1 .......................................................................... 5, 11

R.I.G.L. §17-25-15 ..........................................................................4, 5

R.I.G.L. §17-25-23 ..........................................................................6, 7

R.I.G.L. §17-25.1-1 – R.I.G.L. §17-25.1-6.......................................................... 8

**Articles**

Bradley A. Smith, *Faulty Assumptions and Undemocratic Consequences of Campaign Finance Reforms*, 105 Yale L.J. 1049 (1996) ...................................23, 24

Elizabeth A. Garrett, Daniel A. Smith, *Veiled Political Actions and Campaign Disclosure Laws in Direct Democracy*,
4 Election L.J. 295 (2005) ..........................................................24, 25, 26, 27

Elizabeth Garrett, *McConnell v. FEC and Disclosure*, 3 Election L.J. 237 (2004)....................26, 29

Elizabeth Garrett, *Voting with Cues*, 37 U. Rich L. Rev. 1011 (2003) ....................22, 23, 26

Spencer Overton, *Restraint and Responsibility: Judicial Review of Campaign Reform*, 61 Wash. & Lee L. Rev. 663 (2004) ....................1

## Introduction

Participation is a crucial democratic value,[1] and "and "[t]he greatest menace to freedom is an inert people."[2] Non-profit advocacy groups are a vital means by which individual citizens participate in public discourse about public issues, and they create the opportunity for meaningful widespread participation in the political process. *Restraint and Responsibility* at 726. Individuals organize non-profit advocacy groups to engage in research, organizing and advocacy, often making "unique and important contributions to [both] citizen and legislative deliberation." *Id.* The important democratic values fostered by such grass roots activities, however, can be hindered by complex campaign regulations, and the challenge of campaign finance reform is to protect the electoral process without threatening and chilling pure, non-profit grass roots group advocacy. Rhode Island election law, as applied to ballot question elections, does not meet this challenge.

The State Board of Elections insists that state law PAC requirements apply to "in concert" activities related to ballot advocacy by non-profit advocacy groups, and multiple groups coming together to form a Coalition for the purposes of a specific ballot question. The result is that both the non-profit corporation raising funds for a ballot question campaign, and the Coalition's effort to pool the resources of a number of organizations and individuals, are subject to PAC organizational and reporting requirements.

---

[1] Spencer Overton, *Restraint and Responsibility: Judicial Review of Campaign Reform*, 61 Wash. 8 Lee L. Rev. 663, 712 (2004).

[2] *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring).

In each instance the non-profit organization and Coalition are required to report every contribution over $100, and the name, address and place of employment of the contributor. The State, through the Board of Elections, asserts the purpose of this disclosure requirement is "informational," that is, to inform the electorate of the identity of the non-profit or coalition's financial supporters.

Common Cause asserts the reporting threshold is unconstitutionally overbroad for its intended purpose, because the utility of disclosing the identity of financial contributors has limits. While there is informational value in disclosing the identities of a group's major financial supporters, particularly supporters giving significant sums of money and whose identity and reputation convey meaning to the average voter, requiring either a non-profit advocacy group, or a coalition of groups, to gather, collect and disclose the identity of supporters who have contributed only *de minimis* amounts, and whose identity will convey no useful "cue" to voters, serves no informational purpose. As applied to non-profit groups engaging in ballot advocacy, the $100 disclosure threshold therefore serves no compelling state interest, and therefore unconstitutionally burdens the group's First Amendment freedom of expressive association.

Common Cause supports appropriately circumscribed disclosure requirements supplying voters with useful information. Useful information, however, consists of the identity of the individuals, corporations, or other entities with substantial wealth, who provide major funding for an organization engaged in ballot question activity, particularly when the contributors have identifiable interests and positions that are generally known. Disclosure may also serve an interest in inhibiting corporations or organizations, whose support for a referendum may alienate voters, from creating or using non-profit entities to keep their participation hidden. The $100

disclosure threshold, however, serves neither purpose in a "narrowly tailored," or even "closely drawn" way.

Since the PAC disclosure requirement as currently written imposes burdens not furthering any interest of the state, compelling or otherwise, those requirements should be declared unconstitutional and unenforceable.

**Statement of the Case**

*The Statutory Scheme on its Face*

The title to §17-25-10 of the Rhode Island Campaign Contributions and Expenditures Reporting Act suggests it is intended to address three subjects: 1) "[l]awful methods of contributing to support of candidates," 2) "[r]eporting," and 3) "[d]isposition of anonymous contributions." As initially enacted in 1974 that section, as well as the Act as a whole, addressed only candidate campaigns for public office. Beginning in 1981, however, it was amended to regulate contributions and expenditures made for ballot question advocacy as well, that is, advocacy for "the approval or rejection of any question in any campaign." R.I.G.L. §17-25-10(a), (b). *See* P.L. 1981, ch. 188, sec. 1.

By its present terms subsection 10(a) prohibits *any* contribution or expenditure to advocate approval or rejection of a ballot question unless it is made "through" the campaign treasurer for one of three entities: 1) a candidate for public office, 2) a political party committee, or 3) a political action committee (PAC). As a result, subsection (a) prohibits any person or entity from contributing money for the defeat or passage of a ballot question unless the money goes through the segregated account of a formal PAC. It also appears to prohibit a person or

entity from directly expending money on a ballot question unless it is itself a PAC with a segregated account.

For example, if Common Cause desired to receive contributions for the purpose of advocating for or against a ballot question, under the terms of §17-25-10(a) it would have to form a political action committee and appoint a campaign treasurer in order to collect those contributions.[3] Similarly, if Common Cause wished to expend its own general funds to advocate for or against the same ballot question, by its literal terms section (a) prohibits those funds from being expended "except through" a PAC, meaning Common Cause would either have to give the funds to a Pac or form its own PAC for that purpose.[4] PAC requirements are not insignificant.

The Act broadly defines a "political action committee" as "any group of two(2) or more persons that accepts any contributions . . . to be used for advocating the approval or rejection of any question or questions submitted to voters." R.I.G.L. §17-25-3(9). Section 17-25-15(a) prohibits a PAC from accepting "any contributions or mak[ing] any expenditures prior to filing notice of its organization with the board of elections." If formed for the purposes of ballot question advocacy, the notice must identify "the question or questions whose approval or rejection the committee intends to advocate[,]" and the PAC may not advocate with respect to any other question without amending its notice of organization. R.I.G.L. §17-25-15(a)(1), (b). More importantly, PACs must comply with substantial reporting requirements, disclosing contributions and expenditures. For example they must report,

[3] "No contribution shall be . . . received, . . . to advocate the approval or rejection of any question in any election except through: . . . (3) the duly appointed campaign treasurer, or deputy campaign treasurer of a political action committee." R.I.G.L. §17-25-10(a).

[4] ". . . no expenditures shall be directly made or incurred . . . to advocate the approval or rejection of any question in any election except through: . . . (3) The duly appointed campaign treasurer or deputy campaign treasurer of a political action committee." R.I.G.L. §17-25-10(a).

- the source and amount of *all contributions in excess of $100*, including the name, address, and place of employment of the source, and
- the name and address of each person to whom an expenditure in excess of $100 was made, the amount, and the purpose of the expenditure.

R.I.G.L. §§17-25-7(a); 17-25-15(c)(1), (2).[5]

While subsection (b) of 17-25-10 provides that it is lawful "for any person" to "expend personally from that person's own funds a sum . . . to advocate the approval or rejection of any question;" they may only do so if that expenditure is "not otherwise prohibited by law[.]" If subsection (a) does in fact require all expenditures for ballot advocacy to go through a PAC, the law would "otherwise prohibit" an expenditure of a corporation's general funds unless made through a PAC.[6] Section 17-25-10.1(j) reinforces Sections 10(a) and 10(b), providing: "no entity other than an individual or political action committee . . . shall make *any contribution to or any expenditure on behalf of or in opposition to* any . . . ballot question[.]" (Emphasis added).

In *Vote Choice, Inc. v. DiStefano*, 814 F.Supp. 195 (D.R.I. 1993) (Vote Choice II), the Court held that §17-25-10.1(j)'s requirement that all independent corporate *expenditures* for ballot advocacy purposes must come from a segregated PAC account was unconstitutional. 814 F.Supp. at 198. The Court also determined §17-25-10(a) did not require non-profit corporations to make *contributions* for ballot advocacy through the administrative filter of a PAC. *Id.* at 199.[7]

[5] The RIACLU has set forth the full extent of the administrative and organizational burden of the PAC requirement at pages 33-35 of its brief.

[6] R.I.G.L. §17-25-3(8).

[7] Although he acknowledged that "from a purist's standpoint," the wording of §17-25-10(a)(3) was susceptible of the interpretation that the establishment of a PAC was required, he accepted the Board of Election's representation and evidence that the statute had "never been interpreted by the Board to require corporations to establish PACs for the purpose of making contributions or expenditures with respect to ballot questions." *Id.* at 199. Consequently he applied that interpretation to §17-25-10(a)(3).

The sum and substance of Judge Pettine's rulings are that non-profit and for-profit corporations can independently expend money on ballot advocacy out of their general treasury accounts, as contributions or expenditures, without forming a PAC. The only reporting requirement is to report expenditures in excess of $100.00. But what if a non-profit group such as the RIACLU or Common Cause wants to solicit funds for the specific purpose of ballot advocacy, does the Act require it to form a PAC and report all contributions of $100 or more? What if they wish to contribute money and expertise to a coalition of groups or individuals with the same position on the ballot question, is the coalition required to form a PAC and report all contributions of $100 or more? According to the Act it depends on whether they are "acting in concert" with respect to advocacy for or against the ballot question.

*"Acting in Concert" Contribution and Expenditures*

Section 17-25-10(b) declares it unlawful for any person (that is, any individual, corporation or any other organization) to "*act[ ] in concert with any other person or group . . .* to support or defeat a candidate or to advocate the approval or rejection of any question[.]" (Emphasis added). Subsection(b) then declares that:

> Whether a person is "acting in concert with any other person or group" for the purposes of this subsection shall be determined by application of the standards set forth in §17-25-23.

R.I.G.L. §17-25-10(b).

Prior to 1981, subsection 10(b) did not reference ballot question advocacy. The Act was initially promulgated to regulate campaigns for public office and was structured and drafted with that in mind. It made it unlawful for persons or groups to "act in concert" with respect to the support or defeat of a candidate for political office, unless the parties "in concert" organized a

PAC and complied with the PAC reporting requirements. *See* P.L. 1981, ch. 188, sec. 1. Consequently §17-25-23 addressed "any funds expended" for the purpose of influencing the election of a candidate for public office, and it described situations when the expenditure would be considered either a contribution to the candidate or the candidate's own expenditure. For example, it is considered a candidate contribution or expenditure when:

> [t]here is *any arrangement, coordination, or direction with respect to the expenditure* between the candidate or the candidate's agent and the person making the expenditure[,]

R.I.G.L. §17-25-23(1) (emphasis added), or where:

> [t]he person making the expenditure, including any officer, director, employee, or agent of the person, *has communicated with, advised, or counseled the candidate* or the candidate's agents at any time on the candidate's plans, projects, or needs relating to the candidate's pursuit of election to general office in the same election cycle, including any advice relating to the candidate's decision to seek election to general office[.]

R.I.G.L. §17-25-23 (3) (emphasis added). The remaining scenarios described in §17-25-23 are replete with phrases referencing the "candidate's pursuit," the "candidate's plans," or the "candidate's campaign." The statute is clearly targeted at "coordinated" expenditures that will benefit a candidate's pursuit of public office, with the knowledge of the candidate, but has not been made through a PAC.

In 1981 §17-25-10(b) was amended to apply the bar on non-PAC "acting in concert" activity to non-PAC "advocat[ing for] the approval or rejection of any question," but §17-25-23's definition of "acting in concert" for candidate campaigns was not amended to apply to ballot advocacy. *See* P.L. 1981, ch. 188, sec. 1.[8] Fourteen years later, however, the Board of Elections

---

[8] That was the same year that the General Assembly enacted chapter 17-25.1 to regulate gambling referenda specifically. *See* P.L. 1981, ch. 322, sec. 1. It appears the General

addressed this discrepancy by adopting an exceptionally broad, all encompassing definition of the three words "acting in concert." Two persons or entities, or a person and an entity, "are acting in concert" with respect to a ballot question when:

> (a) there is any arrangement, coordination, or direction between the person making the expenditure and any other person;
>
> (b) if, during the election cycle, the person making the expenditure is, or has been authorized to raise or expend funds on behalf of another person to be used to aid or defeat a ballot question, or if the person making the expense will be receiving any form of compensation or reimbursement from any other person;
>
> (c) the person making the expenditures communicated with, advised or counseled other persons on the plans, projects, and needs relating to the aiding or defeating of the election of the ballot question;
>
> (d) the person making the expenditure retains the professional services of any individual or other person also providing those services to others in connection with the aiding or defeating of the same ballot question;
>
> (e) the person making expenditures communicated or consulted at any time during the election cycle about the person's plans, projects, or needs with any other entity, or officer, director, or employer or any other entity that has made, or intends to make expenditures to aid or defeat the ballot question on the same side as the person making the expenditure or any person whose professional services had been retained by another entity that has made or intends to make expenditures to aid or defeat the same ballot question; and
>
> (f) the expenditure is based on information provided to the person making the expenditure directly or indirectly by others making similar expenditures about the person's

Assembly simply decided to plug references to ballot questions into chapter 17-25 as well. *See* P.L. 1981, ch. 188, sec. 1. As enacted in 1981 chapter 25.1 consisted of §17-25.1-1 and §17-25.1-2. In July 2004 chapter 25.1 was amended to add §17-25.1-3 through §17-25.1-6.

> plans, projects, or needs provided that the other person is aware that the other person has made, or is planning to make expenditures expressly to advocate or defeat the ballot question on the same side as the person making the expenditure.

AO #95-01.

The significant difference between the ban on non-PAC "in concert" activity in candidate elections, and the ban on non-PAC "in concert" activities with respect to ballot questions, is that the ban in candidate elections is narrower, more focused, and designed to prevent the corruption of an individual who may be a public official and in a position to favor the persons or entities he or she acted "in concert with." The "in concert" ban for ballot question campaigning, on the other hand, is not focused on a single person who may be corrupted. Instead it would apply to any and all persons or entities that coordinate efforts in any way to defeat or pass a ballot question. Although there is no danger of one person "corrupting" another, the number of persons or entities it is unlawful to "act in concert with" on a ballot question is exponentially greater than the single candidate and his agents it is unlawful to "act in concert with" in a candidate election.

The definition for "in concert" activity with respect to ballot questions was formulated and announced by the Board of Elections in 1995 in an advisory opinion to the Providence Chamber of Commerce. In that opinion the Board advised the Chamber that it "may seek financial support from its members enabling it to advocate the approval or defeat of a ballot question *so long as the Chamber does not inform its members of the reason for its solicitation*[.]" AO #95-01 (emphasis added). That is, the Chamber could seek contributions from its members for a ballot question campaign, but could not tell them that was its purpose. The Chamber could only advise its members of the contribution's purpose if it formed a PAC. *Id.*

If the Chamber also wanted to encourage other persons, organizations or groups to work to pass or defeat the ballot question, according to the Board it could make an "open request" for them to do so -- but it could not tell them why they should, or advise the other organizations, even indirectly, as to how to spend their money in that common endeavor, unless another PAC was created for that larger collaborative purpose. Of course, each of the separate organizations could not solicit contributions unless they created their own PACs as well, to segregate contributions intended to aid in the organization's ballot question campaign.

Each of these multiple PACs would be required to report both the source and the amount of every contribution in excess of $100. R.I.G.L. §17-25-7(a).

*Common Cause of Rhode Island*

Common Cause of Rhode Island is a nonprofit non-partisan organization formed for the purpose of ensuring effective, open, ethical and accountable government processes that promote representative democracy. With a professional staff of only three – an Executive Director, an Associate Director and a Research Director – it is essentially a volunteer organization that endeavors to educate and mobilize citizens to act on important issues concerning the operation and structure of government.

Since 1992 Common Cause has been involved in several ballot advocacy campaigns – four year terms for statewide General Officers, Merit Selection for Rhode Island judges, modernizing the General Assembly, Separation of Powers, and most recently, whether a Constitutional Convention should have been convened to consider revising the state constitution. In the four campaigns for structural reform of Rhode Island state government Common Cause was involved in a continuum of work beginning with research and continuing through policy

development, legislative lobbying, and eventually ballot advocacy. Coalitions involving other advocacy groups and organizations were built as the proposals evolved, and appeals to Common Cause members for funds were typically made with respect to the issue being worked at that time. In each campaign the prohibition against "acting in concert," and the indeterminacy of what that meant, made it difficult or impossible to share the costs of advocacy campaigns within the coalition.

*The ACLU's Attack on "Acting in Concert."*

The Rhode Island Affiliate of the American Civil Liberties Union (RIACLU) brings this action making essentially three attacks on the Rhode Island Campaign Contributions and Expenditures Reporting Act. First, it takes aim at what was left undone in *Vote Choice II.* In *Vote Choice II* Judge Pettine declared §17-25-10.1(j)'s bar on "*expenditures*" by corporations from their general funds in ballot question advocacy campaigns was unconstitutional, but did not reach the question of the constitutionality of that section's ban on corporate "*contributions*." 814 F.Supp. at 819. Here RIACLU has asserted §17-25-10.1's ban on corporate contributions for ballot question advocacy is as constitutionally infirm as the ban on corporate expenditures. Citing *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Board of Elections does not contest this claim, or defend the constitutionality of the ban on corporate contributions from general funds. (Board Mem. at 5).

Secondly, RIACLU attacks the constitutionality of §17-25-10.1(j)'s limits on corporate contributions to the extent it applies to a ballot question advocacy campaign. Citing *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed 492 (1981), the Board has not defended the constitutionality of this statute either. (Board Mem. at 6).

Lastly, the RIACLU contests the validity of the burdens placed on ballot question advocacy by the "acting in concert with any other person or group" provision in §17-25-10(b). The attack focuses on the Board's definition of "acting in concert" articulated in AO 95-01, the breadth and uncertainty of the type of advocacy that phrase applies to, and the prohibitions and requirements with which that expressive and associational First Amendment conduct would be burdened by PAC requirements. RIACLU ultimately asserts the "acting in concert" burdens should not apply to ballot question advocacy either as a matter of statutory construction or constitutional law.

The Board responds to the overbreadth and vagueness arguments concerning the definition of "acting in concert" in AO 95-01 by attempting to abandon it. (Board Memo. at 4-5). The Board asserts that despite the AO 95-01 definition, it has:

> not sought to extend the term "acting in concert" to any activity apart from *the solicitation and acceptance of contributions.* * * * Thus, despite the broad language of AO 95-01, the actual enforcement by the Board has been limited to *solicitation, accepting and pooling of funds.* The Board has not sought, and does not seek, to police mere coordinated speech.
>
> * * *
>
> The "acting in concert" language in R.I. Gen. Laws §17-25-10(b) has never been applied by the Board to mere coordination, consultation or collaboration. The PAC *reporting and contribution disclosure requirement are only triggered when funds have been contributed from more than one person for the specific purpose of ballot question advocacy.*

(Board Memo. at 4-5) (emphasis added). The Board asserts it has begun "the process of promulgating rules and regulations" to implement its vision of the limited scope of "acting in concert," although no regulations have yet been implemented. (Board Mem. at 5).

The Board then defends the constitutionality of imposing PAC reporting and disclosure requirements, and the requirement to form a PAC itself, on the associational activities of non-profit advocacy groups. It defends the constitutionality of applying PAC organizational and reporting requirements to nonprofit advocacy groups soliciting funds for their own ballot advocacy activity, and to coalitions of groups pooling their resources for coordinated ballot advocacy activity, asserting the PAC burdens are justified in both instances because of the state's compelling interest in disclosure. According to the Board, disclosure is intended to perform an "informational" function. (Board Mem. at 22).

> The public has a legitimate interest in knowing the identity of persons contributing to another person, entity or fund for the support or defeat of a ballot question as well as how those funds are being expended by the entity or fund itself. * * * The influx of money spent to advocate for or against a ballot question produces an onslaught of political communications through which voters must pick out meaningful and accurate messages. Given the complexity of many ballot questions, and the likely inability or unwillingness of the electorate to independently study the details of individual ballot measures, being able to evaluate who is doing the talking is of critical importance.

(Board Mem. at 22).

Common Cause asserts that much of the disclosure required by the $100 threshold for reporting individual contributions serves no meaningful informational interest at all. It does not further any "compelling" or even "substantial" state interest, and therefore interferes, burdens and infringes the exercise of group political speech, and the freedom of expressive association, in an unconstitutional manner.

## Argument

### I.) The PAC organizational and reporting requirements must be evaluated under strict scrutiny.

"[T]here is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776-77, 98 S.Ct. 1407, 1416, 55 L.Ed. 707 (1978) (quoting *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966)). The Speech Clause of the First Amendment not only fosters individual expression, it plays an essential "role in affording the public access to discussion, debate and the dissemination of information and ideas." *Id.* at 783, 98 S.Ct. at 1419. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government[,]" *id.* at 777 n. 12, 98 S.Ct. at 1416 N. 12 (citing *Garrison v. Louisana*, 329 U.S. 64, 74-75, 85 S.Ct. 209, 216, 13 L.Ed.2d 175 (1964)), and "[p]rotection of political speech is the very stuff of the First Amendment[.]" *Republican Party of Minnesota v. White*, 416 F.3d 738, 748 (8th Cir. 2005). Because it is at the core of the First Amendment, it is "highly protected." *Id.* at 749.

But the First Amendment also "protects political association as well as political expression[.]" *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 295 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981) (quoting *Buckley v. Valeo*, 434 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976)). Association for political and expressive purposes has long been a means of participating in our democracy:

> [T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process, * * * The tradition of volunteer committees for collective action has manifested itself in myriad community and

> public activities; in the political process it can focus on a candidate or on a ballot measure. Its value is that by collective effort individuals can make their views known, when individually, their voices would be faint or lost.

454 U.S. at 294, 102 S.Ct. at 436. The freedom to associate is inherent in the liberties protected by the First Amendment, if it were not, many of the Amendment's guarantees would often ring hollow:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances would not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed . . . Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

416 F.3d at 748 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). Consequently, the Supreme Court has found that, inherent in the First Amendment is the freedom of "expressive association," *Boy Scouts of America v. Dale*, 530 U.S. 640, 648, 120 S.Ct. 2446, 2452, 147 L.Ed.2d 554 (2000), and recognized that effective advocacy of public and political ideas "is undeniably enhanced by group association, as the Court has more than once recognized by remarking on the close nexus of speech and assembly." *Citizens Against Rent Control,* 454 at 295, 102 S.Ct. at 437 (quoting *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958)). Moreover, the importance of the freedom to associate "is diluted if it does not include the right to pool money through contributions, for funds are often essential if advocacy is to be truly or optimally effective." *Id.* at 296, 102 S.Ct. at 437 (quoting *Buckley*, 424 U.S. at 65-66, 96 S.Ct. at 656-57).

Government actions that unconstitutionally burden the freedom of expressive association may take many forms. *Dale,* 468 U.S. at 648, 120 S.Ct. at 2452. The focus of Common Cause's discussion of the PAC disclosure requirements is the effect that requirement has on the ability of a number of smaller actors to exercise individual core political speech as "group political speech" or "expressive association." Although the freedom of expressive association is not absolute, it may only be overridden by regulations "adopted to serve compelling state interests unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* (citing *Roberts v. United States Jaycees*, 468 U.S. at 622, 104 S.Ct. 3244). As the Third Circuit Court of Appeals has described, any regulation that significantly disrupts an expressive association "must be narrowly tailored to serve a compelling governmental interest and must use the least restrictive means of promoting the Government's ascribed interest." *Forum for Academic and Institutional Rights v. Rumsfeld*, 390 F.3d 219, 230 (3rd Cir. 2004). Designated "strict scrutiny," *see Burson v. Freeman*, 504 U.S. 191, 211, 112 S.CT. 1846, 119 L.Ed.2d 5 (1992), the compelling interest test is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S.Ct. 2157, 2171, 138 L.Ed.2d 624 (1997).

The argument asserted by Common Cause in this brief must be contrasted with the primary constitutional arguments made against compelled disclosure in *Buckley v. Valeo*. There the First Amendment right at stake was an individual right, not a group right. *Buckley* addressed the potential infringement disclosure requirements would have on an individual's "privacy of association and belief guaranteed by the First Amendment." 424 US. at 64, 96 Ct. at 656. The concern was that the potential for disclosure would deter individuals from contributing because of the possibility of economic or physical harm, or other forms of public hostility should their

views become known. *Id.* at 68-69, 96 S.Ct. at 658. In *Buckley* the Court held that the state interest used to justify the burden of disclosure must survive "*exacting scrutiny*," even if "any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure." *Id.* at 64-65, 96 S.Ct. at 656. The Court held there must be a "*substantial relation* between the governmental interest and the information required to be disclosed." *Id.* at 64, 96 S.Ct. at 656. *Buckley* also foreclosed a facial attack on disclosure requirements where the claim was that the requirement might subject an individual to threats, harassment or reprisals. *McConnell v. Federal Election Commission*, 540 U.S. 93, 197-98, 124 S.Ct. 619, 691-92, 187 L.Ed.2d 491 (2003). In that context, the Court has held that such challenges must be made to the statute as applied to particular individuals in a particular circumstance, and supported by evidence. *Id.* at 199, 124 S.Ct. at 692.

But *Buckley* was concerned not only with the chilling effect of reporting and disclosure requirements on an organization's contributors, *FEC v. Massachusetts Citizens for Life, Inc.*, 429 U.S. 258, 265, 101 S.Ct. 616, 631, 93 L.Ed.2d 539 (1986) (O'Connor, concurring in part and concurring in the judgment) (citing 424 U.S. at 66-68, 96 S.Ct. at 658), (*MCFL*), "but also with the potential burden of disclosure requirements on a group's own speech." *Id.* at 265, 107 S.Ct. at 632 (citing 424 U.S. at 79-82, 96 S.Ct. at 661-664).

The argument set forth here by Common Cause focuses not on the deterrent effect disclosure might have on potential contributors who fear hostility or reprisal, but rather on the burden the administrative and organizational requirements mandatory disclosure would have on the expressive association freedom of the group, and its ability to pool resources for group political speech. *See MCFL*, 479 U.S. at 266, 107 S.Ct. at 632 (O'Connor, J., concurring in part

and concurring in judgment) ("In my view, the significant burden on MCFL in this case comes not from the requirements that it must satisfy, but from the additional organizational restraints imposed on it by the Act . . . require[ing MCFL] to assume a more formalized form[.]"). Common Cause asserts the applicable standard for reviewing such a challenge is strict scrutiny, and that a facial attack on the PAC reporting requirements as applied to non-profit advocacy groups is permissible -- particularly where the dollar threshold for reporting is so low that it requires the reporting of contributions fulfilling no substantial government interest. *See MCFL*, 479 U.S. at 224 n. 7, 107 S.Ct. at 626 n. 7.

**II.) The compelling interest the State claims requires PAC organizational and reporting requirements is "informational."**

In articulating the State's interest allegedly furthered by PAC reporting and disclosure requirements for non-profit groups in ballot question campaigns, the Board of Elections relies not on a ballot question case, but on the candidate campaign case of *McConnell v. Federal Election Commission*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). The Board points to the following quote from *McConnell*:

> The factual record demonstrates that the abuse of the present laws not only permits corporations and labor unions to fund broadcast advertisements designed to influence federal elections, but permits them to do so while concealing their identities from the public. BCRA's [Bipartisan Campaign Reforms Act] disclosure provisions require these organizations to reveal their identities so that the public is able to identify the source of the funding behind broadcast advertisements influencing certain elections . . . Curiously, plaintiffs want to preserve the ability to run these advertisements while hiding behind dubious and misleading names * * * Given these tactics, Plaintiffs never satisfactorily answer the question of how 'uninhibited, robust, and wide open' speech can occur when organizations hide themselves from the scrutiny of the voting public. Plaintiff's argument for striking down BCRA's disclosure

> provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled by BCRA, but ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace.

(Board Mem. at 18-19) (quoting 590 U.S. at 196-97, 124 S.CT. at 690-91). The Board asserts that "only through the filing of a political action committee notice of organization and subsequent reporting can Rhode Island citizens be fully informed of the persons contributing to support or defeat of a ballot question[,]" (Board Mem. at 19), and broadly states that *McConnell* "affirmed that PAC disclosure requirements compelling organizations to reveal their identities [do] not impermissibly infringe upon . . . First Amendment rights." (Board Mem. at 18).

While *McConnell* did uphold the PAC disclosure requirements under BCRA, it did so based upon the distinct state interests in the context of candidate election campaigns: 1) providing the electorate with information about the candidate and his or her supporters; 2) deterring the actual corruption of the candidate and avoiding any appearance thereof; and 3) gathering the data necessary to enforce more substantive election restrictions. 540 U.S. at 196, 124 U.S. at 690. The weakness of the Board's position, however, lies in its mistaken premise that the state interest supporting disclosure requirements in candidate elections is identical to the state interest in disclosure for ballot question elections. They are not. In the candidate case the focus is on preventing public office holders from being corrupted by, or at least becoming beholden to, financial supporters who seek access and influence over the officeholder as they perform their public duties. In ballot cases, where that element of corruption does not exist, the purpose of disclosure is purely informational, and the Supreme Court has recognized this distinction.

In *McConnell*, the Supreme Court considered the Bipartisan Campaign Reform Act of 2002, a series of amendments to the Federal Election Campaign Act of 1971 addressing candidate elections. The Court acknowledged the corruption traditionally associated with elections for public office.

> More than a century ago the "sober-minded Elihu Root" advocated legislation that would prohibit political contributions by corporations in order to prevent "the great aggregations of wealth, from using their corporate funds," directly or indirectly, "to elect legislators who would" vote for their protection and advancement of their interests as against those of the public.

540 U.S. at 115, 124 S.Ct. at 643-44 (internal citations omitted). The Court noted Congress "has repeatedly enacted legislation endorsing Root's judgment." *Id.* at 115, 124 S.Ct. at 644. In early 1972 Congress's "steady improvement" of the national election laws resulted in the enactment of FECA, the primary purpose of which was "*to limit the actuality and appearance of corruption resulting from large individual financial contributions*" to candidates for public office. *Id.* at 117, 120, 124 S.Ct. at 645, 647 (emphasis added). FECA's disclosure and reporting requirements were upheld in *Buckley v. Valeo*, because they vindicated the state's interest in: 1) providing information to the electorate; 2) deterring actual corruption of public officials and discouraging the use of money for improper purposes; and 3) facilitating enforcement of the prohibitions in the Act. 540 U.S. at 121, 124 S.Ct. at 647-48 (citing *Buckley*, 424 U.S. at 66-68, 96 S.Ct. at 612). BCRA's disclosure provisions were upheld for the same reasons. *Id.* at 196, 124 S.Ct. at 690. In candidate campaigns, PAC organizational and disclosure requirements "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 202, 119 S.Ct. 636, 647, 142 L.Ed.2d 599 (1999) (quoting *Buckley v. Valeo*, 424

U.S. at 67, 96 S.Ct. at 612). *McConnell* reasoned "the PAC option allows corporate political participation without the temptation to use corporate funds for *political influence*[.]" *Id.* at 204, 124 S.Ct. at 695 (emphasis added). That is, influence over and access to a corrupted -- or at least heavily influenced -- elected official.

The Supreme Court has recognized, however, that the element and risk of corruption existing in candidate campaigns is absent from an electoral contest over an issue. "To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined . . . ," *Citizens Against Rent Control*, 454 U.S. at 297, 102 S.Ct. at 438 (quoting *Buckley*, 424 U.S. at 26-27, 96 S.Ct. at 638), but:

> [r]eferenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue. To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it. The Constitution "protects expression which is eloquent no less than that which is unconvincing." (citation omitted).

459 U.S. at 298, 102 S.Ct. at 438 (quoting *Bellotti*, 435 U.S. at 790, 98 S.Ct. at 1423). Dicta in *Bellotti* notes that citizens are entrusted with the responsibility for judging and evaluating the relative merits of different sides in an issue election, and that "[t]hey may consider, in making their judgment, the source and credibility of the advocate." 435 U.S. at 791, 98 S.Ct. at 1424. While the state may generally have an interest in reporting and disclosure requirements in ballot question elections, as well as candidate elections, the absence of the office-holder corruption element's threat to representative government makes the interest significantly paler than it is in

the wholly separate context of candidate elections. In the absence of the corruption element, disclosure's sole justification is, as the Board acknowledges, "informational."

But the informational justification has limits, limits formed by the usefulness of the information to the voter, and when the burden of disclosure exceeds those limits the burden on expressive and associational rights becomes constitutionally intolerable. Consequently, this Court must examine the information that the PAC reporting requirements compel non-profit organizations to compile and disclose in ballot question elections, the burden of tracking and producing it, and most important, whether that information assists voters in making informed decisions about ballot questions. If the required information will not assist the voter, the burden of producing it, which interferes with the exercise of fundamental First Amendment rights, is unconstitutional. It is not narrowly tailored to serve a compelling state interest, or even closely drawn to serve a substantial state interest.

## III.) Disclosure burdens a nonprofit advocacy group's First Amendment rights and loses its constitutional viability as the universe of information to be disclosed grows past the information that is actually helpful to voters.

While providing more information to voters sounds worthwhile in principle, disclosure does not come without costs and they must be considered. It imposes burdens on those who must comply with complex laws, Elizabeth Garrett, *Voting with Cues*, 37 U. Rich. L. Rev. 1011 (2033), and it "has the potential for substantially infringing the exercise of First Amendment rights." *Buckley*, 424 U.S. at 66, 96 S.Ct. at 657.[9] If the costs are high enough some groups and

[9] One of the infirmities of the Rhode Island Campaign Contributions and Expenditures Reporting Act is that it treats candidate campaigns and ballot question campaigns as virtually identical processes, subjecting ballot question advocacy and candidate advocacy to the same PAC organizational and reporting requirements, notwithstanding the "apples and oranges" quality of

individuals may no longer be able to contribute or spend money to produce political advertisements, and the amount of speech funded by such sources will decline. *Voting with Cues*, 37 U. Rich L. Rev. at 1011. The Supreme Court has recognized that PAC organizational and reporting requirements burden small non-profit organizations formed for the purposes of issue discussion and the advancement of political ideas. *See MCFL*, 479 U.S. at 254-55, 107 S.Ct. at 626. In *MCFL* the Court recognized that "[d]etailed recordkeeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records, impose administrative costs that many small entities may be unable to bear." *Id.* "Furthermore, such duties require a far more complex and formalized organization than many small groups could manage." *Id.* Such a burden on First Amendment rights can only be justified by a "substantial" or "compelling" state interest. *Id.* at 254 n. 7, 256, 107 S.Ct. at 626 n. 7.

Regulation also typically favors those already familiar with the regulatory machinery and those with the money and sophistication to hire lawyers and accountants to ensure they know under what circumstances they are subject to regulatory filing requirements, and then how to comply with them. *See* Bradley A. Smith, *Faulty Assumptions and Undemocratic Consequences of Campaign Finance Reforms,* 105 Yale L.J. 1049, 1082-83 (1996) ("*Faulty Assumptions*). Consequently, the heat of electoral politics may lead to the filing of complaints with the regulatory bodies policing the elections, subjecting groups and organizations to litigation that, again, requires professional representation. *Faulty Assumptions* at 1083.[10] Some commentators

---

the two. In 1981, the General Assembly took an Act directed solely at candidate campaigns, and with the mere insertion of a few words made its requirements applicable to ballot question campaigns.

[10] One commentator has called such litigation a "major campaign tactic." *Faulty Assumptions* at 1083.

argue that, as a consequence, "[e]fforts to regulate campaigns . . . have [had] the perverse effect of professionalizing [participation in] politics and distancing the system from ordinary citizens." *Faulty Assumptions* at 1083. Regulation generally favors organized and well-financed special interests over grassroot campaign activity.[11]

Disclosure requirements can fulfill important state interests, but the function of disclosure in ballot question elections is strictly informational, and the parameters of the required disclosures must fulfill that function by insuring the information will in fact assist the voter. Thoughtfully targeted, disclosure requirements can ensure and improve voter competence in initiative and referendum elections. Elizabeth Garrett, Daniel A. Smith, *Veiled Political Actors and Campaign Disclosure Laws in Direct Democracy*, 4 Election L.J. 295, 296, (2005) (*Veiled Political Actors*). Thoughtlessly targeted, however, disclosure becomes an unconstitutional burden on the First Amendment freedom of expressive association.

To determine whether disclosure requirements are thoughtfully targeted, and their burdens constitutionally permissible, the Court must consider the purpose of disclosure in ballot campaigns and whether the particular disclosure requirements fulfill that purpose. The theory underlying disclosure is that:

> policymakers can improve the competence of ordinary voters by structuring the informational environment to provide citizens with *cues* . . . that will help them to vote competently with limited data. *Appropriately tailored* disclosure statutes are vital to this effort.

---

[11] Professor Smith reports that "[e]ven sophisticated interest groups have found campaign finance laws to be a substantial hindrance to grassroots campaign activity and voter education efforts." *Id.* at 1084. For example, in 1994 both the American Medical Association and the US. Chamber of Commerce decided against publishing and distributing candidate endorsements to thousands of their dues-paying members because of the threat of litigation from the Federal Election Commission. *Id.*

> Just as people rely on shortcuts, to help them make daily choices, citizens *can obtain cues from certain limited political information* that will help them to decide whether to vote for or against a particular ballot question.

*Veiled Political Actors* at 297 (emphasis added). One effective shortcut for voters in issue elections is knowing which groups support a ballot question, and which groups oppose it, and the intensity of their views. *Veiled Political Actors* at 297. Because some groups, for example ideological groups or economic groups such as labor unions or certain corporations, have become associated with particular positions or interests, knowledge of that position and their support or opposition to a referendum can help voters assess their own position on the issue, and knowing that an actor was willing to spend a significant amount of money on that position is a cue that tells the voter how important the issue is to the actor. *Id.* at 297-98. Awareness of which identifiable groups or entities strongly support or oppose a ballot measure is a shortcut voters can and do use to understand the policy implications of the measure, and how it might affect different segments of society, without having to assess the policy implications for themselves -- a task many voters in our busy society will not have the time or inclination for.

Disclosure laws also mitigate the temptation of groups to hide their support or opposition to a ballot measure by funneling money to newly created non-profit "conduit organizations with names that resonate positively for many voters." *Veiled Political Actors* at 299. For example, knowing that an out-of-state for-profit casino corporation is contributing significant amounts of money to an organization called "Friends of the Cherokee," advocating the passage of a referendum altering the state constitution to permit the corporation to operate a casino in the state, may provide "cues" for voters. It may alert voters to the fact that what seems to be support for amending the constitution is not coming from residents, but from an out-of-state corporation

that's purpose is profit, not assessing or protecting the state's foundational document. Disclosure in that instance provides both useful and meaningful information to voters.

Not all information increases voter competence, however. What information is imparted to voters who are made aware that John Smith or Mary Jones contributed $150, $250 or even $500 to the "Friends of the Cherokee"? When the contributor is unknown to the average voter, and the contribution de minimis, requiring the Friends of the Cherokee to record and disclose those contributions will disclose no meaningful information to the voters for assessing the public policy ramifications of the ballot question. Moreover, compiling large lists of contributors, with numerous unhelpful de minimis contributions, and obscuring voter-helpful major contributors, will only make the task of getting useful information to the voters more difficult. *See id.* at 324, 327 ("[c]urrent disclosure statutes are flawed because they are both over and under inclusive[, p]roviding too much information that is not relevant to voter confidence and thus drown[ing] out helpful voter cues[.]"). It also makes it more burdensome for the group or organization tasked with reporting the contribution to exercise expressive association in relation to the ballot question. To the extent state law requires groups engaging in expressive association to create an organizational structure to report information of no legitimate use to voters, that law imposes a burden furthering *no interest*, let alone a compelling or substantial one.

Disclosure statutes must be tailored to limit the burden of compliance to information that improves voter competence and no more. *Voting with Cues* at 1402; Elizabeth Garrett, *McConnell v. FEC and Disclosure*, 3 Election L.J. 237, 241 (2004). The identity of individual contributors is substantially less helpful as a voting cue than the identity of contributions by a group. *Veiled Political Actors*, at 325-26. Voters aware that Common Cause, the ACLU or the National Rifle Association are contributing substantial financial support for or against a ballot

question are provided with significantly more useful information than if they are aware John Smith and Mary Jones each contributed $150 to the same cause. Requiring grass roots advocacy organizations, or any organization, to report de minimis contributions is a burden with no legitimate or even discernable purpose. It is a "burden without a cause" and the only "function" it has is to burden fundamental First Amendment associational rights.

The only legitimate purpose of disclosure laws is to make voters aware of major contributors bankrolling an organization's advocacy efforts. *See* Board's Brief at 21 ("[t]he public had no way of knowing that the *major supporter* of the ballot question was the Providence and Worcester Railroad and other corporations."); ("Without the disclosure of the identity of these *major contributors*, the names of these 'coalitions' provide little information to the voting public regarding who is actually supporting or opposing a ballot question.") (emphases added); *Veiled Political Actors* at 799 ("[D]islosure of only the name of the organization may be misleading . . . [t]he law must also require identification of the entities providing the *main financial support* for the organization.) (emphasis added).

The purpose of disclosure statutes has historically been to regulate for-profit corporate political activity, not grass roots citizen activity. As the Supreme Court described the rationale for this regulation in *MCFL*, it is focused on:

> The need to restrict "the influence of political war chests funneled through the corporate form," . . . to "eliminate the effect of aggregated wealth on federal elections," . . . to curb the political influence of "those who exercise control over large aggregations of capitol," . . . and to regulate the "substantial aggregations of wealth amassed by the special advantages which go with the corporate form of an organization[.]"

*Id.* at 257, 107 S.Ct. at 627. The concern over the influence of concentrated wealth reflects the belief that it is important to protect "the marketplace of ideas." *Id.* Corporate spending on

political activity raises concerns that "resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace." *Id.* The unfairness results because:

> [t]he resources in the treasury of a business corporation . . . are not an indication of popular support for the corporation's political ideas. They reflect instead the economically motivated decisions of investors and customers. The availability of these resources may make a corporation a formidable political presence, even though the power of the corporation may be no reflection of the power of its ideas.

*Id.* at 258, 107 S.Ct. at 628. The Court has recognized, however, that where a non-profit advocacy organization has not been established by a business corporation, and as a matter of policy accepts no contributions from such an entity, the danger of corporate electoral influence is not present. *Id.* at 263, 107 S.Ct. at 630 ("Voluntary political associations do not suddenly present the specter of corruption merely by assuming the corporate form."). Some lower federal courts have recognized the same holds true for non-profit advocacy corporations that accept only de minimis corporate funding. *See, e.g., Colorado Right to Life Committee, Inc. v. Davidson*, 395 F.Supp.2d 1001, 1012-13 (D. Colo. 2005) (citing *FEC v. Nat'l Rifle Assoc. of Am.*, 254 F.3d 173, 191-193 (D.C. Cir. 2001); *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 713-14 (4th Cir. 1999); *FEC v. Survival Education, Inc.*, 65 F.3d 285, 292 (2d Cir. 1995); *Day v. Holahan*, 34 F.3d 1356 (8th Cir. 1994)). For these courts, the crucial question is whether the non-profit group is serving as a conduit for "the type of direct spending by for-profit corporations that create a threat to the political marketplace." *Id.* at 1013 (quoting *Bartlett*, 168 F.3d at 714). Rhode Island's statutory scheme does not account for the distinct differences between for-profit corporations and non-profit advocacy groups or coalitions. Both are regulated in the same manner notwithstanding the fact they do not present the same threat to the electoral process.

Consequently the state's interest in regulating the non-profit advocacy group is significantly less "compelling" or "substantial," and the burden imposed by PAC organizational and reporting requirements is correspondingly greater.[12]

In sum, it is imperative that election laws requiring the reporting of contributions collected by an organization, to enable it to vigorously and effectively engage in ballot question advocacy, be crafted to "minimize administrative burdens, particularly on entities that do not otherwise have recordkeeping obligations [and . . .] mandate disclosure only of information necessary for voter confidence[.]" Elizabeth Garrett, *McConnell v. FEC and Disclosure*, 3 Election L.J. 237, 241 (2004).

**IV.) The $100 PAC reporting threshold is not substantially related to serving the stated state interest and the "acting in concert" PAC requirements are therefore not constitutionally permitted.**

Minimizing the administrative burdens of reporting and limiting the information to be disclosed to that which will in fact provide cues or valuable perspective for a voter deciding a ballot question, are not merely good public policy -- they are constitutional parameters that must cabin the reach of disclosure statutes. Each of those parameters must be evaluated by focusing on the threshold amount that triggers the duty to disclose. If the threshold is so low it requires

[12] For example, Common Cause has a contribution policy that does not permit it to solicit or accept contributions from for-profit corporations or from labor unions in excess of $1000.00 per year. The policy applies broadly to all for-profit "corporate-like" organizations whether they are technically organized as a corporation, association or a partnership, such as law, lobbying, accounting, and consulting firms, trade and professional organizations. Nor does the policy permit the receipt of any contributions from public officials, political candidates, political parties, political committees or any governmental entity.

It can, however, accept reduced rate and *pro bono* services form law firms and other professional firms on a case-by-case basis if the "in-kind" contribution is determined to be consistent with the mission, independence and best interests of Common Cause.

significant amounts of information to be reported with little or no value to a voter as a "shortcut," the burden of reporting becomes magnified with no corresponding value to the voter or the state, and the requirement loses its constitutional validity. It becomes a burden unsupported by any substantial or compelling interest.

There are two significant, but related constitutional infirmities embedded in the PAC disclosure requirements the Board asserts are triggered by "in concert" activity. First, the reporting and disclosure requirements of Rhode Island law do not distinguish between candidate elections and ballot question votes -- PAC organizational and disclosure requirements apply to both equally notwithstanding that the potential for corruption existing in the former does not exist in the latter. Since the necessity for disclosure statutes is distinct in each situation, the disclosure requirements for each should be tailored to the particular purpose to be served so as not to unduly burden First Amendment speech and associational rights. In the case of ballot question elections, the First Amendment requires that disclosure be limited to identifying major contributors supplying significant financial backing to the group or entity that will engage in ballot advocacy -- the only information that can plausibly provide an analytical "shortcut" for voter information and education.

The second and related constitutional infirmity with Rhode Island's PAC disclosure statutes is the $100 reporting threshold. Voters cannot plausibly find any meaningful cues from the reporting of hundreds of individual $150 or $200 donors, or even other group or entity donors at that level of giving. Providing voters with information concerning de minimis contributions will be of no assistance to them. The contributors will be unknown to the average voter and will simply create a sea of information with no value, obscuring the significant contributions providing some perspective on which segments of society are supporting and opposing the

referendum. Raising the disclosure threshold will not only serve to focus the voter's attention on more relevant and useful information, it will also reduce the administrative burden on the group or entity receiving the contribution.

There is no adequate, let alone compelling, interest in the $100 reporting threshold. Although it is not for this Court to establish what the minimum constitutionally valid threshold is, it is within the Court's prerogative and authority to determine that Rhode Island's $100 threshold is constitutionally invalid, and that it is not narrowly tailored or substantially related to achieving a compelling state interest. Common Cause submits it is not, and the Court should therefore find the PAC organizational and reporting requirements for non-profit advocacy groups "acting in concert" unenforceable, thereby creating the opportunity for the Rhode Island General Assembly to fill the void and enact a disclosure scheme responsive to the constitutional parameters that must apply to ballot question advocacy and grass roots, non-profit political advocacy.

**Conclusion**

For the above-stated reasons amicus curiae, Common Cause of Rhode Island, respectfully urges the Court to find that, for parties "acting in concert" with respect to ballot advocacy, the statutory scheme making it unlawful to do so without establishing and administering a PAC, and disclosing all contributions in excess of $100, violates the First Amendment and is unenforceable.

Common Cause of Rhode Island
By its Attorney,

Thomas R. Bender

Thomas R. Bender, Esq. (#2799)
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154 – telephone
(401) 521-7040 – fax

**PROOF OF SERVICE**

I hereby certify that on this 15 16 day of February, 2006, I served the within document by mailing copies of same to **Howard A. Merton, Esq.**, Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, RI 02903; **James W. Ryan, Esq.**, Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, RI 02903; **Raymond A. Marcaccio, Esq.**, 55 Dorrance Street, Suite 400, Providence, RI 02903; **Thomas A. Palumbo, Esq.**, Assistant Attorney General, Department of Attorney General, 150 South Main Street, Providence, RI 02903; and **Robert G. Flanders, Jr., Esq.**, **Mitchell R. Edwards, Esq.**, Hinckley, Allen & Snyder, LLP, 1500 Fleet Center, Providence, RI 02903.

Thomas R. Bender

of Hanson Curran LLP