**UNITED STATES OF AMERICA**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND AFFILIATE AMERICAN CIVIL LIBERTIES UNION, INC., ET.AL. Plaintiffs | : | |
| v. | : | |
| ROGER N. BEGIN, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE RHODE ISLAND BOARD OF ELECTIONS, ET. AL. Defendants | : | C.A. NO. 04-487/T |
| v. | : | |
| GREATER PROVIDENCE CHAMBER OF COMMERCE, Intervenor | : | |

**BRIEF OF AMICUS CURIAE**
**UNIVERSITY OF RHODE ISLAND**

UNIVERSITY OF RHODE ISLAND

By Its Attorney,

Louis J. Saccoccio RI Reg 0685
Office of the General Counsel
University of Rhode Island
Green Hall, 35 Campus Avenue
Kingston, Rhode Island 02881
(401) 874-4486 Office
(401) 874-4803 Fax

## TABLE OF CONTENTS

**PAGE**

I. FACTS .......................................................... 2

A. University of Rhode Island .......................................... 2
B. The University of Rhode Island Foundation........................... 3
C. The Alumni Association of the University of Rhode Island.......... 4

II. THE 2004 AND 2006 URI BALLOT QUESTIONS...................... 5

III. THE PROHIBITION OF CORPORATE CONTRIBUTIONS IN........ 7
SUPPORT OF OR IN OPPOSITION TO BALLOT QUESTIONS IS
UNCONSTITUTIONAL

IV. THE CONTRIBUTION LIMITATIONS OF R.I.G.L. §17-25-10.1(a).. 13
ARE UNCONSTITUTIONAL

V. R.I.G.L. §17-25-10(b) CAN AND SHOULD BE CONSTRUED TO… 16
AVOID THE CONSTITUTIONAL QUESTION

VI. CONCLUSION......................................................... 18

# **Table of Authorities**

**Page**

Cases

*Citizens Against Rent Control v. Berkeley*, 454 U.D. 290, 298 (1981).......................... 8

*First National Bank of Boston v. Bellotti,* 435 U.S. 765 (1978)................................ 8

*C & C Plywood Corporation v. Hanson,* 583 F.2d 421 (CA 9th) 1978........................ 9

*Vote Choice, Inc. v. DeStefano,* 814 F.Supp 186 (D.RI 1992).................................. 10

*FEC v. Massachusetts Citizens for Life ("MCLF"),* 479 U.S. 238 (1986).................... 10

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990)............................ 11

*Citizens for Rent Control v. Berkeley,* 454 U.S. 290 (1981).................................... 14

Statutes

R.I.G.L. § 16-59-1 ........ 3

R.I.G.L. § 16-59-1(b) ........ 4

R.I.G.L. § 17-25-10.1(h) and (j) ........ 7, 8, 18

R.I.G.L. § 17-25-10.1(j) ........ 8, 10

R.I.G.L. § 17-25-10.1(a)(3) ........ 10

R.I.G.L. § 17-25-10.1(a) ........ 13, 16, 18

R.I.G.L. § 17-25-10.1(b) ........ 14, 16, 18

R.I.G.L. § 17-25-3(8) ........ 16

R.I.G.L. § 17-25-23 ........ 17, 18

R.I.G.L. § 17-25-10(b) ........ 17

**UNITED STATES OF AMERICA**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND AFFILIATE AMERICAN CIVIL LIBERTIES UNION, INC., ET.AL.<br>Plaintiffs | :<br>: | |
| v. | : | |
| ROGER N. BEGIN, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE RHODE ISLAND BOARD OF ELECTIONS, ET. AL.<br>Defendants | :<br>:<br>: | C.A. NO. 04-487/T |
| v. | : | |
| GREATER PROVIDENCE CHAMBER OF COMMERCE,<br>Intervenor | :<br>: | |

**BRIEF OF AMICUS CURIAE**
**UNIVERSITY OF RHODE ISLAND**

The University of Rhode Island ("URI") by invitation and approval of this Court, respectfully submits this *Friend of the Court* memorandum addressing issues now pending before this court in the above captioned matter. For the reasons set forth in this memorandum URI supports the position of the Plaintiffs Rhode Island Affiliate of the American Civil Liberties Union and Stephen Brown challenging the constitutionality of the Rhode Island Campaign Contributions And Expenditures Reporting Act as construed and interpreted by the Rhode Island

Board of Elections (the "Board"). In general, URI asserts that the relevant sections of the Act and Board Advisory that prohibits and limits corporate contributions in support of or in opposition to ballot questions are in violation of the First Amendment and therefore unconstitutional. In addition, URI asserts that the Act can and should be construed to avoid the constitutional question. In particular, the Board's interpretation of the Act is clearly in contravention to the plain language of the Act and would prohibit or severely limit URI's ability to work *in concert* with its long standing affiliated entities, namely the University of Rhode Island Foundation and the URI Alumni Association as well as other related entities.

## I. The University of Rhode Island and its Affiliated Entities.

### A. University of Rhode Island

The University of Rhode Island has grown from its humble beginning in 1892 as the State's college of agriculture and mechanic arts to its present status as the state's only public institution of higher education offering undergraduate, graduate, and professional students the distinctive educational opportunities of a major research institution. The University offers over 100 majors in seven degree-granting colleges with over 12,000 students on its Kingston campus and another 3000 in Providence. It employees just under 3000 individuals including approximately 700 faculty. Long recognized for its work in oceanography, the University, through its researchers, is engaged in projects that have local, national

and international significance in a multitude of disciplines. Its facilities now include its main campus in Kingston, the graduate school of oceanography on Narragansett Bay, an environmental campus and conference center in West Greenwich and the College of Continuing Education located in the former Shepard Building in Providence. The governing board for URI has been the board of governors for higher education since 1981.[1]

**B. The University of Rhode Island Foundation**

The University of Rhode Island Foundation ("URI Foundation") is a public corporation established by act of the General Assembly in 1957[2], a copy of which is appended to this memorandum as Exhibit A. The principle purpose in creating the URI Foundation can be found in the *Preamble* to the act as follows:

> "Whereas ***it is greatly in the public interest*** "to sponsor and encourage private gifts of funds and property ***to aid and assist the University of Rhode Island*** in attaining its objectives, and particularly in connection with such of its activities, and those of its students and faculty, ***for which adequate provision is not ordinarily made by appropriation from the public funds***; and
>
> Whereas, To such ends, there is need for an organization to administer gifts, devises and legacies of money and property from private sources;" (emphasis added)

A general review of this act clearly shows that while affiliated with URI by law, the URI Foundation enjoys a separate corporate existence distinct from

[1] See: R.I.G.L. §§16-59-1 et.seq.
[2] The URI Foundation enjoys non-profit status and is recognized as a 501(c)(3) corporation under the internal revenue code.

URI and the board of governors for higher education. It has its own board of trustees and is managed by an executive board consisting of the president of URI, the chairman of the board of trustees of state colleges,[3] the president of the University of Rhode Island alumni association, ex officio, and sixteen members elected by the URI Foundation's board of trustees. The URI Foundation can also sue and be sued in its own corporate name.

### C. The Alumni Association of the University of Rhode Island

Commonly referred to as the URI Alumni Association, the Alumni Association of the University of Rhode Island (the "Alumni Association") was first formed as an unincorporated association in 1922 and later incorporated in 1932 as a Rhode Island non-profit corporation. The purpose of the Alumni Association is set forth in its by-laws and mission statement as follows:

> "It is the purpose of the Alumni Association of the University of Rhode Island ***to promote the interest of the University of Rhode Island***, to provide opportunities for the professional, social and intellectual growth of its members and to strengthen their attachment to and ***financial support to their alma mater***." (emphasis added)[4]

Similar to the URI Foundation, the Alumni Association is an independent corporate entity distinct from both URI and the board of governors for higher education whose membership includes all graduates from URI. It has its own executive board consisting of a President, President-Elect, two (2) Vice

---

[3] The board of trustees of state colleges was succeeded by the board of regents for education pertaining to postsecondary education which in turn was succeeded by the present board of governors for higher education. See: R.I.G.L. §16-59-1(b)

[4] See: Exhibit B – Alumni Association Mission Statement, By-Laws

Presidents, an immediate Past President, a Treasurer, six (6) Councilors-at-Large, and an alumni representative from each college of the University who are members of the Alumni Association. Ex-Officio members of the executive board, both voting and non-voting, include representatives from the student alumni association, faculty senate, student senate and URI Foundation

## II. The 2004 and 2006 URI Ballot Questions

In the November 2004 election several bond issues were on the ballot and submitted to the voters for approval that, for the most part, involved critical capital improvement projects for the University of Rhode Island.[5] In short, they can be listed as follows:

- $50,000,000 for construction of the Center for Biotechnology at the Kingston Campus;
- $14,000,000 for the Pell Library and Undersea Exploration Center at the Bay Campus;
- $6,700,000 for upgrades to Meade Stadium and construction of the athletic performance center in Kingston; and
- $50,000,000 for residence halls

Voter approval of these bond issues were viewed as critical to enable URI to continue implementation of its strategic and master plans to enhance the academic excellence already achieved. During this particular election cycle there was significantly more ballot questions than usual competing for voter attention and approval. In all, twelve bond items were on the ballot, including the four for

[5] Actually of the $50,000,000 for resident halls, $30,000,000 was for Rhode Island College.

URI, as well as highly publicized and debated ballot questions involving casino gambling, a constitutional convention and separation of powers. Needless to say, the stiff competition for voter attention required URI to promote its referenda to the voters clearly and aggressively through an extensive and broad promotional campaign much of which would be based on radio and print media buys. Since this was also a Presidential election year competition for prime media spots was expected to be keen.

URI naturally turned to its affiliated entities for the necessary financial assistance in this effort. The projected budget for this campaign exceeded $90,000 of which the sum of $80,000 represented combined contributions from the URI Foundation, the Alumni Association, and the Rhode Island Ram Athletic Association (RIRAA), which is actually a standing committee of the Alumni Association made up of the various athletic program boosters.[6]

Ultimately, the voters approved three of the four URI bond referenda, rejecting only the bond money being asked for improvements to Meade Stadium and construction of a new athletic performance center.

In the 2006 election, additional and significant URI bond issues will be on the ballot to be submitted to the voters for approval involving the construction of new buildings and facilities for the College of Pharmacy, a new chemistry

[6] The URI Foundation contributed $50,000, the Alumni Association $10,000 and the RIRAA $20,000. Approximately $12,000 was contributed by Rhode Island College affiliated entities as a result of RIC's interest in the resident hall bonds.

department building and new building and facilities for the College of Nursing. Under the Board's present interpretation of the law, URI will not be able to look to its affiliated entities as it has in the past to finance its promotional campaign nor will the URI Foundation, Alumni Association and other supporters of URI be able to make contributions at the same level as they had in 2004 without violating that law and being subject to criminal prosecution. Aside from the obvious constitutional deprivation this will have on the rights of URI Alumni and other supporters, it also deprives the voters of valuable information necessary to make an informed decision on the URI ballot questions and the future of public higher education in this state.

## III. The prohibition of corporate contributions in support of or in opposition to ballot questions is unconstitutional.

The University of Rhode Island concurs with the plaintiff in the assertion that the prohibition of corporate contributions as set forth in §17-25-10.1(h) and (j) of the Rhode Island Campaign Contributions and Expenditures Reporting Act is in violation of the First Amendment as it applies to the States by the Fourteenth Amendment and is therefore unconstitutional.

The relevant portions of the referenced subsections read as follows;

> "It shall be unlawful ***for any corporation***, whether profit or non-profit, domestic corporation or foreign corporation, *** or other business entity ***to make any campaign contribution or expenditure,*** *** to or for any candidate, political action committee, or political party committee, or for any candidate, political action committee, or political party committee to

> accept any campaign contribution or expenditure from a corporation or other business entity." RIGL §17-25-10.1(h)(1) (emphasis added)
>
> "*** no entity other than an individual, a political action committee *** , a political party committee ***, or an authorized committee of an elected official or candidate ***  ***shall make any contribution to or any expenditure on behalf of or in opposition to any*** candidate, ***ballot question***, political action committee, or political party."
> RIGL §17-25-10.1(j) (emphasis added)

The combined reading of these subsections clearly establish an *absolute prohibition* of any corporate contributions made or directed in support of or in opposition to ballot questions. It is submitted that such absolute prohibitions on the exercise of core first amendment activities requires the closest of scrutiny and can only be justified, if ever, on the clearest showing of a subordinating and compelling state interest. No such showing has been made in this case

It is settled law and no longer a question that states cannot prohibit corporations any more than it can preclude individuals from making contributions or expenditures on ballot measures. Citizens Against Rent Control v. Berkeley, 454 U.S. 290, 298 (1981), citing First National Bank of Boston v. Bellotti, 435 U.S. 765 (1978). To paraphrase the court in *Bellotti*, the proper question is not whether corporations have First Amendment rights but instead whether the law or regulation in question abridges expression that the First Amendment was meant to protect. 435 U.S. at 776. In distinguishing between partisan election campaigns and ballot measures the courts have generally held that ballot questions typically

involve the very kind of expression the First Amendment was designed to protect.

In this regard the language of the Court in *Bellotti* is instructive:

> "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections, * * * simply is not present in a popular vote on a public issue. To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution "protects expression that is eloquent no less than that which is unconvincing." * * * We noted only recently that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." * * * Moreover, the people in our Democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate. But if there be any danger that the people cannot evaluate the information and arguments advanced by appellants, it is a danger contemplated by the Framers of the First Amendment. * * * In sum, [a] restriction so destructive of the right of public discussion [as §8[7]], without greater or more imminent danger to the public interest than existed in this case, is incompatible with the freedoms secured by the First Amendment." 435 U.S. 765, 790-792

In C & C Plywood Corporation v. Hanson, 583 F.2d 421 (CA 9th) 1978, the Ninth Circuit struck down a Montana statute that, similar to the statute being challenged in this case, prohibited corporate contributions supporting or opposing ballot measures.

> "The corporations' right to express their views on "issues of general public interest" may not be abridged by the state unless

[7] *Bellotti* struck down a Massachusetts statute which prohibited corporations from making contributions or expenditures for the purpose of influencing or affecting the vote of any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation.

> a compelling state interest is shown. (citing *Bellotti*) * * * The state interest in preventing corruption of officials, which provided the basis for the Supreme Court's finding in *Buckley*[8] that restrict-tions could permissibly be placed on contributions, is not at issue here. Where corporations seek to influence the electorate and not an individual candidate or party, no such state interest exists because corporate activities cannot create political debts of the kind contemplated in *Buckley*. * * *" 583 F.2d 421at 425

Finally, this Court has already ruled that the prohibition of corporate contributions and expenditures to influence ballot questions in RIGL §17-25-10.1(j) was an unconstitutional infringement on the First and Fourteenth Amendment rights of the plaintiff ACLU. *Vote Choice, Inc. v. DeStefano*, 814 F.Supp 186 (D.RI 1992)[9] The court in *Vote Choice* then turned to the question of whether the state could require that such corporate contributions and expenditures be made through a political action committee. Relying on *FEC v. Massachusetts Citizens for Life* ("*MCLF*"), 479 U.S. 238 (1986) the court found that the statutory requirement in RIGL 17-25-10.1(a)(3) was an impermissible infringement on First Amendment activities as it applied to the ACLU a *non-profit corporation* with characteristics similar to that of MCFL. It should be noted here, that the URI affiliated entities are also non-profit corporations with characteristics similar to that of MCLF.

---

[8] *Buckley v. Valeo*, 424 U.S. 1 (1976)

[9] Plaintiff notes in its memorandum that the issue of contributions was not properly raised in *Vote Choice* and therefore was not part of the courts ruling. However, it is clear from the decision that it was intended to cover both contributions and expenditures. This is also supported by the Courts reliance on *Bellotti.*

However, the court in *Vote Choice* was not ready to extend this decision to for-profit corporations on the strength of *Bellotti* alone citing Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990) as possibly subjecting *Bellotti* to question. In a footnote, the court elaborated on its concern as follows:

> "In *Austin*, the Supreme Court departed from the "sole legitimate objective" (prevention of corruption of elected representatives) rationale and identified a heretofore unrecognized "compelling state interest of eliminating from the political process the corrosive effect of political war chests' amassed with the aid of the legal advantage given to corporations." * * * The court subsequently upheld a Michigan statute that prohibited independent corporate expenditures with respect to candidate elections. While the court continued to differentiate between provisions regulating expenditures with respect to candidate elections and those regulating expenditures connected with ballot questions, the logical extension of its reasoning in *Austin* may eventually emasculate or overrule *Bellotti*. Given the Supreme Court's tacit approval of *Bellotti* in *Austin*, however, I must follow the teachings of Bellotti and strike down §17-25-10.1(j)'s blanket prohibition on independent corporate contributions and expenditures in reference to ballot questions." FN 9

A review of the *Austin* decision will show that this concern is not well founded and that *Bellotti* and its progeny continue to remain the law of the land some sixteen (16) years later. In the first instance, the Michigan law in *Austin* dealt with a partial restriction on independent corporate expenditures and not an absolute prohibition as imposed by the Rhode Island law. Secondly, the prohibition contained in the Michigan law was limited to "independent expenditures in support of, or in opposition to, any ***candidate*** in elections for state

office" and imposed no such restrictions or limitations relating to corporate expenditures relating to the support of, or opposition to, ballot questions.

In *Austin*, the court had to determine whether §54(1) of the Michigan Campaign Finance Act violated either the First or the Fourteenth Amendment to the Constitution. Section 54(1) prohibited corporations from using corporate treasury funds for independent expenditures in support of, or in opposition to, ***any candidate*** in elections for state office. However, Michigan law did allow corporations to make such expenditures from segregated funds used solely for political purposes. An independent expenditure was defined as one "not made at the direction of, or under the control of, another person and if he expenditure is not a contribution to a committee." See: 494 U.S. 652, 655 Under these circumstances the court held that although expressive rights were implicated in this case, the application of §54(1) to the Chamber of Commerce was constitutional because the provision was narrowly tailored to serve a compelling state interest of eliminating from the political process the corrosive effect of political "war chests" amassed with the aid of the legal advantages given to corporations. While the prior cases dealing with such restrictions relating to candidate elections were justified by the state's interest in preventing *financial quid pro quo* corruption, the court in *Austin* recognized that the Michigan regulation was aimed at different type of corruption in the same political arena (i.e. candidate elections); namely the corrosive and distorting effects of immense

aggregations of wealth accumulated with the help of the corporate form. In short, the *Austin* court recognized that when it comes to candidate elections, the corruptive effect that can result from massive corporate "war chests" may not be much different than the evil associated with financial quid pro quo corruption and can therefore be considered a sufficient compelling state interest to support reasonable restrictions on independent corporate campaign contributions and expenditures. There is nothing is *Austin*, however, to suggest it was intended to apply to corporate contributions and expenditures relating to the support or opposition of ballot questions.

**IV. The contribution limitations of R.I.G.L. §17-25-10.1(a) are unconstitutional.**

The University of Rhode Island concurs with the plaintiff in the assertion that the contribution limitations set forth in §17-25-10.1(a) of the Rhode Island Campaign Contributions and Expenditures Reporting Act applicable to ballot questions are in violation of the First Amendment as it applies to the States by the Fourteenth Amendment and is therefore unconstitutional.

R.I.G.L. §17-25-10.1(a) provides in part as follows:

> (1) No person, *** nor any political action committee shall make a contribution or contributions to any candidate, * * * or political action committee or political party committee which in the aggregate exceed one thousand (1,000) within a calendar year, nor shall any person make contributions to more than one state or local candidate, to more than one political action committee, or to more than one political party committee, or to a combination of state and local candidates

> and political action committees and political party committees which in the aggregate exceed ten thousand dollars ($10,000) within a calendar year, nor shall any political action committee make such contributions which in the aggregate exceed twenty-five thousand dollars ($25,000) within a calendar year, nor shall any candidate or any political action committee or any political party committee accept a contribution or contributions which in the aggregate exceed one thousand dollars ($1,000) within a calendar year from any one person or political action committee."

As noted in plaintiffs' trial memorandum at footnote 3, these limitations as written apply to candidates, political party committees and political action committees but as a result of the Board's interpretation of §17-25-10(b) in Advisory Opinion 95-01 any entity receiving a contribution from another constitutes a political action committee.

The issue of the constitutionality of contribution limitations associated with ballot questions was settled in Citizens for Rent Control v. Berkeley, 454 U.S. 290 (1981). In *Berkeley*, the court struck down a local ordinance that imposed a limitation of $250 on contributions to committees formed to support or oppose ballot measures submitted to popular vote. *Berkeley* is also instructive as it relates to the freedom of association and the impact of the Board's interpretation of acting *in concert*.

> "We begin by recalling that the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process. The 18th-century Committees of Correspondence and the pamphletteers were early examples of this phenomena and the Federalist Papers the most significant and lasting example. * * * Its value is that by collective effort individuals can make their

> views know, when, individually, their voices would be faint or lost. * * *
>
> The Court has acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues: "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniable enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly."
> * * *
> More recently the Court stated: "The First Amendment protects political association as well as political expression." 454 U.S. 290, at 294, 295

The court specifically connected the right to pool money through contributions to the freedom of association with the following language:

> "* * * the freedom of association " is diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally effective. * * * Under the Berkeley ordinance an affluent person can, acting alone, spend without limit to advocate individual views on a ballot measure. It is only when contributions are made in concert with one or more others in the exercise of the right of association that they are restricted by §602" 454 U.S. 290 at 296, 297

The court concluded that the restraint imposed by the Berkeley ordinance on rights of association and in turn on individual and collective rights of expression plainly contravenes both the right of association and the speech guarantees of the First Amendment and did not advance a legitimate governmental interest significant enough to justify its infringement of First Amendment rights.

The contribution limitations imposed by R.I.G.L. §17-25-10.1(a) infringe on the freedoms of association and expression in no less a manner as the infringement of these rights in *Berkely.* In URI's case, this would severely limit, if not outright prohibit, the URI Foundation and Alumni Association as well as individual alumnus and other URI supporters from associating and expressing its support for URI ballot questions.

**V. R.I.G.L. §17-25-10(b) can and should be construed to avoid the constitutional question.**

The University of Rhode Island concurs with the plaintiffs in the assertion that the constitutional issues raised by the Board's interpretation of the "in concert" language of R.I.G.L. §17-25-10(b) can and should be avoided by proper statutory construction.

R.I.G.L. §17-25-10(b) provides in pertinent part as follows:

> "It shall be lawful for any person, not otherwise prohibited by law and not acting in concert with any other person or group, to expend personally from the person's own funds a sum which is not to be repaid to him or her for any purpose not prohibited by law to support or defeat a candidate or to advocate the approval or rejection of any question; provided, that any person making the expenditure shall be required to report all of his or her expenditures and expenses, if the total money so expended exceeds one hundred dollars ($100) within a calendar year, to the board of elections within seven (7) days of making the expenditure * * * Whether a person is ***"acting in concert with any other person or group"*** for the purpose of this subsection shall be determined by application of the standards set forth in §17-25-23" (emphasis added)

R.I.G.L. §17-25-3(8) defines a "Person" to mean "an individual,

> partnership, committee, association, ***corporation***, and any other organization." (emphasis added)

This subsection of the statute is clear and unambiguous and the language of the section must given its plain meaning under established rules of statutory construction. *Health Care Review, Inc. v. Shalala*, 926 F.Supp 274 (D.RI) 1996; *Poverman v. Walnut Hill Plaza, Inc.*, 261 F.Supp 176 (D.RI) 1966; *R.I. Depositors Economic Protection Corporation v. Coffey and Martinelli, Ltd.*, 821 A.2d 222 (R.I. 2003); *Pucci v. Algiere*, 261 A.2d 1 (R.I. 1970). Applying these rules, the only conclusion can be made and contrary to the Board's Advisory 95-01, "[w]hether a person is acting ***in concert*** with any other person or group" for the purpose of this subsection ***shall be determined*** by application of the standards set forth in §17-25-23." R.I.G.L. §17-25-10(b) (emphasis added) This section does not state that §17-25-23 shall be used as a guide, rather it clearly states that the determination as to whether a person is acting *in concert* shall be made by application of the standards of §17-25-23. Since the standards set forth in §17-25-23 admittedly only apply to candidate elections and make no reference to ballot questions, then the only rational conclusion to be reached is that it was never intended to apply to ballot questions. This would eliminate the contribution limitation and allow any *Person*, as defined in the law, to work together with other like-minded persons and groups and make contributions and expenditures related to ballot questions without infringing on their First Amendment rights of speech and association. Specifically, it would allow URI to continue to work

closely with its affiliated entities in the manner intended by their very existence and to the benefit of not only the institution but to the citizens of this state.

## VI. Conclusion

For the reasons set forth herein, URI respectfully urges this Court to enter judgment for plaintiff and to strike down as unconstitutional both the prohibition on corporate contributions set forth in R.I.G.L. §17-25-10.1(h)&(j) and the contribution limitations set forth in R.I.G.L. §17-25-10.1(a) as they apply to supporting or defeating ballot questions and also to declare Advisory Opinion 95-01 unconstitutionally overbroad. URI further urges this court to construe the definition of *"in concert"* as set forth in R.I.G.L. §17-25-23 by the plain meaning of the language to avoid the constitutional question raised by its incorporation in R.I.G.L. §17-25-10(b) or, in the alternative, to strike down these sections of the law as unconstitutionally vague and overbroad.

University of Rhode Island

By: ______________________

Louis J. Saccoccio RI Reg 0685
Office of the General Counsel
University of Rhode Island
Green Hall, 35 Campus Avenue
Kingston, Rhode Island 02881
(401) 874-4486 Office
(401) 874-4803 Fax

Dated: February 20, 2006

**CERTIFICATE OF SERVICE**

| | |
|---|---|
| Howard A. Merten, Esq.<br>Partridge, Snow & Hahn LLP<br>180 South Main Street<br>Providence, RI 02903<br>861-8200<br>Fax: 861-8210 | James W. Ryan, Esq.<br>Partridge, Snow & Hahn LLP<br>180 South Main Street<br>Providence, RI 02903<br>861-8200<br>Fax: 861-8210 |
| Thomas A. Palombo, Esq.<br>Attorney General's Office<br>150 South Main Street<br>Providence, RI 02903<br>274-4400<br>Fax: 222-2995 | Christine M. Curley, Esq.<br>275 Beacon Drive<br>North Kingstown, RI 02852<br>294-0847 |
| Raymond A. Marcaccio, Esq.<br>55 Dorrance Street<br>Suite 400<br>Providence, RI 02903<br>861-2900<br>Fax: 861-2922 | Thomas R. Bender, Esq.<br>Hanson Curran LLP<br>The Francis Building<br>146 Westminster Street<br>Providence, RI 02903 |

I certify that I mailed a copy of this Amicus Brief to the above named counsel of record on the 21st day of February, 2006.

[signature]