**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

RHODE ISLAND AFFILIATE, AMERICAN CIVIL LIBERTIES UNION, INC., and STEVEN BROWN, individually and in his capacity as Executive Director of Rhode Island Affiliate, American Civil Liberties Union, Inc.,

Plaintiffs,

THE GREATER PROVIDENCE CHAMBER OF COMMERCE,

Intervenor Plaintiff,

v. C.A. No. 04-487-T

ROGER N. BEGIN, in his official capacity as Chairman of the Rhode Island Board of Elections, THOMAS V. IANNITTI, JUDITH H. BAILEY, JOHN A. DALUZ, FLORENCE G. JOHNSON, FRANK J. REGO, and RAYMOND A. XAVIER, in their capacities as Commissioners of the Rhode Island Board of Elections, and GEORGE BOWEN, in his official capacity as Acting Executive Director,

Defendants.

**MEMORANDUM AND ORDER**

ERNEST C. TORRES, Chief Judge

**Introduction**

The Rhode Island affiliate of the American Civil Liberties Union ("the ACLU"); Steven Brown, its executive director; and the Greater Providence Chamber of Commerce ("the Chamber"), as

Intervenor, (collectively, "the plaintiffs"), seek declaratory and injunctive relief regarding portions of Rhode Island's "Campaign Contributions and Expenditures Reporting Act" (R.I. Gen. Laws §§ 17-25-1, et seq.) that the plaintiffs claim violate their rights under the First Amendment to the United States Constitution. The challenged provisions restrict, and require disclosure of, contributions and expenditures made to influence the public's vote on ballot questions.

The parties have submitted the case for a decision on the merits based upon what they agree are the relevant facts and upon the memoranda of law that they have submitted.[1] For the reasons hereinafter stated, the requested relief is granted, in part, and denied, in part.

[1]Because rulings on the issues raised by the plaintiffs could have ramifications extending far beyond this case, particularly with respect to the contribution reporting requirements, the Court invited any interested parties (specifically including various media outlets) to submit *amicus curiae* briefs. The only organizations accepting that invitation were the Rhode Island Foundation, the United Way of Rhode Island, the University of Rhode Island, and Common Cause of Rhode Island. The Rhode Island Attorney General also submitted an *amicus curiae* brief after being notified by the Court that the constitutionality of a Rhode Island statute was being challenged.

## Background Facts

The submissions of the parties indicate that the following facts are undisputed.

Both the ACLU and the Chamber are not-for-profit corporations composed of numerous individual and corporate members. They sometimes engage in public advocacy efforts on a wide range of issues that may include pressing for the passage or defeat of ballot questions put to the Rhode Island electorate. In furtherance of these efforts, the ACLU and the Chamber often make direct expenditures, as well as contributions to other organizations or coalitions, in support of or opposition to ballot questions presented to the voters.

Most of the ACLU's funding is derived from its national umbrella organization (the American Civil Liberties Union) and from sales of advertising in the program distributed at its annual dinner. Both members and non-members are solicited to purchase such ads by a variety of means, including a newsletter that describes, *inter alia,* the organization's efforts in supporting or opposing proposed ballot questions.

The Chamber derives its funding primarily from membership dues but, sometimes, it solicits both its members and the general public for additional funds to be used in advocating for or against ballot questions.

In November of this year, Rhode Islanders will be asked to

vote on a proposal to restore voting rights to felons immediately upon their release from prison. The ACLU supports this proposal and states that it wishes to work with a coalition of non-profit organizations to secure its passage. More specifically, the ACLU wants to contribute $1,500.00 to the coalition in order to support its efforts, but it has withheld the funds for fear of violating the challenged provisions of the Act. The ACLU states that, for the same reason, other organizations also have refrained from providing more than $10,000 in funding.

Although the Chamber has not identified any specific ballot question that it wants to support or oppose, it has expressed a desire to continue its past practice of soliciting contributions to be used in supporting or opposing ballot questions in which its members may be interested.

## Statutory Overview

The Rhode Island Campaign Contributions and Expenditures Reporting Act (R.I. Gen. Laws §§ 17-25-1, et seq.) ("the Act") restricts and requires reporting of contributions and expenditures made to support or oppose the election of political candidates and/or the approval of ballot questions. See R.I. Gen. Laws §§ 17-25-2, -3, -7, -10, -10.1, -11, -15. The challenges in this case are directed only at the provisions relating to ballot questions.

With respect to ballot questions, the Act provides that

contributions may be received only by political action committees ("PACs"), see id. at § 17-25-10(a), which, in turn, are required to report them, periodically, to the Board of Elections ("the Board"), see id. at §§ 17-25-7(a), -11(a)-(d), -15(c). Since all reports filed under the Act are public records, see id. at § 17-25-5(a)(4), the requirement that all contributions be funneled through PACs enables voters to identify the sources of funds contributed to support or oppose a particular ballot measure. The Act also provides that expenditures with respect to ballot measures may be made only by PACs or "persons"[2] who do not act "in concert" with others. See id. at § 17-25-10(a)(3), (b). In either event, such expenditures must be reported to the Board, although in different ways, depending on whether the expenditure is made by a PAC or a "person." Compare id. at § 17-25-11(a)-(d) (PACs), with id. at § 17-25-10(b) (persons "not acting in concert").

In addition to the general prohibition against contributions not made to or by PACs, the Act specifically prohibits corporations and other entities besides PACs from making contributions, see id. at § 17-25-10.1(h), (j), and it establishes dollar limits on the contributions that may be made by PACs and other persons eligible to make contributions, see id. at § 17-25-

[2]The Act broadly defines "person" to mean "an individual, partnership, committee, association, corporation, and any other organization," R.I. Gen. Laws § 17-25-3(8), but implicitly excludes PACs from this definition, see, e.g., id. at § 17-25-10.1(a)(2) ("a person or [PAC] . . . may contribute . . .").

10.1(a).

In this case, the plaintiffs challenge:

1. the provision in subsection 10(b) that exempts only persons "not acting in concert with any other person or group" from the prohibition against expenditures by any person or entity other than a PAC;
2. the provisions in subsections 10.1(h) and (j) that prohibit corporations and any other entities besides PACs from making contributions with respect to ballot questions;[3] and
3. the provisions in subsection 10.1(a) that establish dollar limits on the contributions that may be made with respect to ballot questions by PACs and other persons permitted to make such contributions.[4]

The plaintiffs argue that these provisions violate their rights under the First Amendment to the United States Constitution, which is made binding on the States by the Fourteenth Amendment.

---

[3]In Vote Choice, Inc. v. DiStefano, 814 F. Supp. 195, 198 (D.R.I. 1993) ("Vote Choice II"), aff'd, 4 F.3d 26 (1st Cir. 1993), Judge Pettine permanently enjoined enforcement of that portion of subsection 10.1(j) "that prohibits corporations from making any independent expenditures with respect to ballot questions." (emphasis in original). By "independent expenditures," Judge Pettine was referring to expenditures made from the corporation's own funds. See id.

[4]The Act does not limit the dollar amounts that may be expended by those permitted to make expenditures.

## Analysis

### I. The Analytical Framework

#### A. Severability

In determining whether a challenged provision is unconstitutional, this Court "must view it in the context of the whole statutory scheme." Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 33 (1st Cir. 1993) (citing Storer v. Brown, 415 U.S. 724, 737, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974); Williams v. Rhodes, 393 U.S. 23, 34, 89 S. Ct. 5, 21 L. Ed. 2d 24 (1968)). If a provision is unconstitutional, a determination, then, must be made as to whether that provision can be severed and the rest of the statute may be enforced. Cf. Driver v. DiStefano, 914 F. Supp. 797, 801-02 (D.R.I. 1996).

Whether a statutory provision is severable is a matter of state law. R.I. Med. Soc'y v. Whitehouse, 239 F.3d 104, 106 (1st Cir. 2001) (citing Leavitt v. Jane L., 518 U.S. 137, 139, 116 S. Ct. 2068, 135 L. Ed. 2d 443 (1996) (per curiam)). "Under Rhode Island law, 'a court may hold a portion of a statute unconstitutional and uphold the rest when the unconstitutional portion is not indispensable to the rest of the statute and can be severed without destroying legislative purpose and intent.'" Id. (quoting Landrigan v. McElroy, 457 A.2d 1056, 1061 (R.I. 1983)). A statutory provision is severable when the remaining provisions of the statute are sufficiently coherent to be enforceable and it

appears that, "at the time the statute was enacted, the legislature would have passed it absent the constitutionally objectionable provision." Id. at 106-07 (quoting Landrigan, 457 A.2d at 1061) (additional citations omitted); see also United States v. Grigsby, 85 F. Supp. 2d 100, 108-09 (D.R.I. 2000) (citations omitted). Severability clauses are probative of legislative intent but not necessarily conclusive. Whitehouse, 239 F.3d at 106 (citations omitted).

The Act contains both a general severability clause, see R.I. Gen. Laws § 17-25-17(a), and a clause stating that the application of any provision to ballot question referenda is severable from the application of that provision to candidate elections, see id. at § 17-25-17(b). These clauses strongly suggest a legislative intent that, if any of the challenged provisions are invalidated, the remaining provisions should be enforced.

B. The Level of Scrutiny

1. Core v. Non-Core Rights

It is well established that regulation of political activity is subject to strict scrutiny if the regulation burdens core First Amendment rights. See, e.g., Austin v. Mich. State Chamber of Commerce, 494 U.S. 652, 657, 110 S. Ct. 1391, 1396, 108 L. Ed. 2d 652, 662-63 (1990) (citations omitted); see, e.g., FEC v. Mass. Citizens for Life, Inc., 479 U.S. 238, 251-52, 107 S. Ct. 616, 624, 93 L. Ed. 2d 539, 552 (1986) ("MCFL") (Brennan, J., for the

plurality) (citations omitted); see, e.g., First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S. Ct. 1407, 1421, 55 L. Ed. 2d 707, 724 (1978) (citations omitted). In order to justify such a regulation under the strict scrutiny test, a state must demonstrate: (1) the existence of a compelling governmental interest, (2) that the challenged provision is necessary to advance that interest, and (3) that the provision is narrowly tailored to do so. See Austin, 494 U.S. at 657, 110 S. Ct. at 1396, 108 L. Ed. 2d at 662-63 (citations omitted); see Citizens Against Rent Control/Coal. for Fair Hous. v. Berkeley, 454 U.S. 290, 298-300, 102 S. Ct. 434, 438-39, 70 L. Ed. 2d 492, 500-01 (1981). A provision is considered to be narrowly tailored if it burdens only that amount of speech necessary to serve the compelling governmental interest. See Bellotti, 435 U.S. at 792-95, 98 S. Ct. at 1424-26, 55 L. Ed. 2d at 728-30.

On the other hand, if the statute burdens only non-core rights, a lesser level of scrutiny is employed. FEC v. Beaumont, 539 U.S. 146, 161-62, 123 S. Ct. 2200, 2210-11, 156 L. Ed. 2d 179, 193-94 (2003) (citations omitted); see Buckley v. Valeo, 424 U.S. 1, 44-45, 96 S. Ct. 612, 647, 46 L. Ed. 2d 659, 702 (1976) (per curiam) (distinguishing between the "exacting scrutiny" applicable to core First Amendment rights and the lesser level of scrutiny applicable to non-core rights). While the precise difference between strict scrutiny and this lesser level of scrutiny is not

entirely clear, the relevant inquiry under this lesser level of scrutiny is whether the challenged provision is "closely drawn to match a sufficiently important [government] interest." Beaumont, 539 U.S. at 162, 123 S. Ct. at 2210, 156 L. Ed. 2d at 194 (citing Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 387-88, 120 S. Ct. 897, 145 L. Ed. 2d 886 (2000); Buckley, 424 U.S. at 44-45, 96 S. Ct. 612, 46 L. Ed. 2d 659; Austin, 494 U.S. at 657, 110 S. Ct. 1391, 108 L. Ed. 2d 652) (internal quotation marks omitted). Thus, under this test, the challenged provision may pass constitutional muster even if it is not the absolutely least restrictive alternative available to further the State's interest. See id.

2. The Magnitude of the Burden

The role that the extent to which First Amendment rights are burdened plays in determining the applicable level of scrutiny also is unclear. Compare Beaumont, 539 U.S. at 161-62, 123 S. Ct. at 2210-11, 156 L. Ed. 2d at 193-94 (citations omitted), with Burdick v. Takushi, 504 U.S. 428, 434, 112 S. Ct. 2059, 2063, 119 L. Ed. 2d 245, 253-54 (1992) (citations omitted).

In Burdick, the Supreme Court upheld a ban on write-in candidates and indicated that the level of scrutiny depends on the magnitude of the burden imposed:

> the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights . . . when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling

> importance" . . . [b]ut when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify the restrictions.

504 U.S. at 434, 112 S. Ct. at 2063, 119 L. Ed. 2d at 253-54 (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S. Ct. 698, 116 L. Ed. 2d 711 (1992); Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983)); see also Berkeley, 454 U.S. at 310, 102 S. Ct. at 444, 70 L. Ed. 2d at 508 (White, J., dissenting) ("Every form of regulation -- from taxes to compulsory bargaining -- has some effect on the ability of individuals and corporations to engage in expressive activity. We must therefore focus on the extent to which expressive and associational activity is restricted . . . . When the infringement is as slight and ephemeral as it is here, the requisite state interest to justify the regulation need not be so high.").

On the other hand, in Beaumont, the Court upheld a statute prohibiting non-profit corporations from making contributions or expenditures with respect to candidate elections except through separate funds established for that purpose. See 539 U.S. at 149-52, 123 S. Ct. at 2203-05, 156 L. Ed. 2d at 185-87 (citations omitted). While the Court did not overrule or even refer to Burdick, it held that the level of scrutiny applicable to a "political financial restriction[]" depends only on the "nature of the activity regulated." Id. at 161-62, 123 S. Ct. at 2210-11, 156

L. Ed. 2d at 193-94 (citations omitted). The Court indicated that the extent of the burden is a factor to be considered, but that it comes into play only after the appropriate level of scrutiny has been selected. Id. at 162, 123 S. Ct. at 2211, 156 L. Ed. 2d at 194.

> [T]he level of scrutiny is based on the importance of the "political activity at issue" to effective speech or political association . . . Indeed, this recognition that degree of scrutiny turns on the nature of the activity regulated is the only practical way to square two leading cases: [FEC v. Nat'l Right to Work Comm., 459 U.S. 197, 201-02, 103 S. Ct. 552, 74 L. Ed. 2d 364 (1982) and MCFL, 479 U.S. at 252-55, 107 S. Ct. 616, 93 L. Ed. 2d 539] . . . It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself.

Id. at 161-62, 123 S. Ct. at 2210-11, 156 L. Ed. 2d at 193-94 (additional internal citations omitted).

Under either approach, it is clear that, at some point, the magnitude of the burden imposed is a factor to be considered.

3. The Nature of the Activity Regulated

In determining whether statutes regulating campaign financing burden core First Amendment rights, the Supreme Court has drawn a distinction between the regulation of expenditures and the regulation of contributions.

Direct expenditures have been described as "core" political expression, see Buckley, 424 U.S. at 39, 96 S. Ct. at 644, 46 L. Ed. 2d at 699 (quoting Williams, 393 U.S. at 32), that is at the "heart of the First Amendment's protection," Bellotti, 435 U.S. at

776, 98 S. Ct. at 1415, 55 L. Ed. 2d at 717. Accordingly, the Supreme Court has held that restrictions on expenditures are subject to "strict" or "exacting" scrutiny. See, e.g., Austin, 494 U.S. at 666, 110 S. Ct. at 1401, 108 L. Ed. 2d at 669; see, e.g., Bellotti, 435 U.S. at 786, 98 S. Ct. at 1421, 55 L. Ed. 2d at 724 (citations omitted); see, e.g., Buckley, 424 U.S. at 44-45, 96 S. Ct. at 647, 46 L. Ed. 2d at 702.

Contributions, on the other hand, while still protected, have been said to "lie closer to the edges than to the core of political expression" because they only indirectly result in actual political speech. Beaumont, 539 U.S. at 161-62, 123 S. Ct. at 2210, 156 L. Ed. 2d at 193-94 (citing, *inter alia*, FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440, 121 S. Ct. 2351, 150 L. Ed. 2d 461 (2001)); see MCFL, 479 U.S. at 259-60, 107 S. Ct. at 629, 93 L. Ed. 2d at 557 ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending") (citations omitted); see Berkeley, 454 U.S. at 301, 102 S. Ct. at 440, 70 L. Ed. 2d at 502 (Marshall, J., concurring) ("this court has always drawn a distinction between restrictions on contributions, and direct limitations on the amount an individual can expend for his own speech" subjecting the former to "less rigorous scrutiny than a direct restriction on expenditures") (emphasis in original); see Buckley, 424 U.S. at 20-21, 96 S. Ct. at 635-36, 46 L. Ed. 2d at

688-89). Accordingly, restrictions on contributions are subject to the somewhat less rigorous level of scrutiny that requires only that they be "closely drawn" to further a "sufficiently important [government] interest." Beaumont, 539 U.S. at 162, 123 S. Ct. at 2210, 156 L. Ed. 2d at 194 (citations omitted).

## II. The Relevant Case Law

### A. The State's Interest in Disclosure

In this case, the proffered justification for the challenged provisions is the State's interest in public disclosure of the sources of funds expended or contributed with respect to ballot questions in order to assist voters in evaluating them.[5]

The plaintiffs argue that, in order to establish such an interest, the Board must present empirical evidence demonstrating that Rhode Island voters currently lack sufficient information with which to make informed decisions, but the Supreme Court has said that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." Nixon, 528 U.S. at 391, 120 S. Ct. at 906, 145 L. Ed. 2d at 900. Since both the Supreme Court and the Ninth Circuit have

---

[5]The Board also mentions "protect[ing] the integrity of the state's political process," "assisting enforcement of campaign finance laws," and "providing data for regulating campaign practices" but only as arguments in favor of public disclosure. (See Defs.' Trial Br. 1, 19, 20.)

recognized that states have a strong interest in public disclosure of the sources of campaign financing, that interest is more than plausible and far from novel. The Supreme Court has recognized the importance of that interest on several occasions.

In Buckley, the Court held that the governmental interest in public disclosure of the sources of political contributions was "sufficiently important" to justify a requirement that the sources and amounts of such contributions be reported to the FEC. See 424 U.S. at 63-68, 96 S. Ct. at 655-58, 46 L. Ed. 2d at 712-16 (citations omitted). Similarly, in McConnell v. FEC, the Court upheld a requirement that those who expend more than $10,000 per year on "electioneering communications" report those expenditures, as well as the identities of others who contributed funds to support them, to the FEC, on the ground that such disclosure furthers the "First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." 540 U.S. 93, 195-202, 124 S. Ct. 619, 689-94, 157 L. Ed. 2d 491, 580-84 (2003) (quoting, with approval, lower court's opinion); see also MCFL, 479 U.S. at 262, 107 S. Ct. at 630, 93 L. Ed. 2d at 559 (noting that "reporting obligations provide precisely the information necessary to monitor [an organization's] independent spending activity and its receipt of contributions" to further the government's interest in disclosure).

The Ninth Circuit, also, has expressly recognized that public

disclosure of the sources of funding to support or oppose ballot measures may be a compelling state interest that might justify a requirement that contributions and expenditures be reported. See Cal. Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1107 (9th Cir. 2003) (remanding to the district court for determination of the magnitude of the state's interest).

The basis for a state's interest in requiring public disclosure of the sources of campaign funding with respect to ballot measures was aptly stated by Justice White in his dissent in Berkeley, where he said that, when disclosure of funding sources for political communications is required,

> [v]oters will be able to identify the source of such messages and recognize that the communication reflects, for example, the opinion of a single powerful corporate interest rather than the views of a large number of individuals. As the existence of disclosure laws in many states suggests, information concerning who supports or opposes a ballot measure significantly affects voter evaluation of the proposal.

454 U.S. at 309, 102 S. Ct. at 444, 70 L. Ed. 2d at 507 (internal citations omitted).

B. The Buckley, Bellotti, Berkeley Trilogy

As already noted, in Buckley, the Court upheld statutory limits on the amounts that could be contributed to candidates because of the governmental interest in preventing *quid pro quo* corruption, but it held limits on the amounts that could be expended in candidate elections unconstitutional because direct expenditures are "core" political expression entitled to greater

First Amendment protection and because direct expenditures do not present the same risk of *quid pro quo* corruption as contributions. 424 U.S. at 26-29, 44-48, 96 S. Ct. at 638-40, 647-48, 46 L. Ed. 2d at 692-94, 702-04 (citations omitted). Since Buckley, the Supreme Court has addressed contributions and/or expenditures with respect to ballot questions on two occasions.

In Bellotti, the Court found unconstitutional a restriction on ballot question expenditures by striking down a Massachusetts statute that prohibited corporations from expending their own funds to influence votes on referenda not "materially affecting" the corporations' business. 435 U.S. at 767-68, 98 S. Ct. at 1411, 55 L. Ed. 2d at 712. The Court held that the prohibition did not survive "exacting scrutiny" because the State failed to carry its burden of showing that the prohibition furthered either of the State's proffered interests in "preventing diminution of the citizen's confidence in government" or "protecting the rights of shareholders whose views differ from those expressed by management on behalf of the corporation." Id. at 786-88, 98 S. Ct. at 1421-22, 55 L. Ed. 2d at 724-25 (citations omitted). The Court recognized that those interests may be "weighty . . . in the context of partisan candidate elections" but found that "they either are not implicated in this case or are not served at all, or in other than a random manner, by the prohibition." Id. at 787-88,

98 S. Ct. at 1422, 55 L. Ed. 2d at 725.[6] With respect to the issue of citizen confidence in government, the Bellotti Court pointed to the absence of any evidence to support the claim that corporate participation would exert such an undue influence as to destroy the public's confidence in the integrity of government and held that the risk of *quid pro quo* corruption relied upon in Buckley "simply is not present in a popular vote on a public issue." Id. at 789-90, 98 S. Ct. at 1422-23, 55 L. Ed. 2d at 726 (citations omitted).[7]

Bellotti also rejected the argument that wealthy corporations might be able to mount campaigns that drown out other points of view because the State had made no showing that corporations had an overwhelming voice in influencing referenda in Massachusetts, id. (citations omitted), and because "the fact that advocacy may persuade the electorate is hardly a reason to suppress it . . . [because] . . . 'the concept that government may restrict the

[6]Bellotti recognized that "preserving the integrity of the electoral process, preventing corruption, and sustaining the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government are interests of the highest importance." 435 U.S. at 788-89, 98 S. Ct. at 1422, 55 L. Ed. 2d at 725 (citations and internal quotation marks omitted). It also recognized "[p]reservation of the individual citizen's confidence in government" as "equally important." Id. at 789, 98 S. Ct. at 1422, 55 L. Ed. 2d at 726 (citations omitted).

[7]The Bellotti Court stated that, "[i]f [the state's] arguments were supported by record or legislative findings that corporate advocacy threatened imminently to undermine democratic processes, thereby denigrating rather than serving First Amendment interests, these arguments would merit our consideration." 435 U.S. at 789, 98 S. Ct. at 1422-23, 55 L. Ed. 2d at 726 (citation omitted).

speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment,'" id. at 790-91, 98 S. Ct. at 1423, 55 L. Ed. 2d at 726-27 (quoting Buckley, 424 U.S. at 48-49).[8]

In Berkeley, the Court declared unconstitutional an ordinance limiting the amount that one could contribute to a committee formed to support or oppose a ballot measure. 454 U.S. at 292-94, 102 S. Ct. at 435-36, 70 L. Ed. 2d at 496-97 (citations omitted). The Court based its decision on three grounds: (1) Bellotti's holding that ballot question votes do not involve the same risk of *quid pro quo* corruption as candidate elections; (2) a finding that the ordinance burdened associational rights because, while it limited the amounts that a person could contribute to a group supporting or opposing a ballot measure, it left persons acting alone free to expend unlimited amounts; and (3) a finding that the contribution limit did not further the State's interest in disclosure because

---

[8]Later, in Austin, the Supreme Court upheld a Michigan statute banning corporations from making expenditures to influence candidate elections, except through separate, stand-alone funds, on the ground that a state has a compelling interest in preventing "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form." 494 U.S. at 658-60, 110 S. Ct. at 1396-97, 108 L. Ed. 2d at 662-64 (citations omitted); see also MCFL, 479 U.S. at 256-57, 107 S. Ct. at 627, 93 L. Ed. 2d at 555-56 (citations omitted) (discussing same government interest). Some commentators have argued that the Austin rationale should apply to ballot questions as well as candidate elections. See Mont. Chamber of Commerce v. Argenbright, 226 F.3d 1049, 1060-61 (9th Cir. 2000) (Hawkins, J., dissenting) (collecting sources).

another provision in the ordinance required that the identities of contributors be reported. See id. at 295-300, 102 S. Ct. at 437-39, 70 L. Ed. 2d at 498-501 (citations omitted).

None of these cases holds that a state's interest in public disclosure of campaign funding sources can never justify regulation of contributions and/or expenditures with respect to ballot questions. In fact, the interest in disclosure was not even proffered as a justification for the challenged regulation in Bellotti. See 435 U.S. at 787, 98 S. Ct. at 1421-22, 55 L. Ed. 2d at 725. Furthermore, as already noted, Buckley specifically recognized a governmental interest in "provid[ing] the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office." 424 U.S. at 66-67, 96 S. Ct. at 657, 46 L. Ed. 2d at 715 (internal citation and quotation marks omitted). In addition, while Berkeley rejected the public interest in disclosure as a justification for limiting the amounts that could be contributed in support of or opposition to ballot measures, it did so not because it found a lack of any legitimate governmental interest in disclosure, but, rather, because the limitation did not serve that interest, inasmuch as another portion of the ordinance at issue in that case provided for disclosure. See 454 U.S. at 298-300, 102 S. Ct. at 438-39, 70 L. Ed. 2d at 500-501 (noting that the city could vindicate its interest by mandating

"public filing[s] revealing the amounts contributed" and by "outlaw[ing] anonymous contributions") (citations omitted).

**III. "In Concert" Expenditures - Subsection 10(b)**

Subsection 10(b), when read in conjunction with subsection 10(a), permits only PACs and persons "not acting in concert with any other person or group" to make expenditures in support of or opposition to ballot measures. See R.I. Gen. Laws § 17-25-10(a)(3), (b). More specifically, subsection 10(a) requires that all expenditures and contributions be made through PACs, but subsection 10(b) creates a limited exception that permits persons "not acting in concert" to make expenditures with respect to ballot questions from their own funds, provided that expenditures exceeding $100 in a calendar year are reported. See id.

The relevant portion of subsection 10(b) provides:

> It shall be lawful for any person, not otherwise prohibited by law and not acting in concert with any other person or group, to expend personally from that person's own funds a sum which is not to be repaid to him or her for any purpose not prohibited by law to support or defeat a candidate or to advocate the approval or rejection of any [ballot] question; provided, that any person making the expenditure shall be required to report all of his or her expenditures and expenses, if the total of the money so expended exceeds one hundred dollars ($100) within a calendar year. . . .

Id. at § 17-25-10(b). Subsection 10(b) goes on to state that, "[w]hether a person is 'acting in concert with any other person or group' . . . shall be determined by application of the standards

set forth in § 17-25-23." Id.

The plaintiffs argue that subsection 10(b) should not be construed as applying to ballot questions because the factors enumerated in the definition of "in concert" contained in section 23 pertain only to candidate elections. See id. at § 17-25-23. In addition, the plaintiffs argue that, even if subsection 10(b) is construed as applying to ballot questions, it is unconstitutionally vague and it violates their First Amendment rights.

While the prospect of avoiding any need to address the statute's constitutionality is appealing, the issue cannot be skirted because it appears from subsection 10(b), itself, and from the Act, as a whole, that the "not acting in concert" provision and the definition of "in concert" contained in section 23 apply to ballot question referenda as well as candidate elections. See id. at §§ 17-25-10(b), -23. The plain language of subsection 10(b) makes it clear that the "not acting in concert" limitation refers to expenditures with respect to both ballot questions and candidate elections and subsection 10(b) expressly refers to "the standards set forth in § 17-25-23" for guidance in defining "in concert." See id. at § 17-25-10(b).

The plaintiffs argue that subsection 10(b) is unconstitutionally vague, but there is no need to address that argument because the "not acting in concert" limitation fails the strict scrutiny test. Although the plaintiffs have not challenged

subsection 10(a), the impact that the "not acting in concert" limitation contained in subsection 10(b) has on First Amendment rights cannot be understood unless the two subsections are read together. When considered in that context, the "not acting in concert" limitation significantly infringes on the plaintiffs' First Amendment rights.

As previously stated, direct expenditures are viewed as a form of core political expression that is at the center of the protection afforded by the First Amendment. See Buckley, 424 U.S. at 39, 96 S. Ct. at 644, 46 L. Ed. 2d at 699 (citation omitted); see Bellotti, 435 U.S. at 776, 98 S. Ct. at 1415, 55 L. Ed. 2d at 717. The "not acting in concert" limitation burdens the exercise of that right by forcing individuals or groups who wish to coordinate their efforts with others to form a PAC in order to make expenditures in furtherance of those efforts. See MCFL, 479 U.S. at 252-55, 107 S. Ct. at 624-27, 93 L. Ed. 2d at 552-55 (citations omitted). Furthermore, the fact that persons acting "in concert" are prohibited from making any expenditures but persons who act independently are free to make such expenditures, places the plaintiffs at a relative disadvantage based on the exercise of their associational rights. See Berkeley, 454 U.S. at 296, 102 S. Ct. at 437, 70 L. Ed. 2d at 499 (citation omitted).

In imposing these burdens, the "not acting in concert" limitation does not pass constitutional muster because it does not

further any compelling state interest. The interest proffered as justification is the interest in seeing that the sources of funds used to support or oppose ballot measures are disclosed to the public so that voters may better evaluate the merits of such measures. However, while this may be a compelling state interest, it is difficult to see how the interest is furthered by prohibiting a person from making direct expenditures with respect to ballot questions simply because that person is acting "in concert" with others. Since subsection 10(b) requires that expenditures in excess of $100 be reported, the parties making them are readily identifiable and the State's interest in disclosure is adequately served by that requirement. See MCFL, 479 U.S. at 262, 107 S. Ct. at 630, 93 L. Ed. 2d at 559 (PAC requirement held to be unnecessarily burdensome in light of requirement that expenditures be reported); see Berkeley, 454 U.S. at 298-300, 102 S. Ct. at 438-39, 70 L. Ed. 2d at 500-501 (provision limiting amounts that could be contributed with respect to ballot questions was not justified as furthering the city's interest in disclosure when disclosure was already required by other provisions) (citations omitted). Prohibiting persons acting "in concert" from making expenditures and requiring, instead, that they contribute those amounts to a PAC, which, in turn, would make the expenditure and report both the contribution and the expenditure, does not appear to contribute anything to the furtherance of that interest.

Nor does it appear that eliminating the "not acting in concert" limitation with respect to expenditures would create any loophole that would frustrate the State's interest in public disclosure of the sources of contributions. The reporting requirements with respect to contributions are established by subsection 10(a), which requires that all contributions be made through PACs, see R.I. Gen. Laws § 17-25-10(a)(3), and by sections 7, 11, and 15, which require that the PACs report those contributions to the Board, see id. at §§ 17-25-7(a), -11(a)-(d), -15(c). Requiring that all contributions be funneled through PACs prevents contributors from circumventing the reporting requirements by contributing funds to another person or entity that could expend the funds without having to report the source.

In short, the "not acting in concert" limitation contained in subsection 10(b) is unconstitutional to the extent that it prevents a person from making direct expenditures with respect to ballot questions if such person is acting in consultation or cooperation with others.

## IV. Making Contributions - Subsections 10.1(h) and (j)

Subsection 10.1(j) prohibits entities other than PACs (but not individuals) from making expenditures or contributions with respect

to ballot questions.[9] Subsection 10.1(h) prohibits expenditures and contributions by both profit and non-profit corporations as well as other business entities.[10] The prohibition in subsection 10.1(h) appears to apply only to candidate elections and, in any event, it is redundant because, unlike the broader prohibition contained in subsection 10.1(j), it applies only to corporations and business entities. See R.I. Gen. Laws § 17-25-10.1(h), (j).

The plaintiffs argue that the outright prohibition on contributions violates their First Amendment rights. They point to Judge Pettine's decisions in the Vote Choice case, declaring the prohibition against corporate expenditures with respect to ballot question votes to be unconstitutional, see Vote Choice, Inc. v. DiStefano, 814 F. Supp. 186, 190 n.9 (D.R.I. 1992); see Vote Choice II, 814 F. Supp. at 198, and they seek to extend that holding to the prohibition against corporate contributions.

---

[9]Subsection (j) provides: "Except as provided in subsection (h) of this section, no entity other than an individual, a [PAC], a political party committee . . ., or an authorized committee of an elected official or candidate . . . shall make any contribution to or any expenditure on behalf of or in opposition to any candidate, ballot question, [PAC], or political party." R.I. Gen. Laws § 17-25-10.1(j) (emphasis added).

[10]Subsection (h) provides: "It shall be unlawful for any corporation, whether profit or non-profit, domestic corporation or foreign corporation, . . . or other business entity to make any campaign contribution or expenditure . . . to or for any candidate, [PAC], or political party committee, or for any candidate, [PAC], or political party committee to accept any campaign contribution or expenditure from a corporation or other business entity . . ." R.I. Gen. Laws § 17-25-10.1(h).

The Board and the State do not attempt to defend the outright prohibition against contributions made by a corporation from its own funds in order to support or oppose ballot questions. (See Defs.' Trial Br. 5; see Br. of the Att'y Gen. 3-4.) Indeed, it seems clear that, in general, "a state could not prohibit corporations any more than it could preclude individuals from making contributions or expenditures advocating views on ballot measures." See Berkeley, 454 U.S. at 297-98, 102 S. Ct. at 438, 70 L. Ed. 2d at 500 (citing Bellotti, 435 U.S. 765). That is especially true in this case because the ban on corporate contributions does nothing to further the State's interest in seeing that the sources of funds expended with respect to ballot questions are disclosed, inasmuch as disclosure already is mandated by the requirement in subsection 10(a) that "contributions" be made only to PACs and the requirements in sections 7, 11, and 15 that PACs report the contributions. See R.I. Gen. Laws §§ 17-25-7(a), -10(a)(3), -11(a)-(d), -15(c). Accordingly, to the extent that they prohibit corporations or other non-PAC entities from making contributions from their own funds[11] in order to support or oppose ballot measures, subsections 10.1(h) and (j) are unconstitutional.

[11]In the case of membership organizations like the plaintiffs, an entity's own funds presumably would include dues received from members but not amounts contributed by members or non-members for the purpose of supporting or opposing ballot measures.

## V. The PAC Requirement Regarding Contributions

The ACLU and Brown complain that, even without the prohibition against corporate contributions, the Act, as interpreted by the Board, prevents them from making contributions to entities other than PACs and prevents them from receiving contributions unless they form PACs. That observation is accurate, but it is unrelated to the constitutionality of any of the challenged sections.

Subsection 10(b) deals only with limitations on who may make expenditures and subsections 10.1(h) and (j) deal only with whether a non-PAC entity may make contributions at all. See R.I. Gen. Laws §§ 17-25-10(b), -10.1(h), -10.1(j). Moreover, as previously stated, the challenged restrictions in those subsections are unconstitutional. There is nothing in any of those subsections that purports to prevent contributions from being made to entities that are not PACs or that purports to prevent an entity that is not a PAC from receiving contributions. See id. The statutory provisions that funnel all contributions through PACs are contained in subsection 10(a), see id. at § 17-25-10(a)(3), which, for

reasons that are not entirely clear, has not been challenged.[12]

Even if subsection 10(b) and/or subsections 10.1(h) and (j) are construed as somehow incorporating the restrictions contained in subsection 10(a), those restrictions would pass constitutional muster.

A. Making Contributions to Non-PACs

The fact that contributions can be made only to PACs does not directly burden the exercise of First Amendment rights in any significant way, unless one accepts the dubious premise that a person has a constitutional right to make political contributions to entities that cannot lawfully receive them. Cf. Republican Nat'l Comm. v. FEC, 487 F. Supp. 280, 286 (S.D.N.Y. 1980) (three-judge panel) (explaining that potential contributors' First Amendment rights were not unconstitutionally abridged when a candidate was barred from accepting private contributions as a condition of his receipt of public campaign funding), aff'd, 445 U.S. 955, 100 S. Ct. 1639, 64 L. Ed. 2d 231 (1980) (mem.). Unlike

---

[12]The failure to challenge subsection 10(a) appears to be based on the dismissal, in Vote Choice II, of a challenge to that subsection's requirement that contributions and expenditures be made only through PACs. (See Compl. at ¶ 21; see Intervenor's Compl. at ¶ 21) (both citing 814 F. Supp. at 198-99). Although Judge Pettine indicated, in that case, that the statutory language makes the prohibition applicable to ballot questions, he accepted the Board's contention that subsection 10(a) "does not, and has never been interpreted to, require corporations to establish PACs for the purpose of making contributions and expenditures with respect to ballot questions." Vote Choice II, 814 F. Supp. at 198.

an outright prohibition on contributions, the requirement that contributions be made only to PACs does not prevent the plaintiffs from making contributions; it simply regulates the kinds of entities to which contributions may be made. The plaintiffs remain free to contribute to any PACs that they choose or to make expenditures independently or in concert with others. Nor does making a contribution to a PAC, as opposed to some other entity, impose any procedural burden on the plaintiffs' exercise of their First Amendment rights because sections 7, 11, and 15 require that contributions be reported by the PAC and not the contributor. See R.I. Gen. Laws §§ 17-25-7(a), -11(a)-(d), -15(c).

Moreover, even if funneling all contributions through PACs is viewed as imposing some indirect burden on the plaintiffs' exercise of their First Amendment rights, that burden is justified by the State's interest in public disclosure of the sources of campaign funds. Unlike expenditures, which pass directly from the party making them to the vendor of the goods or services being purchased, a contribution may pass through many hands before being expended for its ultimate purpose. Consequently, unless contributions are reported at each step along the way, the true source of the funds may be concealed from public view. A person could make secret contributions in support of or opposition to a ballot question by forming a corporation or other entity, providing funds to that entity, and causing that entity, in turn, to expend the funds or to

contribute them to another entity that makes the expenditure. By permitting contributions to be made only to PACs and by requiring PACs to report all contributions received, the "funneling" requirement furthers the State's interest in public disclosure of campaign funding sources.

While there might be other ways of ensuring that contributions are reported, none have been identified and it is difficult to envision any other method that places a lesser burden on the plaintiffs' freedom to financially support or oppose ballot measures.

B. Receipt of Contributions By Non-PACs

While the requirement of forming a PAC does place a burden on entities that solicit and receive contributions, that burden is not significantly greater than the burden that they otherwise would bear. The plaintiffs point out that a PAC must designate a treasurer, keep records of contributions received and expenditures made, and report those contributions and expenditures to the Board. See R.I. Gen. Laws §§ 17-25-7(a), -8.1(a), -11(a)-(d), -15(c). But these requirements are not materially different from what, as a practical matter, any entity receiving contributions and expending those funds would have to do in order to conduct its affairs in a businesslike manner and satisfy the expenditure reporting requirements contained in subsection 10(b). See id. at § 17-25-10(b).

Furthermore, even if non-PACs were permitted to receive contributions, the State, in order to further its interest in public disclosure, presumably, would require that the contributions be reported. Such a requirement would force non-PAC recipients to perform most, if not all, of the duties that they cite as the burdens of forming a PAC. The only additional burdens that might be imposed by operating as a PAC would consist primarily of filing a notice of organization, see id. at § 17-25-15(a), and, after the election, filing a cumulative report of all contributions received and expenditures made, see id. at § 17-25-11(b).

These additional requirements would pass constitutional muster because the burden that they may impose is relatively modest and because the "funneling" requirement appears to further the State's interest in public disclosure of the sources of campaign funding. Furthermore, there do not appear to be any less restrictive alternatives that would effectively further that interest.

As already stated, requiring that contributions be reported by non-PAC recipients would require them to perform virtually the same tasks now required of PACs. Moreover, requiring contributions to be reported by each contributor would impose on contributors a burden that they do not now shoulder. Such a reporting system, also, would make it much more difficult to track the contributions or monitor compliance. Voters would have to search through reports filed by all contributors regarding a variety of ballot questions

in order to identify the sources of funding with respect to a particular question instead of looking only at reports filed by the PACs formed to support or oppose that question.

The ACLU's proposal that entities having "well-known public persona" be permitted to receive contributions without forming PACs would render the ambiguities that the plaintiffs, themselves, have cited in the "not acting in concert" limitation pale by comparison. It is difficult to imagine how the Board would determine whether a particular organization has a "well-known public persona." In addition, to the extent that the ACLU's proposal suggests that such organizations should be exempt from the reporting requirements, there would be no way for voters to know the source of those contributions. Consequently, the ACLU's proposal would create an exception that would swallow the rule and gut the Act's disclosure requirements.

In short, it appears that, although the requirement that contributions be made to or received by only PACs may prevent the plaintiffs from raising campaign funds unless they form PACs, the relatively modest burden imposed by that requirement is justified by the fact that the requirement is closely drawn to further a sufficiently important State interest in providing voters with information regarding the sources of funds used to support or oppose ballot measures.

## VI. The Dollar Limits on Contributions - Subsection 10.1(a)

Subsection 10.1(a) limits the amounts that any person or PAC may contribute "to any candidate . . . or [PAC] or political party committee." R.I. Gen. Laws § 17-25-10.1(a)(1). It prohibits contributions to a single recipient of more than $1,000 in a calendar year. Id. It also limits, to $10,000, the aggregate annual contributions that may be made by a person and, to $25,000, the aggregate annual contributions that may be made by a PAC. Id. No dollar limit is established for contributions by candidates to their own campaigns. Id.[13]

The plaintiffs argue that subsection 10.1(a) limits the amounts that they and their members can contribute in support of or in opposition to ballot questions and, therefore, that it violates their First Amendment rights of political expression and association. The Board and the Attorney General have offered no

[13]Subsection 10.1(a) provides: "No person, other than the candidate to his or her own campaign, nor any [PAC] shall make a contribution or contributions to any candidate . . . or [PAC] or political party committee which in the aggregate exceed one thousand dollars ($1,000) within a calendar year, nor shall any person make contributions to more than one state or local candidate, to more than one [PAC], or to more than one political party committee, or to a combination of state and local candidates and [PACs] and political party committees which in the aggregate exceed ten thousand dollars ($10,000) within a calendar year, nor shall any [PAC] make such contributions which in the aggregate exceed twenty-five thousand dollars ($25,000) within a calendar year, nor shall any candidate or any [PAC] or any political party committee accept a contribution or contributions which in the aggregate exceed one thousand dollars ($1,000) within a calendar year from any one person or [PAC]." R.I. Gen. Laws § 17-25-10.1(a)(1).

defense of the limits, at least insofar as they may apply to contributions regarding ballot questions. (See Defs.' Trial Br. 6; see Br. of the Att'y Gen. 4-5.)

The Supreme Court's decision in Berkeley casts grave doubt on the constitutionality of dollar limits on the amounts that may be contributed with respect to ballot measures, especially when different limits are established for different categories of contributors. See 454 U.S. at 299, 102 S. Ct. at 439, 70 L. Ed. 2d at 299. However, there is no need to decide whether Berkeley renders subsection 10.1(a) unconstitutional because this Court finds that subsection 10.1(a) does not apply to contributions with respect to ballot questions.

Although the parties apparently assume that subsection 10.1(a) limits contributions with respect to ballot questions, it is well established that, when the constitutionality of a state statute is challenged, a court, if "fairly possible," should construe the statute in a manner that does not render it unconstitutional. See Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio, 221 F.3d 235, 241-42 (1st Cir. 2000) (citing Arizonans for Official English v. Arizona, 520 U.S. 43, 78, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997)). Here, it is not only possible, but also much more reasonable, to construe subsection 10.1(a) as inapplicable to contributions with respect to ballot measures. Consequently, it is not necessary to decide whether subsection

10.1(a) is constitutional as applied to such contributions.

Unlike subsection 10.1(j), subsection 10.1(a) does not contain any reference to ballot questions. See R.I. Gen. Laws § 17-25-10.1(a), (j). It refers exclusively to contributions to candidates, PACs, and political party committees. See id. at § 17-25-10.1(a). Moreover, the fact that subsection 10.1(a) exempts "the candidate" from its dollar limits reinforces the conclusion that it is directed only at contributions made in candidate elections. See id.

## Conclusion

For all of the foregoing reasons, judgment shall enter as follows:

1. The "not acting in concert with any other person or group" clause in R.I. Gen. Laws § 17-25-10(b) is hereby declared to violate the First Amendment to the United States Constitution to the extent that it applies to expenditures made in support of or opposition to ballot questions.
2. R.I. Gen. Laws § 17-25-10.1(h) and (j) are hereby declared to violate the First Amendment to the United States Constitution to the extent that they prohibit corporations or other entities from making contributions from their own funds in support of or opposition to ballot questions.
3. The dollar limits on contributions contained in R.I. Gen. Laws § 17-25-10.1(a) are hereby declared to apply only to contributions made with respect to candidate elections and not to contributions made in support of or opposition to ballot questions.

Accordingly, judgment also shall enter permanently enjoining the State of Rhode Island and the Board of Elections from enforcing the aforesaid provisions to the extent that they have been declared unconstitutional.

In all other respects, the plaintiffs' claims are denied and dismissed.

IT IS SO ORDERED:

Ernest C. Torres
Chief Judge

Date: April 25, 2006